**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JASON WAYNE HURST, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    1:10CV725 |
| | ) |
| GERALD BRANKER, Warden, Central | ) |
| Prison, Raleigh, North Carolina, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus via 28 U.S.C. § 2254. (Docket Entry 1.) Respondent has moved for summary judgment. (Docket Entry 17.)[1] For the reasons that follow, Claims I, II, V, VII, VIII, IX, X, XII, and XIII fail under 28 U.S.C. § 2254(d), Claims III and IV are procedurally barred, Claim VI is not cognizable on federal habeas review, and Claim XI lacks merit. This Court thus should enter summary judgment for Respondent and should dismiss this action.

THE STATE COURT PROCEEDINGS

In March 2004, a jury in Randolph County, North Carolina found Petitioner guilty of first degree murder and recommended a sentence

_____

[1] In so doing, Respondent filed paper copies of the state court record, including transcripts of Petitioner's trial (State's Exs. A1-A14 ("Trial Tr.")) and evidentiary hearing on his post-conviction Motion for Appropriate Relief (State's Exs. C3-C8 ("MAR Evid. Hrg. Tr.")). (Docket Entry 19.)

of death. (Docket Entry 4-1 at 26-32.) Upon the state superior court's entry of judgment in accordance with the jury's foregoing finding and recommendation, Petitioner took a direct appeal, but the Supreme Court of North Carolina unanimously affirmed his conviction and sentence. State v. Hurst, 360 N.C. 181, 624 S.E.2d 309 (2006). The United States Supreme Court thereafter denied certiorari review. Hurst v. North Carolina, 549 U.S. 875 (2006).

Petitioner, through counsel, filed a Motion for Appropriate Relief ("MAR") raising eight claims in the state superior court. (Docket Entries 2-1, 3-1.) He subsequently filed an Amendment to his MAR ("AMAR") regarding MAR Claim VIII. (Docket Entry 5-1.) The state superior court "denie[d] seven of the eight claims in [Petitioner's] MAR and AMAR on the pleadings, and direct[ed] that [MAR] [C]laim II [which alleged ineffective assistance of counsel in investigating mitigating sentencing factors] proceed to an evidentiary hearing." (Docket Entry 6-1 at 2.)[2] After that hearing, Petitioner "filed a second amended MAR ['2AMAR'] [to amend MAR Claim II]." (Docket Entry 6-3 at 3.) The state superior court "received post evidentiary hearing briefs . . . [and] heard oral argument . . . [before] den[ying] [Petitioner's] MAR Claim II and his 2AMAR from the bench [and] making findings of fact and

_____

[2] Where, as with this document, the pagination in the CM/ECF footer differs from the document's original pagination because of the addition of a title page, pinpoint citations refer to the page numbers that appear in the CM/ECF footer.

2

conclusions of law [in a written order]." (Id.)  The Supreme Court

of North Carolina denied review of the state superior court's MAR

orders.  State v. Hurst, 364 N.C. 244, 698 S.E.2d 664 (2010).

THE EVIDENCE AT TRIAL

The Supreme Court of North Carolina summarized the evidence

presented at Petitioner's trial as follows:

> On 9 June 2002, Daniel Branch told his wife Barbara
> that he and [Petitioner] were going to travel to
> Asheboro.  According to Barbara, [Petitioner] was an
> acquaintance who was supposed to help Branch sell some
> firearms.  After loading several long guns into his 1977
> blue Thunderbird, Branch left home around 11:00 or 11:30
> that morning.  She never saw him alive again.
>
> The next day, Barbara filed a missing persons report
> and Detective Kevin Ray . . . began an investigation.  On
> 11 June 2002, while pursuing a lead that [Petitioner] had
> been seen in West Virginia driving a Thunderbird matching
> the description of Branch's vehicle, Detective Ray
> discovered that [Petitioner] had been romantically
> involved with Kim Persinger in West Virginia and that she
> was pregnant with his child.  Kim's brother indicated to
> Detective Ray that Branch had been killed in North
> Carolina and that his body was in a field near the
> Montgomery and Randolph County line.
>
> Detective Ray . . . searched a large, cleared tract
> of land at the described location and found the body of
> Daniel Branch.  The victim was lying on his back and one
> of his pockets had been pulled out.  The investigators
> observed that he appeared to have suffered gunshot wounds
> to the torso and head.  Two expended shotgun shell
> casings were found near his body.
>
> The same day, state police and sheriffs in West
> Virginia began searching for [Petitioner] and the
> victim's blue Thunderbird . . . [and] located both at a
> convenience store near Rock Creek, where [Petitioner] was
> taken into custody without incident.  During the arrest,
> [Petitioner] stated that "he was just glad it was over"
> and that "he had killed a guy in North Carolina."  Even
> though he was given his *Miranda* warnings, [Petitioner]

3

continued to talk, repeating that he had killed a man in North Carolina with a shotgun and brought his car to West Virginia. . . . [Petitioner was] transported to the state police detachment in Beckley, where he again was advised of his *Miranda* rights. After waiving those rights, [he] confessed to the murder of Daniel Branch.

In his confession, [Petitioner] said that he knew Branch from having traded guns with him in the past. [Petitioner] claimed that the victim called him the day before the murder and asked him to meet to trade some guns. [Petitioner] said that "[h]e knew [he] was going to kill [Branch]" as soon as their telephone conversation ended and "began to plan." The next day, [Petitioner] met Branch at the field where the killing occurred to purchase a twelve-gauge Mossberg pump shotgun. When [Petitioner] asked Branch if he could test-fire the weapon, the victim agreed. At [Petitioner's] urging, Branch walked into the field to set up some cans and bottles. As he did, [Petitioner] opened fire, shooting the victim three times.

After the first shot, which [Petitioner] indicated struck Branch in the ribs or stomach, the victim yelled "no, no, don't shoot," and turned to run. [Petitioner] shot Branch again, hitting him in the side and causing him to fall. [Petitioner] then walked toward the victim and shot him in the head. After the final shot, [Petitioner] reached into the victim's pocket, took his keys, and left the scene in Branch's car. An autopsy confirmed that Branch had suffered shotgun wounds in his lower left chest and abdominal area, in his right side, and in his right jaw.

[Petitioner] told the officers that the Mossberg shotgun was at the house of a relative, Leon Burgess, where he had traded it for a .410 gauge shotgun. Burgess later confirmed the trade and gave the murder weapon to the investigators. A .410 gauge shotgun was recovered from the victim's Thunderbird that [Petitioner] had been driving when arrested. [Petitioner] also stated that he had sold Branch's .22 caliber rifle.

During the interview, [Petitioner] said that the victim had not provoked or threatened him and declined to give a reason for the shooting. He said he did not know the victim that well, but that he was "an okay guy." [Petitioner] stated that he was not sorry for killing

4

Branch but that he felt sorry for the victim's family.

     [Petitioner] did not testify at trial. During the guilt phase of the trial, he presented instead James H. Hilkey, PhD., an expert forensic psychologist, who testified that [Petitioner] suffered from borderline personality disorder ["BPD"], traits of antisocial personality disorder, and depression. Dr. Hilkey stated that, in his opinion, [Petitioner's] psychological disorders "affected his ability to weigh and consider the consequences of his actions and to form specific intent to kill." Dr. Hilkey was also of the opinion that at the time of the shooting, Petitioner "was under the influence of a mental or emotional disturbance and his capacity to conform his conduct to the requirements of the law was impaired." However, Dr. Hilkey also testified that [Petitioner's] "clearly average" I.Q. was 104 and that he knew killing the victim was wrong. Dr. Hilkey found no signs that [Petitioner] suffered from neurological damage or distortions.

Hurst, 360 N.C. at 184-86, 624 S.E.2d at 314-15.

The Supreme Court of North Carolina further reported that:

     At his sentencing proceeding, [Petitioner] presented several family members as witnesses. He also relied on Dr. Hilkey's testimony . . . . [This] evidence [showed] that [Petitioner] was raised in a "tumultuous" environment[,] . . . that his relationship with his parents was "extremely chaotic," that [his] father physically abused and assaulted him and his mother, that [his] parents suffered from mental health problems, and that [his] father introduced [him] to alcohol and illegal drugs at an early age.

     Dr. Hilkey testified that [Petitioner's] upbringing manifested itself as BPD when he grew older. Dr. Hilkey stated, inter alia, that [Petitioner] felt responsible for his parents' fighting; that [Petitioner's] family history was being replicated in his relationships; and that [Petitioner] felt unsure and unstable when not in a relationship, demonstrated reckless behavior and substance abuse, exhibited a "flat affect" or lack of emotional response to important events such as his role in the instant offense, and responded to events leading up to the murder by exhibiting a "transient depersonalization." Dr. Hilkey added that [Petitioner]

5

still hoped against all logic that his trial might bring his family together. According to Dr. Hilkey, [Petitioner's] slaying of Daniel Branch had no purpose other than allowing [Petitioner] to take the victim's car so he could travel to West Virginia to reunite with Kim. In addition, [Petitioner presented evidence of] previous failed relationships with women that resulted in severe depression, instances of job truancy, and irresponsible substance abuse as evidence of emotional immaturity.
    . . . .

[O]ther [evidence] counterbalance[d] [Petitioner's] evidence of emotional immaturity. [Petitioner's] uncle testified that when he broke his leg during the summer of 1997, [Petitioner] "was right there for [him]" and did "everything" for him while he was recovering. When [Petitioner] was seventeen years old, he went to live with his cousin Teresa Gillespie so he could be closer to his job. Gillespie testified that [Petitioner] "was great with [her] son," regularly performed household chores, and even offered to help at [her] parents' house. Not long thereafter, [Petitioner] began a relationship with a woman named Benita and was "crazy about" her baby Deandre. When Benita's mother left, [Petitioner] moved in to help with the finances, working double shifts to provide for Benita and Deandre. Kim Persinger's disabled father testified that while [Petitioner] was living with his family in West Virginia, he was "[p]olite all the time" and did "whatever needed [to be] done" around the house. Shortly before the murder, [Petitioner] told his sister he was moving back to North Carolina from West Virginia to put a home together for Kim and their child, that "he was done partying and . . . had to straighten up," that he had found a job, and that he was going to start saving for expenses.

Id. at 199-200, 624 S.E.2d at 323 (final ellipses in original).

### THE CLAIMS IN THE INSTANT PETITION

The instant Petition contains these claims:

I    The Petitioner was denied the right to confront his accusers, to a fair and impartial jury, and to due process of law where a juror consulted with her father during sentencing deliberations about her decision as to whether to vote for life or death.

6

II    The Petitioner was denied the effective assistance of
      counsel and due process of law when trial counsel
      failed to properly investigate and present mitigating
      evidence in support of mitigating factors.

III   The Petitioner was denied his right to a jury trial,
      to due process of law, to equal protection under the
      law, to fair notice of the charges against him, to a
      fundamentally fair trial, and to be free from cruel
      and unusual punishment because of the ambiguity in the
      verdict rendered by the jury.

IV    The Petitioner was denied his right to a jury trial,
      to due process of law, to equal protection under the
      law, to a fundamentally fair trial, and to be free
      from cruel and unusual punishment because the jury at
      his trial was not properly polled.

V     The Petitioner was denied the effective assistance of
      counsel and due process of law when both trial and
      appellate counsel failed to challenge either the
      unanimity of the verdict or the unconstitutional
      polling of the jury.

VI    The Petitioner was denied his right to due process of
      law, to equal protection under the law, to a
      fundamentally fair trial, and to be free from cruel
      and unusual punishment because the trial court entered
      a judgment of death even though it lacked jurisdiction
      to do so.

VII   The Petitioner was denied the effective assistance of
      counsel and due process of law when both trial and
      appellate counsel failed to challenge the jurisdiction
      of the court.

VIII  The Petitioner was denied his right to testify on his
      own behalf because his trial attorneys failed to
      adequately advise him about the advantages and
      disadvantages of testifying.

IX    The Petitioner was denied the right to confront
      evidence, to a fair and impartial jury, and to due
      process of law because a newspaper was present in the
      jury room, read by potential jurors, and discussed
      amongst potential jurors during jury selection.

X     The Petitioner was denied his right to due process of

7

law and to be free from cruel and unusual punishment because the sentencing instructions as to the "especially heinous, atrocious, or cruel" aggravating circumstance was [sic] vague and overbroad.

XI    The Petitioner was denied his right to due process of law because the trial court failed to intervene when the prosecutor argued to vote for death because the crime was premeditated and was not in self-defense.

XII   The Petitioner was denied his right to a jury trial and to due process of law because the indictment against him only alleged the elements of second degree murder.

XIII  The Petitioner was denied his right to a jury trial and to due process of law because the indictment failed to allege any element that authorized a sentence of death.

(Docket Entry 1-1 at 2-4 (capitalization and page cites omitted).)

## THE HABEAS CORPUS STANDARD OF REVIEW

### Procedural Default

Absent <u>either</u> cause and prejudice <u>or</u> a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits based on an adequate and independent state procedural rule.    See <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989).[3]  "[T]he cause standard requires the petitioner to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in state court . . . [such as] interference by officials that makes compliance

_____

[3] A procedural rule qualifies as adequate if the state court consistently applies it, <u>Johnson v. Mississippi</u>, 486 U.S. 578, 587 (1988), and independent if it does not depend on a federal constitutional standard, <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985).

8

with the State's procedural rule impracticable [or] a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel is cause." <u>McClesky v. Zant</u>, 499 U.S. 467, 493-94 (1991) (internal brackets, citations, ellipses, and quotation marks omitted). "To establish prejudice, [a petitioner] must show 'not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" <u>McCarver v. Lee</u>, 221 F.3d 583, 592 (4th Cir. 2000) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)). The "miscarriage of justice" exception applies only in "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." <u>McCleskey</u>, 499 U.S. at 494; <u>see also</u> <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992) (holding that "miscarriage of justice exception is concerned with actual as compared to legal innocence").[4]

<u>Review on the Merits</u>

Limitations on federal habeas review include the following:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings

---

[4] As to a death sentence, a petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." <u>Sawyer</u>, 505 U.S. at 336.

unless the adjudication of the claim--

> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an <u>unreasonable</u> determination of the facts in light of the evidence presented in the State court proceeding.

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, <u>a determination of a factual issue made by a State court shall be presumed to be correct</u>. The applicant shall have the burden of rebutting the presumption of correctness by <u>clear and convincing evidence</u>.

28 U.S.C. § 2254 (emphasis added);[5] <u>see also</u> <u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011) (holding that "petitioner carries the burden" under Section 2254(d)). Section 2254 imposes "a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit

---

[5] "[A] state court decision can be contrary to [the Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law . . . [or] confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000) (opinion of O'Connor, J., for the Court). "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>id.</u> at 409-10 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one . . . .").

of the doubt." <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398.

<u>DISCUSSION OF CLAIMS</u>

<u>Claim I</u> - <u>Juror's Contact with Her Father</u>

Claim I of the instant Petition contends Petitioner "was denied the right to confront his accusers, to a fair and impartial jury, and to due process of law where a juror consulted with her father during sentencing deliberations about her decision as to whether to vote for life or death." (Docket Entry 1-1 at 2 (capitalization and page cites omitted).) Because Petitioner has failed to show that the state superior court's decision to reject this same claim on the merits was contrary to or an unreasonable application of federal law (as determined by the United States Supreme Court) or was based on an unreasonable determination of the facts presented to the state superior court, this Court should deny Petitioner's request for relief as to Claim I of his Petition.

*State Court Proceedings*

Like Claim I of his instant Petition, Petitioner's MAR Claim I asserted that "a juror was improperly influenced by an external source prior to penalty phase deliberations . . . ." (Docket Entry 2-1 at 3 (capitalization omitted).) As support for that claim, Petitioner highlighted this portion of an affidavit from a juror:

> During the trial, I often had lunch with my father who worked near the courthouse. Prior to deliberations, I asked [him] where I could look in the Bible for help and guidance in making my decision for [sic] between life and death. After the jury had found [Petitioner] guilty but before we decided his sentence, I opened my Bible at home

11

because I wanted to read something to help me with my
decision.  My father had given me the section in the
Bible where I could find "an eye for an eye."  That night
after reading that section in the Bible, it helped me
sleep better.  It didn't make the decision any easier.
The next day during deliberations, I voted for the death
penalty.

(Docket Entry 2-1 at 6 (quoting Docket Entry 4-1 at 5).)

Petitioner's MAR Claim I asserted that "[t]he communication between [the juror] and her father, in which he directed her to the 'eye for an eye' passage in the Bible . . . constituted an improper external influence . . . . By suggesting that she seek guidance in the 'eye for an eye' passage, her father implied what her decision should be – death." (Id. at 7-8.)  According to Petitioner, this implied message "tended to influence [the juror's] partiality [and] . . . . [p]rejudice should be presumed . . . ." (Id. at 8-9.)

After the State moved for denial of MAR Claim I (State's Ex. L, Answer and Motion to Deny MAR Claims I and III through VII on the Pleadings and to Dismiss MAR Claim VIII at 14-15),[6] Petitioner replied that "when [the juror] asked her father for advice as to where to look in the Bible . . . she invited his opinion as to what her decision [between life and death] should be" and "when [he] responded by directing [the juror] to a particular section in the Bible that included an 'eye for an eye passage' [the juror's

_____

[6] State's Exhibit L does not appear in electronic form on the Docket.  (Docket Entry 19 at 2 (¶ 12).)  The Court's paper copy contains two separately paginated documents:  1) Motion to Strike Hearsay Affidavit; and 2) Answer and Motion to Deny MAR Claims I and III through VII on the Pleadings and to Dismiss MAR Claim VIII.

12

father] expressed his opinion on that matter." (State's Ex. O at 2.)[7] Petitioner also suggested the state superior court could take judicial notice that three Old Testament passages (i.e., Exodus 21:24, Leviticus 24:20, and Deuteronomy 19:21) and one New Testament passage (i.e., Matthew 5:38-39) contain the phrase "eye for an eye." (Id. at 2-3.) He opined that, because an "obvious difference [exists] between the sections in the Old and New Testaments,"[8] the question of which passage the juror's father identified "warrants factual development at a hearing." (Id. at 3.) Finally, Petitioner contended that:

1) the state superior court "should grant a hearing on [MAR Claim I] in order to allow additional development of the facts that support it, including the particular passage [cited]" (id.);

2) the state superior court "must then determine whether or not the external influence was made upon [the juror] and if so, whether or not it was innocuous" (id.); and

3) if the external influence occurred and does not qualify as innocuous, the state superior court must require the State "to bear the heavy burden of disproving the presumption that the external

_____

[7] Said document appears only in the Court's paper file. (See Docket Entry 19 at 2 (¶ 15).)

[8] In Petitioner's view, these "Old Testament Passages all state clearly that the punishment to be imposed in a case in which one man causes the death of another is death." (State's Ex. O at 3.) The New Testament quotation cited by Petitioner acknowledges the "'eye for an eye'" phrase, but adds "'whosoever shall smite thee on thy right cheek, turn to him the other also.'" (Id.)

13

influence resulted in prejudice to [Petitioner]" (id.).

The state superior court then held a hearing, including on MAR Claim I. (State's Ex. C1 at 12, 20.)[9] Just before the hearing began, Petitioner filed a Motion for Discovery by Depositions (Docket Entry 5-2 at 1), along with an affidavit from Adam Pfeifer who had procured the juror affidavit. (Id. at 7.) According to Pfeifer, "[Petitioner's MAR] attorneys [later] asked [Pfeifer] to try to interview [the juror] again to get more details about her conversation with her father." (Id.) Pfeifer "returned to [the juror's home] . . . [but she] told [Pfeifer] she was too busy to talk at that time and to return in a couple of hours." (Id.) "[Pfeifer] returned in a couple of hours as [the juror had] directed. Although it appeared [the juror] was still at the home, . . . [she] did not come to the door." (Id.)[10]

Pfeifer's affidavit further related that he "interviewed [the juror's] father . . . [who] confirmed that he had a conversation with his daughter about an 'eye for an eye' section of the Bible during his daughter's deliberations in [Petitioner's] trial." (Id. at 8.) The juror's father reportedly stated "that he had called

_____

[9] State's Exhibit C1 consists of that hearing transcript and appears in the Court's paper file (see Docket Entry 19 at 1 (¶ 3)).

[10] Pfeifer concluded from these circumstances that the juror did not "intend[] to speak to [him] any further about her jury service, or the conversation she had with her father about the 'eye for an eye' section of the Bible." (Docket Entry 5-2 at 8.) Pfeifer's affidavit did not describe what additional "details" Petitioner sought from the juror. (See id. at 7-8.)

14

his mother [i.e., the juror's grandmother], who live[d] in [another state], and got a biblical reference from her before providing it to his daughter." (Id.) Pfeifer's affidavit did not assert that the juror's father failed to answer any inquiry from Pfeifer or ever refused contact with Pfeifer. (See Docket Entry 5-2 at 7-8.) Pfeifer asserted that he "called [the juror's grandmother] several times in order to speak to her about the conversation she had with her son but was unsuccessful in reaching her." (Id.)[11]

Based on the juror's and Pfeifer's affidavits, Petitioner argued the state superior court "should order the deposition of [the juror, her father, and her grandmother] . . . [to] assist in the search for truth about [the juror's] extrajudicial conversations with her father . . . ." (Id. at 3.) Petitioner described the scope of the requested depositions only as follows: "whether any improper or undue influence was brought to bear on [the juror] in relation to [Petitioner's] capital trial[.]" (Id. at 5.) The Motion for Discovery by Depositions offered no forecast of specific questions Petitioner wished to ask. (See id. at 2-5.) Nor did said Motion explain why the Court lacked a sufficient basis to rule on MAR Claim I without deposition testimony. (See id.)

During the hearing, the State argued that, "[s]ince the Bible

_____

[11] Due to her failure to return his telephone calls, Pfeifer "d[id] not believe that [the juror's grandmother] intend[ed] to speak to [him] . . . ." (Docket Entry 5-2 at 8.) His affidavit did not describe the information he sought. (See id. at 7-8.)

15

itself has nothing to do with aggravators and mitigators [that a jury must apply in considering a death sentence] . . ., then when [the juror] asked for [sic] 'tell me a passage in the Bible' and was given one of the eye-for-an-eye passages, there cannot have been any attempt to influence [the juror] because the Bible is not an external influence . . . ." (State's Ex. C1 at 16.)  The State further asserted that Petitioner's affidavits did not support the view that the juror's father "tr[ied] to tell her what to decide." (Id. at 17.)  Petitioner (through his MAR counsel) countered:  "Our position is that when [the juror] asked her father for guidance and her father . . . said, 'Read this section,' and she said she read the section he pointed to, that that was tantamount to expressing his opinion on what the decision should be."  (Id. at 22.)

The state superior court queried Petitioner's MAR counsel about the significance of the fact that the juror's affidavit "doesn't say, 'I asked <u>my father for guidance</u> on what to do about this . . . ponderous thing I was involved in,' [but instead says] 'I asked my father <u>where I could go to the Bible for guidance</u>.'" (Id. at 24 (emphasis added).)  Petitioner's MAR counsel did not address the distinction identified by the state superior court, but rather responded by simply reiterating the view that because the juror's father "pointed [the juror] to a section that . . . specifically indicated that the appropriate thing to do is life for life, like eye for eye, death for death . . . [Petitioner] could

16

show it was an influence upon [the juror]." (<u>Id.</u> at 25.)

At that juncture, Petitioner's MAR counsel expressed a desire "to develop these facts at a hearing." (<u>Id.</u>) He did not explain what specific development the record required, but instead simply asserted that said Motion would allow Petitioner to "flush out exactly how this – these conversations [between the juror and her father and between the juror's father and grandmother] went." (<u>Id.</u> at 25-26.)[12] Petitioner's MAR counsel did not identify what aspect of "these conversations" Petitioner wished to "flush out" or why the state superior court needed such information to rule on MAR Claim I. (<u>See</u> <u>id.</u> at 26-27.) Rather, Petitioner's MAR counsel concluded his argument to the state superior court as follows:

> We think [the facts in the affidavits from the juror and
> Pfeifer] go beyond the Bible-reading cases . . . . [I]f
> [the juror] had just read [the Bible], then that's –
> that's one thing. But her father and her grandmother
> being involved and pointing her to a particular section
> of the Bible, we believe takes us out of the line of
> cases [the State] is relying on [to oppose MAR Claim I].

(<u>Id.</u> at 27.)

Near the end of the hearing, after discussion of other issues related to Petitioner's MAR (<u>see</u> <u>id.</u> at 27-125), the state superior

---

[12] Earlier in the hearing, in apparent response to a comment by the State about the absence of evidence that the juror's father "knew what case [the juror] was on" (State's Ex. C1 at 17), Petitioner's MAR counsel asserted that Petitioner "could flush that out . . . at a hearing or either at depositions" (<u>id.</u> at 22). Petitioner's MAR counsel, however, made clear that he did not perceive the issue of the juror's father's knowledge of Petitioner's identity as material to MAR Claim I. (<u>See</u> <u>id.</u>)

court asked about "[a]nything else . . . we need to do today?" (Id. at 125.) Petitioner's MAR counsel brought up "the motion for discovery by depositions" and asked if the state superior court "want[ed] to reserve ruling on that until [it] rule[d] on the State's motion [to deny MAR Claim I] . . . . ." (Id.) Before relinquishing the floor, Petitioner's MAR counsel stated:

> [T]he basis for our motion [seeking depositions] is that we send [sic] an investigator out to speak to [the juror]. We've spoken to her one time. We would like to find out exactly which eye-for-an-eye section he – her father pointed her to. She won't speak to us anymore.
>
> I mean, these are things that we can do in a hearing. We certainly could ask her these questions at a hearing, but in the absence of the power to compel these folks to answer our questions, we've not been able to get all the answers that we were looking for.

(Id. at 125-26.)

The state superior court asked if the juror and her father "characterized" the Bible passage at issue as an "eye for eye" passage (id. at 126) and Petitioner's MAR counsel answered:

> Yes, sir. That's how [the juror] characterized it originally in her affidavit . . . . [Her father] directed her to a passage in the Bible that contained 'an eye for an eye.' And so our initial affidavit is . . . nonspecific [about which 'eye for an eye' passage from the Bible the juror's father cited] and we've – we've sent back Mr. Pfeifer to speak to [the juror] again, and that's been unavailing; his attempts to contact her grandmother have been unavailing. He has spoken to her father on one occasion.
>
> But we would like to have the opportunity to ask these folks questions under oath limited specifically to the narrow issue of whether there was any improper or undue influence exerted upon [the juror] through these conversations.

18

(Id.)

Subsequently, the state superior court ruled as follows:

1.  In [MAR] [C]laim I, [Petitioner] presents the affidavit of [a] juror . . . who averred <u>inter alia</u> that she had lunch with her father prior to sentencing deliberations at [Petitioner's] trial and requested her father to direct her to a Bible passage to help in dealing with her sentencing decision. The juror's father directed her to one of the "eye for an eye" passages in the Bible. That night [said juror] read the passage: it helped her sleep better but did not make her sentencing decision any easier. On this basis, <u>[Petitioner] claims that [the juror] was subjected to an improper external influence by her father</u> . . . .

2.  The Fourth Circuit Court of Appeals has determined that the Bible does not constitute an improper external influence in a capital case, whether read aloud by one juror to the others during sentencing deliberations, whether read by a juror in the privacy of his home, or whether read to herself by a juror during deliberations.

3.  Moreover, [Petitioner] presented no evidence that [the juror's] father knew what case [the juror] was sitting on, and <u>no evidence that he deliberately attempted to influence her vote by directing her to a specific passage in the Bible</u>. Instead, [Petitioner] presented a motion for depositions of [the juror], her father, and her grandmother.

Based on the foregoing, the [state superior] [c]ourt ma[de] the following conclusions of law:

1.  As a matter of federal constitutional law, as explained in the Fourth Circuit decisions cited above, [Petitioner's] claim is without merit.

2.  [Petitioner's] motion for depositions of [the juror], her father, and her grandmother is DENIED.

3.  <u>The State's motion to deny [MAR] [C]laim I on the pleadings is ALLOWED</u>.

(Docket Entry 6-1 at 5-7 (emphasis added) (internal citations

19

omitted).) Petitioner sought further review (State's Ex. CC at 53-62),[13] which the Supreme Court of North Carolina summarily denied, <u>Hurst</u>, 364 N.C. at 244, 698 S.E.2d at 664.

*Application of Section 2254(d) and (e)(1)*

The state superior court specifically found, inter alia, that:

1) in MAR Claim I, Petitioner asserted "that [a juror] was subjected to an improper external influence by her father" (Docket Entry 6-1 at 5);

2) Petitioner presented "no evidence that [the juror's father] deliberately attempted to influence [the juror's] vote by directing her to a specific passage in the Bible" (<u>id.</u> at 6); and

3) MAR Claim I failed on the pleadings (<u>id.</u> at 7).

Accordingly, because this juror influence claim (which Petitioner now presents as Claim I of his instant Petition) "was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), this Court cannot grant relief thereon unless Petitioner shows that the state superior court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," <u>id.</u> (internal paragraph numbering

---

[13] State's Exhibit CC consists of Petitioner's certiorari petition to the North Carolina Supreme Court and appears only in the Court's paper file. (Docket Entry 19 at 3 (¶ 29).)

omitted); <u>see also</u> <u>Cullen</u>, ___ U.S. at ___ and ___, 131 S. Ct. at 1398 and 1402 (holding that "petitioner carries the burden of proof" as to Section 2254(d) and that "Section 2254(d) applies even where there has been a summary denial [in state court]"). Further, any "determination of a factual issue made by [the state superior] court shall be presumed to be correct . . . [and Petitioner] ha[s] the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Petitioner contends that "[t]he state court ruling was contrary to clearly established Supreme Court law because it did not deem the communication between [the juror] and her father to be presumptively prejudicial." (Docket Entry 1-1 at 19.)[14] In support

---

[14] In his Petition, Petitioner largely addresses Claim I as if he concedes the state superior court adjudicated it on the merits such that Section 2254(d) applies. (<u>See</u> Docket Entry 1-1 at 19-24.) However, in the "Conclusion" to this section of his Petition, "Petitioner contends that as a result of the state court's unreasonable determination of the facts in light of the evidence, without holding an evidentiary hearing, that a full and fair determination of the merits of the [instant claim was] not reached by the state court. As such, the deferential standard of 28 U.S.C. § 2254(d) should not apply . . . ." (<u>Id.</u> at 25.) For reasons set forth below, Petitioner has not shown that the state superior court made an unreasonable determination of the facts in light of the evidence or that the evidence compelled the state superior court to find a sufficiently serious external influence on the juror to raise a presumption of prejudice necessitating an evidentiary hearing on the issue of harm. In opposing Respondent's summary judgment motion, Petitioner took a slightly different tack by arguing that "the state [superior] court's failure to allow factual development of [MAR Claim I] through an evidentiary hearing or other discovery procedures resulted in a decision that was not 'on the merits.' Thus, a review under 28 U.S.C. § 2254(d) is not appropriate . . . ." (Docket Entry 23 at 4.) This Court, however, previously has rejected the contention that the state superior

21

of this position, Petitioner cites <u>Remmer v. United States</u>, 347

U.S. 227 (1954). (<u>Id.</u>) In that case (which arose from a federal

tax evasion prosecution), "a person unnamed had communicated with

a certain juror . . . and remarked to him that he could profit by

bringing in a verdict favorable to [the defendant]. The juror

reported the incident to the judge, who informed the prosecuting

attorneys . . . ." <u>Remmer</u>, 347 U.S. at 228. "As a result, the

Federal Bureau of Investigation ["F.B.I."] was requested to make an

investigation," <u>id.</u>, during which "an F.B.I. agent [was sent to

interview the juror] in the midst of [the] trial," <u>id.</u> at 229.

"The F.B.I. [then made a] report [which] was considered by the

judge and prosecutors alone, and they apparently concluded that the

statement to the juror was made in jest, and nothing further was

done or said about the matter." <u>Id.</u> at 228. "[The defendant] and

his counsel first learned of the matter by reading of it in the

newspapers after the [jury returned a guilty] verdict." <u>Id.</u>

Thereafter, the defendant moved for a new trial and requested

a hearing, <u>id.</u>, but "[t]he [d]istrict [c]ourt, without holding [a]

hearing denied the motion for new trial," <u>id.</u> at 229. After the

court of appeals affirmed, the United States Supreme Court remanded

the case to the district court for a hearing and held that:

> In a criminal case, any private communication, contact,
> or tampering directly or indirectly, with a juror during

---

court improperly denied Petitioner an opportunity to develop the
record. (<u>See</u> Docket Entry 49 at 18-27; Docket Entry 52 at 1-2.)

> a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer, 347 U.S. at 229.[15]

However, in a later case involving federal habeas review of a state conviction, in which it had occasion to consider, inter alia, the import of Remmer, the Supreme Court observed "that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217 (1982). The Smith Court also emphasized that in "a federal habeas action [a state court's] findings are presumptively correct . . . and may be overcome only by convincing evidence." Id. at 218.

"Although [Smith did not] deal[] directly with extraneous communications to members of the jury, [it is] nonetheless instructive in any situation where a jury verdict is being impeached." Stockton v. Virginia, 852 F.2d 740, 744 (4th Cir. 1988). More specifically:

---

[15] Another Supreme Court opinion followed the remand, Remmer v. United States, 350 U.S. 377 (1956), such that courts sometimes refer to the two decisions as Remmer I and Remmer II. See, e.g., United States v. Cheek, 94 F.3d 136, 139-43 (4th Cir. 1996).

23

> Our system of criminal justice rests in large measure
> upon a confidence in conscientious juror deliberations
> and juror attentiveness, both to the evidence at trial
> and to the instructions of the trial judge. This
> confidence is not to be displaced every time a third
> party communication reaches the ears of a juror during
> trial. Thus, while a presumption of prejudice attaches
> to an impermissible communication, the presumption is not
> one to be casually invoked.

Id. at 744-45 (internal citations omitted). "When this sequence of proof involves fact-finding by the state courts, those determinations must be afforded further deference in federal habeas proceedings." Id. at 745.

Consistent with that view of Smith and Remmer, the United States Court of Appeals for the Fourth Circuit "has established a three-step process for analyzing allegations of extrajudicial juror contact," United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996):

> The party who is attacking the verdict bears the initial
> burden of introducing competent evidence that the
> extrajudicial communications or contacts were more than
> innocuous interventions. If this minimal standard is
> satisfied, the Remmer I presumption is triggered
> automatically. The burden then shifts to the prevailing
> party to prove that there exists no reasonable
> possibility that the jury's verdict was influenced by an
> improper communication.

Id. (internal citations and quotation marks omitted); see also Haley v. Blue Ridge Transfer Co., Inc., 802 F.2d 1532, 1537 n.9 (4th Cir. 1986) ("[C]ertain kinds of extrajudicial contacts may amount to nothing more than innocuous interventions that simply could not justify a presumption of prejudicial effect.").

In this case, the state superior court found Petitioner

24

offered "no evidence that [the juror's father] deliberately attempted to influence [the juror's] vote by directing her to a specific passage in the Bible." (Docket Entry 6-1 at 6.)[16] Determinations of this sort constitute factual findings. See, e.g., Rushen v. Spain, 464 U.S. 114, 120 (1983) (holding that "substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact"). As such, this determination by the state superior court "shall be presumed to be correct . . . [and Petitioner] ha[s] the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not identified clear and convincing evidence that undermines this finding. Nor has Petitioner shown that the state superior court made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

---

[16] This determination as to the innocuous nature of the contact between the juror and her father belies Petitioner's assertion that "[t]he state [superior] court misapprehended the controlling law because it premised its findings and its decision on the use of the Bible alone" (Docket Entry 1-1 at 20). Nor could Petitioner contend that the state superior court's finding on this point came without notice. During the MAR hearing, the State explicitly argued that Petitioner's affidavits did not support the view that the juror's father "tr[ied] to tell her what to decide" (State's Ex. C1 at 17) and the state superior court specifically questioned Petitioner's MAR counsel about the fact that the juror's affidavit "doesn't say, 'I asked my father for guidance on what to do about this . . . ponderous thing I was involved in,' [but instead says] 'I asked my father where I could go to the Bible for guidance.'" (Id. at 24 (emphasis added).) Petitioner's MAR counsel, however, declined to address that issue directly. (Id. at 25.)

To meet his burden under Section 2254(d)(2) and (e)(1), Petitioner relies entirely on the affidavits of the juror and Pfeifer. (See Docket Entry 1-1 at 13-14 (setting out "Relevant Facts").) From that evidence, Petitioner intimates the state superior court should have found as a "fact that [the juror's] father conveyed his and possibly his mother's opinion as to what [the juror's] sentencing decision should be when he directed her to an 'eye for an eye' passage." (Id. at 22; see also id. at 24 (asserting that evidence shows juror's father gave her "fatherly advice" after juror "asked for advice about her decision").) In fact, neither the affidavit from the juror nor the affidavit from Pfeifer support Petitioner's foregoing conclusion, much less provide clear and convincing evidence to overcome the state superior court's contrary determination.

First, the juror's affidavit reflects that she did not ask her father for advice about how to decide between life and death sentences, but rather that she "asked [her] father where [she] could look in the Bible for help and guidance in making [that] decision . . . ." (Docket Entry 4-1 at 5.) Second, Pfeifer's affidavit does not establish that the juror's father conveyed his personal view about what verdict the juror should render, but only that he "got a biblical reference from [the juror's grandmother and] provid[ed] it to [the juror]." (Docket Entry 5-2 at 7-8.) Under these circumstances, the state superior court reasonably

26

treated the juror's father's response to the juror's request for help locating a Bible verse as wholly different from intrusions into jury decision-making that courts deem presumptively prejudicial, see, e.g., Parker v. Gladden, 385 U.S. 363, 363-64 (1966) (reversing conviction where "bailiff assigned to shepherd the sequestered jury . . . stated to one of the jurors in the presence of others . . . 'Oh that wicked fellow (petitioner), he is guilty'"); Fullwood v. Lee, 290 F.3d 663, 676-82 (4th Cir. 2002) (remanding habeas case where juror averred other juror "was strongly influenced by her husband [who told her to] . . . sentence [the defendant] to death" (internal ellipses and quotation marks omitted)); Stockton, 852 F.2d at 743-44 (affirming habeas relief where, "[a]fter inquiring about the progress of their deliberations, [restaurant owner] told the jurors that he thought 'they ought to fry the son of a bitch'").[17]

---

[17] Perhaps in recognition of the firm foundation of the state superior court's finding of an absence of evidence that the juror's father "attempted to influence [the juror's] vote by directing her to a specific passage in the Bible" (Docket Entry 6-1 at 6), Petitioner seeks to side-step that factual determination by asserting that "it is very likely that by directing [the juror] to [an eye-for-an-eye] passage, [the juror's father] influenced her verdict, whether or not he intended to do so." (Docket Entry 1-1 at 23.) This argument provides no basis for invalidating the state superior court's decision. As an initial matter, Petitioner has identified no evidence the juror perceived her father as having expressed a personal opinion about what verdict she should render. (See id.) Nor do the circumstances support an inference that the juror would have interpreted her father as having done so. Simply put, the evidence establishes that the juror did not ask her father for his opinion about an appropriate sentence; she asked him to help her locate Bible verses she could consider. No reason exists

Given the state superior court's unimpeached (and thus reasonable) finding that Petitioner produced no evidence the juror's father tried to influence the verdict, its decision to deny this claim must stand because Petitioner had the burden of offering "competent evidence that the extrajudicial communications or contacts were more than innocuous interventions," Cheek, 94 F.3d at 141. Stated differently, absent any showing that the juror's father attempted to impose his will on the jury, the state superior court acted consistently with Remmer and Smith in declining to presume prejudice. See Stockton, 852 F.2d at 745 ("[W]hile a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked."); Haley, 802 F.2d at 1537 n.9 (stating that "innocuous

to believe the juror thought that when her father answered a question she did ask (i.e., "where I could look in the Bible for help and guidance in making my decision" (Docket Entry 4-1 at 5)), he actually answered a question she did not ask (i.e., what punishment he thought she should select). Moreover, Petitioner's assumption that the juror would have construed her father's action in referring her to an "eye-for-an-eye" passage as an expression of his personal belief about the proper sentence requires the further assumption that the juror thought the Bible also contained verses that counseled against imposition of the death penalty and that, by opting not to refer her to such passages, her father expressed his opinion. However, the record contains no evidence the juror had any idea what the Bible had to say about capital punishment, much less that she understood it to possess competing viewpoints on the subject. In other words, Petitioner contends the juror necessarily viewed her father as a biased editor of the Bible, i.e., one who combed through its conflicting statements about the death penalty and selected a verse that suited his personal agenda; however, the record actually reflects that the juror used her father like a neutral index, i.e., one who could simply point her to where in the Bible material related to capital punishment appeared.

interventions . . . could not justify a presumption of prejudicial effect"). The Court therefore should deny Claim I, because, in the language of Section 2254(d), the state superior court's decision to reject Petitioner's claim of an improper external influence on jury deliberations neither was contrary to <u>Remmer</u> and <u>Smith</u> nor involved an unreasonable application of said decisions to this case.

<u>Claim II</u> - <u>Ineffective Assistance of Counsel (Mitigation)</u>

As to Claim II, the Petition asserts that Petitioner's trial counsel provided ineffective assistance as to sentencing. (Docket Entry 1-1 at 26-47.) Specifically, it contends they should have investigated and should have offered at trial expert testimony regarding Petitioner's alleged Alcohol Related Neurodevelopmental Disorder ("ARND") and resulting functional age of 12. (<u>Id.</u>) According to the Petition, such evidence would have supported at least two statutory mitigators: N.C. Gen. Stat. § 15A-2000(f)(6) and (7) (impaired capacity (submitted to but not found by the jury) and age (not submitted to the jury)). (Docket Entry 1-1 at 42.)

In general, the "performance" and "prejudice" standard of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), governs such claims. Under <u>Strickland</u>, a petitioner must show 1) "that counsel's performance was deficient" and 2) "that the deficient performance prejudiced the defense." <u>Id.</u> at 687. However, when (as in this case) a federal habeas court reviews an ineffective assistance of counsel claim under Section 2254(d), the "state court must be

29

granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington v. Richter*, ___ U.S. ___, ___, 131 S. Ct. 770, 785 (2011). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at ___, 131 S. Ct. at 786.[18] Simply put, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Id.* at ___, 131 S. Ct. at 788 (internal citations and quotation marks omitted). Viewed through that lens, Claim II falls short on both the performance and prejudice prongs.

<em>Performance</em>

"[C]ounsel has a duty to make reasonable investigations <u>or</u> to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added). For capital cases, such investigations "should comprise efforts to discover *all reasonably available* mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (emphasis in original) (quoting American Bar Association Guidelines for the Appointment and

---

[18] For example, under Section 2254(d), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, ___ U.S. at ___, 131 S. Ct. at 786-87.

Performance of Counsel in Death Penalty Cases ("ABA Guidelines")
11.4.1(C), p. 93 (1989)).[19]  "In assessing counsel's investigation,
[courts] must conduct an objective review of [counsel's]
performance, measured for reasonableness under prevailing
professional norms, which includes a context-dependent
consideration of the challenged conduct as seen from counsel's
perspective at the time." Id. at 523 (internal quotation marks and
citations omitted).  As part of that assessment, "counsel should be
'strongly presumed' to have rendered adequate assistance," Cullen,
___ U.S. at ___, 131 S. Ct. at 1403 (quoting Strickland, 466 U.S.
at 690), and "every effort [must] be made to eliminate the
distorting effects of hindsight," Strickland, 466 U.S. at 689.

Following their appointment in 2002 (see Docket Entry 1-1 at
4), Petitioner's trial counsel, Franklin E. Wells, Jr. and
Jonathan Megerian, focused on developing a mitigation-based defense
strategy.  (MAR Evid. Hrg. Tr. at 249-51, 264-69 (documenting
testimony of Wells).)  They recognized their duty to perform an
independent investigation and to employ experts. (Id. at 254-56.)
In the guilt phase, Petitioner's trial counsel called Dr. Hilkey,
a psychologist who testified about Petitioner's dysfunctional
upbringing, his mental impairments (i.e., BPD and depression), and

_____

[19]  The ABA Guidelines serve "merely as evidence of what
reasonably diligent attorneys would do, [not] as inexorable
commands with which all capital defense counsel must fully comply."
Bobby v. Van Hook, 588 U.S. 4, __, 130 S. Ct. 13, 17 (2009)
(internal quotation marks omitted)).

31

their negative effect on his decision-making, as well as the fact that Petitioner had normal intelligence and no signs of neurological damage. See Hurst, 360 N.C. at 186, 199, 624 S.E.2d at 315, 323. At sentencing, Dr. Claudia Coleman, a neuropsychologist, testified that, based on her independent evaluation of Petitioner, she concurred with Dr. Hilkey's diagnoses and (like Dr. Hilkey) found no basis "to believe that [Petitioner] had any . . . neuropsychological deficits or specific brain impairment." (Trial Tr. at 2125-27.) In her written report (introduced at trial), Dr. Coleman concluded:

> [T]here was significant evidence of chronic mood and personality disturbance as well as alcohol dependence. Each of these factors can acutely impair cognitive abilities in terms of reasoning and judgment, and the combination can result in significantly compromised thinking. The available history indicated that during episodes of distress [Petitioner] has experienced such deterioration. It is my opinion that at the time of the alleged offense [Petitioner] was under the influence of mental and emotional disorders and that his capacity to conform his conduct to the requirements of the law was impaired due to these disorders.

(Id. at 2129-30.) Petitioner's trial counsel also presented testimony from family members of Petitioner regarding his troubled childhood. See Hurst, 360 N.C. at 199, 624 S.E.2d at 323.

Despite the fact, acknowledged by Petitioner, that his "[t]rial counsel utilized the services of mitigation and psychological experts to assist in the preparation of [his] trial and sentencing" (Docket Entry 1-1 at 9), Petitioner asserted in his MAR that he "was deprived of effective assistance of counsel at the

32

sentencing phase of his trial due to his [trial] counsel's failure to investigate and present mitigating evidence . . . that [Petitioner] was exposed to alcohol in utero in substantial quantities and suffered from alcohol-related neurodevelopmental disorder (ARND)." (Docket Entry 2-1 at 9.) The state superior court heard evidence on this claim over five days. (MAR Evid. Hrg. Tr. at 24-85, 100-311, 321-90, 394-405, 432-586, 597-707.) It then found, inter alia, as follows:

> 6. . . . [E]xpert witness [Dr. Sandra Zinn testified] . . . that [Petitioner] may have been affected in some way by prenatal consumption of alcohol by his mother. . . .

> 8. . . . [Petitioner's mother] engage[d] in the behavior of consuming alcoholic beverages while pregnant with [him], at least at some point during her pregnancy.

> 9. Trial counsel for [Petitioner] and the mitigation specialist hired by trial counsel did not specifically inquire of [Petitioner's] mother whether she had consumed alcohol prenatally and did not conduct any additional investigation as to this issue with [Petitioner's] family, friends or associates.

> 10. Any evidence regarding prenatal consumption of alcohol by [Petitioner's] mother was not submitted to any mental health experts called by [Petitioner] at trial; neither was it submitted to the jury . . . .

> 11. [The state superior court] is thoroughly aware of the standard by which to determine ineffective assistance of counsel as set out in <u>Strickland</u> . . . .

> 12. [The state superior court] must determine whether the failure of trial counsel to investigate prenatal alcohol use by [Petitioner's] mother and their consequent failure to request statutory or non-statutory mitigating factors denied [Petitioner] his right to effective assistance of counsel at the sentencing phase of trial. In making this determination, [the state

superior court] has reviewed trial transcripts, particularly the transcripts of the testimony of the trial experts during both phases of trial, and the testimony of [Dr. Zinn that Petitioner] presented at the evidentiary hearing on his MAR.

. . . .

14. With regard to the performance component of the Strickland test, . . . the facts indicate that trial counsel obtained the services of a psychologist, a neuropsychologist, a mitigation specialist, and a fact investigator. Both through the mitigation specialist and personally, trial counsel met with various and numerous members of [Petitioner's] family, friends of the family, and with [Petitioner] himself.

15. [Petitioner] had the services of experts who appear from the record to have been very well-qualified expert witnesses, specifically Dr. Hilkey and Dr. Coleman. Both experts diagnosed [Petitioner] as having borderline personality disorder, major depressive disorder, and alcohol dependence and psychoactive substance abuse.

16. Neither of the trial experts concluded that [Petitioner] had any deficiency due to neurocognitive disorder or brain damage. Both experts concluded that [Petitioner's] IQ was average to above average.

17. Based on this testimony, . . . the [state superior] court submitted numerous statutory and non statutory mitigating factors to the jury . . . [including]: Was this murder committed while [Petitioner] was under the influence of a mental or emotional disturbance? This is a statutory mitigating factor to which the jury answered "yes"; Was the capacity of [Petitioner] to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired? This is a statutory mitigating factor to which the jury answered "no"; Was [Petitioner] a victim of physical abuse as a child at the hands of his father? The jury answered "yes"; Was [Petitioner] introduced to drugs and alcohol at age of 13 by his father, who smoked pot and drank with [Petitioner]? The jury answered "yes"; Throughout his childhood, did [Petitioner] witness numerous acts of physical violence by his father against his mother? The jury answered

34

"yes"; Did [Petitioner] desperately desire a stable, loving relationship? The jury answered "yes"; By his teenage years, did [Petitioner] exhibit signs of treatable psychological illness and addictions, which were not effectively diagnosed or treated? The jury answered "yes"; and Did the significant family history of mental illness and addiction make [Petitioner] vulnerable to psychological and emotional problems? To which the jury answered "no". The jury weighed the mitigating and aggravating factors and recommended a sentence of death.

    . . . .

19. All the evidence presented by both parties is that [Petitioner's] trial counsel are experienced, competent attorneys, that they have together and separately tried and defended capital cases both before and after the case sub judice. The [instant] case appears to have been the first time that a death sentence was recommended in a capital case tried by either [of them].

    . . . .

22. . . . [T]he evidence presented during the guilt/ innocence and sentencing phases of [Petitioner's] trial . . . shows that [Petitioner] planned this murder at least a day in advance, that he set the scenario which allowed him to shoot and kill the victim, steal the victim's property, escape from the scene of the shooting, and subsequently sell the stolen property.

(Docket Entry 6-3 at 6-10 (internal parenthetical numbers omitted from ¶ 17); <u>accord</u> MAR Evid. Hrg. Tr. at 783-90.)

Based on its foregoing findings, the state superior court held that Petitioner "failed to meet his burden of proving trial counsel were ineffective as defined in <u>Strickland</u> . . . ." (Docket Entry 6-3 at 11; <u>accord</u> MAR Evid. Hrg. Tr. at 791.) Because the state superior court adjudicated this claim on the merits, after an evidentiary hearing, this Court must apply the highly deferential

35

review mandated by Section 2254(d).[20] As such, under Harrington, the "pivotal question" becomes whether the state superior court rendered a reasonable ruling pursuant to Strickland (which itself sets a standard highly deferential to trial counsel and the result obtained at trial). From numerous perspectives, the record and pertinent authority establish that the state superior court did not act unreasonably by failing to find that Petitioner's trial counsel performed below reasonable professional standards as to mitigation.

First, the fact that Petitioner ultimately received the death penalty has no relevance in assessing the adequacy of his trial counsel's performance. See, e.g., Strickland, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of

_____

[20] In discussing Claim II, the Petition and Petitioner's summary judgment brief generally acknowledge that the limited review prescribed by Section 2254(d) governs this Court's adjudication of said claim. (See Docket Entry 1-1 at 26, 43, 46; Docket Entry 24 at 16-19.) The Petition's "Conclusion" subsection as to Claim II, however, asserts that, because "the state [superior] court concluded as a matter of law, [Petitioner] has failed to meet his burden of proving that trial counsel were ineffective under Strickland . . ., this Court should conduct a review de novo." (Docket Entry 1-1 at 46-47 (internal quotation marks omitted).) The "Standard of Review" portion of his summary judgment brief regarding Claim II makes a similar undeveloped demand for de novo review. (Docket Entry 24 at 17.) Such conclusory contentions fail given the Supreme Court's holding that "Section 2254(d) applies even where there has been a summary denial [in state court]." Cullen, ___ U.S. at ___, 131 S. Ct. at 1402.

36

counsel was unreasonable."). Instead, "counsel should be 'strongly presumed' to have rendered adequate assistance," Cullen, ___ U.S. at ___, 131 S. Ct. at 1403 (quoting Strickland, 466 U.S. at 690), and "every effort [must] be made to eliminate the distorting effects of hindsight," Strickland, 466 U.S. at 689.

Second, the record reflects Petitioner's trial counsel made an extensive investigation into mitigation-related matters. As the state superior court found, Petitioner's trial counsel "obtained the services of a psychologist, a neuropsychologist, a mitigation specialist, and a fact investigator. Both through the mitigation specialist and personally, trial counsel met with various and numerous members of [Petitioner's] family, friends of the family, and with [Petitioner] himself." (Docket Entry 6-3 at 7.) The state superior court and Dr. Zinn (Petitioner's mental health expert at the MAR hearing) each took note of the strong credentials of Drs. Hilkey and Coleman (the mental health experts employed by Petitioner's trial counsel). (See id.; MAR Evid. Hrg. Tr. at 550, 606, 608, 612.) Further, Dr. Zinn acknowledged that Dr. Coleman "did extensive testing" of Petitioner to support her finding of a total absence of any reason "'to believe that he had any . . . neuropsychological deficits, or specific brain impairment.'" (MAR Evid. Hrg. Tr. at 607 (emphasis added).)[21] Moreover, as Dr. Zinn

_____

[21] Dr. Zinn also recognized that Dr. Hilkey independently reached the same conclusion. (See MAR Evid. Hrg. Tr. at 608.)

37

conceded, Dr. Coleman's testing fell within the range of "screening tests to detect brain injury due to in utero alcohol exposure" (id. at 636) and Dr. Coleman's trial testimony specifically and thoroughly addressed issues of "executive control and functioning" (id.), one of the key neurological areas linked to fetal alcohol exposure (according to Dr. Zinn) (see, e.g., id. at 546-48, 560).

Third, Petitioner's trial counsel utilized the fruits of their investigation into Petitioner's background to present "evidence that [he] was raised in a 'tumultuous' environment[,] . . . that his relationship with his parents was 'extremely chaotic,' that [his] father physically abused and assaulted him and his mother, that [his] parents suffered from mental health problems, and that [his] father introduced [him] to alcohol and illegal drugs at an early age." Hurst, 360 N.C. at 199, 624 S.E.2d at 323. Through the testimony of Drs. Hilkey and Coleman, Petitioner's trial counsel employed such evidence of Petitioner's childhood trauma not only to create sympathy for Petitioner, but also to construct a recognized, mental disorder-based explanation for his shocking criminal conduct and damning post-apprehension reaction. See, e.g., id. at 199, 624 S.E.2d at 323 ("Dr. Hilkey testified that [Petitioner's] upbringing manifested itself as BPD when he grew older . . . [which caused his] 'flat affect' or lack of emotional response to . . . his role in the instant offense, and [his] respon[se] to events leading up to the murder . . . [of] 'transient

38

depersonalization'"); see also id. at 186, 624 S.E.2d at 315 ("Dr. Hilkey stated that . . . [Petitioner's] psychological disorders 'affected his ability to weigh and consider the consequences of his actions and to form specific intent to kill' [and] . . . that at the time of the shooting [he] 'was under the influence of a mental or emotional disturbance and his capacity to conform his conduct to the requirements of the law was impaired.'").

Fourth, as the state superior court found, based on the foregoing evidence, Petitioner's trial counsel succeeded in securing submission of "numerous statutory and non statutory mitigating factors to the jury" (Docket Entry 6-3 at 8), including:

> Was this murder committed while [Petitioner] was under the influence of a mental or emotional disturbance? . . .; Was the capacity of [Petitioner] to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired? . . .; Was [Petitioner] a victim of physical abuse as a child at the hands of his father? . . .; Was [Petitioner] introduced to drugs and alcohol at age of 13 by his father, who smoked pot and drank with [him]? . . .; Throughout his childhood, did [Petitioner] witness numerous acts of physical violence by his father against his mother? . . .; Did [Petitioner] desperately desire a stable, loving relationship? . . .; By his teenage years, did [Petitioner] exhibit signs of treatable psychological illness and addictions, which were not effectively diagnosed or treated? . . .; and Did the significant family history of mental illness and addiction make [Petitioner] vulnerable to psychological and emotional problems?

(Id. at 8-9.)

Fifth, Dr. Zinn acknowledged that, whereas the diagnosis of BPD was well-established before 1987 (at the latest) based on "a

set of criteria in [the Diagnostic and Statistical Manual for Mental Disorders ('DSM')] that everybody agrees on" (MAR Evid. Hrg. Tr. at 613),[22] even as of 2008 (i.e., four years after Petitioner's trial) ARND "is not in the DSM" and "there's actually a lot of controversy about [ARND's] diagnostic criteria" (id. at 599-600). In fact, during the time leading up to Petitioner's trial in 2004, ARND did not represent a mental impairment competent counsel necessarily should have known to pursue. According to Dr. Zinn:

> [T]he first publicized report [on the effect of alcohol in utero] was published in French in France in the late '60s. And then in the early '70s a set of researchers in the United States published some case studies of individuals who had this [F]etal Alcohol Syndrome ["FAS"] where . . . offspring of alcoholic mothers had very similar facial features, tended to be retarded, [and] had a number of behavioral problems.
>         . . . .
>
> Initially, . . . [FAS] was what was studied. But as people began to enroll more and more mothers who drank alcohol and followed them throughout pregnancy [they] realized that not all . . . affected by alcohol in utero had this same level of impairment . . . .

---

[22] Courts have described the DSM as "the authoritative reference used in diagnosing mental disorders . . . ." Young v. Murphy, 615 F.3d 59, 61 n.1 (1st Cir. 2010); accord, e.g., McGee v. Bartow, 593 F.3d 556, 575 (7th Cir. 2010) (observing that "Supreme Court has cited the DSM authoritatively, most notably in [Kansas v.] Crane, 534 U.S. [407,] 411, 414 [(2002)]"); United States v. Long, 562 F.3d 325, 334 n.22 (5th Cir. 2009) ("We take judicial notice of these [diagnostic criteria from the DSM because the DSM's] authoritative nature makes the criteria 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b))). Moreover, Dr. Zinn agreed that the DSM sets out diagnostic criteria "that not only can other experts look at, but [that] even lay people can pick up and look at . . . and judge [information] against." (MAR Evid. Hrg. Tr. at 613.)

. . . The Institute of Medicine in 1996 published a
report on [FAS] and what have been called [Fetal Alcohol]
[S]pectrum [D]isorders ["FASD"] or [F]etal [A]lcohol
[E]ffects ["FAE"]. . . .

. . . [ARND] was the term that was proposed by the
Institute of Medicine [to] describe[] the more broad
effects and the behavioral effects that can occur in
individuals who do not meet criteria for some of the more
so-called severe diagnoses. . . .

(Id. at 491-94.)[23]

However, Dr. Zinn admitted that "[t]he Institute of Medicine
criteria [for ARND published in 1996] . . . are generally regarded
in the medical community as being too vague to have a lot of
benefit in the clinical setting[.]" (Id. at 602.) She further
conceded that in publications released after Petitioner's trial:

1) the National Institutes of Health noted that criteria for
diagnosing ARND were inadequately established (id. at 602-03, 613);

2) the Centers for Disease Control reported that development
of ARND diagnostic criteria required research (id. at 627-29); and

3) the director of the Fetal Alcohol Diagnostic Program in
Duluth, Minnesota ("a well-regarded clinic") stated that ARND was

_____

[23] Later in her testimony, Dr. Zinn agreed that "FASD is an
umbrella term which encompasses [FAS] and . . . [ARND] . . . ."
(MAR Evid. Hrg. Tr. at 614.) Ann Streissguth, a researcher whose
work Dr. Zinn consulted (MAR Evid. Hrg. Tr. at 491), "uses [ARND]
interchangeably with FAE." Dr. Jane Aronson, Medical Resources:
Common Diseases: Fetal Alcohol Syndrome Related Disorders and
Children Adopted from Abroad, 215 Prac. L. Inst. Crim. L. & Urb.
Probs. 135, 139 (2008). In other words, "[FASD] comprises [FAS]
and what used to be called [FAE but is now called ARND by some]."
Kathryn Page, Ph. D., The Invisible Havoc of Prenatal Alcohol
Damage, 4 J. Center for Fams., Child. & Cts. 67, 67 n.1 (2003).

41

"not recognized in . . . diagnostic coding resources in the [United States]" and that, although "FAS is clearly defined," no "[n]ational consensus" or "agree[d] [upon] diagnostic criteria" existed as to other fetal alcohol disorders (id. at 701-03).

In light of the foregoing evidence showing a lack (certainly in 2004 and apparently in 2008) of any widely-accepted standards for diagnosing ARND, it comes as no surprise that Dr. Zinn could identify no studies "showing the reliability of a diagnosis of ARND[.]" (Id. at 631-32.) Moreover, at the MAR hearing, Dr. Zinn (the lone expert on whom Petitioner bases his claim that his trial counsel should have pursued an ARND-based defense) testified she had never diagnosed anyone with ARND before so diagnosing Petitioner for his post-conviction litigation. (MAR Evid. Hrg. Tr. at 598.) Dr. Zinn's inexperience with ARND as of 2008 highlights the degree to which investigation into such matters remained well outside the bounds of what the state superior court reasonably had to treat as a necessary component of a reasonable mitigation strategy during the relevant time period of 2002 through March 2004. Simply put, when trial counsel prepared Petitioner's defense, ARND did not represent a mental condition sufficiently well-established to require its pursuit as a mitigation theory.[24]

---

[24] By way of example, an article published shortly before Petitioner's trial observed that "[t]he effects of drinking on the fetus during pregnancy are not well understood by the average person, and indeed professional communities largely remain ignorant of the problem. . . . [A]s one foster grandmother [colorfully] put

42

Sixth, Petitioner has not cited one case, before (or since) his trial, where a capital defendant introduced evidence of ARND (or FAE or FASD) as mitigation.  (See Docket Entry 1-1 at 26-47; Docket Entry 24 at 16-19.)  Another court recently found this sort of deficiency in another petitioner's showing highly significant:

> Petitioner has not identified a single instance in which . . . [FASD] had ever been successfully employed at the punishment phase of a capital murder trial . . . .
>
> That such an argument [i.e., that some form of FASD mitigated capital murder], coupled with actual evidence [the] petitioner suffered [from some form of FASD], might have been theoretically available at the time of petitioner's trial did not render the failure of [his] trial counsel to pursue such a defensive theory professionally deficient.  "The defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources."

Sells v. Thaler, No. SA-08-CA-465-OG, 2012 WL 2562666, at *58 (W.D. Tex. June 28, 2012) (unpublished) (quoting Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992)).

Seventh, again in the words of the Sells Court:

> If [petitioner's new expert opinion evidence regarding] the effects of [ARND or the like] are deemed credible,

---

it, 'every doctor in the book called it something else and told me to take another damn parenting class!' . . .  FASD is rarely covered in medical school – in fact, a recent study found that only 17 percent of today's ob-gyn texts recommend abstinence during pregnancy. . . .  [T]here is practically no training on the subject in social work, mental health, juvenile justice, and other systems responsible for the care of people at risk."  Page, Invisible Havoc, supra, at 68-69 (emphasis added).  In other words, during the relevant time period, even professional disciplines other than law, to which capital defense counsel turn for help, had a "paucity of information about FASD."  Id.

then <u>there were objectively reasonable reasons why</u> <u>petitioner's trial counsel could have chosen not to have</u> <u>pursued such a line of defense</u> at the punishment phase of petitioner's capital murder trial. Chief among these [is the evidence] that prenatal alcohol exposure causes significant malformation in structures within the brain . . . meaning <u>a finding of [ARND or the like] meant</u> <u>petitioner was permanently marked as brain altered</u> . . . [with] damaged executive functioning, resulting in . . . inability to apply consequences from past actions (i.e., an inability to learn from one's mistakes), lack of impulse control . . . and the inability to experience or display remorse. Thus, <u>pursuit of a defense at the</u> <u>punishment phase of [the] trial premised upon petitioner</u> <u>suffering from [ARND or the like] would have amounted to</u> <u>an admission by petitioner's trial counsel that</u> <u>petitioner would, in fact, pose a substantial risk of</u> <u>future violent conduct.</u>

<u>Id.</u> (internal emphasis, footnote, and parentheticals omitted) (emphasis added).[25]

---

[25] In this regard, Dr. Zinn opined that:

[F]rom my testing and from all the evidence that I reviewed, . . . although [Petitioner] may be able to say what is right and wrong, he has difficulty using that knowledge to actually regulate his behavior, and . . . in the real world <u>he would go for the immediate payoff</u> <u>irrespective of what the consequences were</u>.

. . . [I]n order to conform one's self to the law, one has <u>to realize that there are consequences</u>. One has to . . . be able <u>to want to belong to a larger social</u> <u>structure</u> . . . . And <u>I don't think that these are</u> <u>abilities that [Petitioner] has displayed</u>.

. . . I've actually talked to some of the investigators who have looked at individuals who have damage in these particular areas [of the brain].

And [individuals with such brain damage] can have intact IQs, they can tell you . . . here's what an individual should do in a certain situation, but <u>their real-world</u> <u>choices and behavior are just abominable</u>. They are not regulating their choices out in the world based on what

44

In sum, the record shows Petitioner's trial counsel conducted a thorough mitigation investigation, employed acknowledged experts, and presented a well-grounded mitigation theory at trial. "There are countless ways to provide effective assistance in any given case." _Strickland_, 466 U.S. at 689. In this case, "counsel conducted a meaningful adversarial challenge to the imposition of the death penalty. . . . When, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance." _Jamison v. Collins_, 100 F. Supp. 2d 647, 732 (S.D. Ohio 2000) (internal brackets and quotation marks omitted); _see also Fleenor v. Farley_, 47 F. Supp. 2d 1021, 1049 (S.D. Ind. 1998) ("The ability to turn up new evidence in mitigation (even evidence fully consistent with counsel's strategic choices) does not prove ineffectiveness. . . . The argument that [trial counsel] were ineffective because . . . [others] find points to criticize runs directly contrary to [_Strickland_]."), _aff'd sub nom., Fleenor v. Anderson_, 171 F.3d 1096 (7th Cir. 1999).

Moreover, the record reflects that the mitigation strategy Petitioner faults his trial counsel for failing to pursue involved

---

they know. . . . Anatomical evidence suggests that the circuits that are designed to pull in all of this information and incorporate it in decision-making are not functioning properly.

(MAR Evid. Hrg. Tr. at 584-85 (emphasis added).)

a mental condition which lacked accepted diagnostic criteria of proven reliability, wide-spread recognition among relevant professionals, and any known history of use in capital cases. A thought experiment illustrates the impropriety of declaring unreasonable the state superior court's failure to pronounce Petitioner's trial counsel incompetent under such circumstances. Imagine Petitioner's trial counsel had put on a mitigation case based on ARND and the jury had voted for death. Question – What could Petitioner say about their performance? Answer – He could assert that they acted in a professionally unreasonable manner:

1) by presenting a defense based on a mental impairment <u>not</u> then recognized in the DSM, supported by reliability studies, or well-known among relevant professionals, which entities like the National Institutes of Health and the Centers for Disease Control said had inadequate diagnostic criteria and which no known death penalty defense team ever had used as part of a mitigation case;

2) by relying on an expert who had never diagnosed another person with the mental impairment in question and who acknowledged that two highly-regarded experts had thoroughly tested Petitioner (including with tests used to identify the neurological damage allegedly associated with the mental impairment in question), but had concluded he did not have any neurological damage; and

3) by exposing the jury to evidence that Petitioner had a permanent anatomical condition that made him a menace to society.

46

The fact that Petitioner could mount such an attack on an ARND-based mitigation case demonstrates that his trial counsel did not act in a professionally negligent fashion by failing to pursue such an approach, particularly given the appropriate mitigation defense they did present. At a minimum, the state superior court's failure to find otherwise does not qualify as unreasonable under Section 2254(d). The Court thus should deny relief on Claim II. Any other ruling would ignore the Supreme Court's admonitions that:

1) in assessing the performance of counsel, federal habeas courts must "eliminate the distorting effects of hindsight," Strickland, 466 U.S. at 689; and

2) in reviewing state court judgments, federal habeas courts must limit relief to "error[s] well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington, ___ U.S. at ___, 131 S. Ct. at 786-87.

*Prejudice*

"[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Strickland, 466 U.S. at 692. Under this prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . [because] not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693; see also id. at 692

47

(observing that "Sixth Amendment guarantee of counsel" exists "to justify reliance on the outcome of the proceeding"). Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.[26] "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen, ___ U.S. at ___, 131 S. Ct. at 1403.

Moreover, because the state superior court adjudicated this claim on the merits, this Court must apply Section 2254(d). See id. at ___, 131 S. Ct. at 1402; Harrington, ___ U.S. at ___, 131 S. Ct. at 786-87. Here, the failure of the state superior court to find prejudice due to the alleged inadequacy of the mitigation defense by Petitioner's trial counsel does not qualify as unreasonable for at least three reasons.

First, the Petition simply asserts that "information about [Petitioner's mother's] alcohol use while she was pregnant with the Petitioner was highly significant" (Docket Entry 1-1 at 41 (emphasis added)) and that "failure to investigate and develop mitigating evidence of [her] alcohol use while she was pregnant with the Petitioner resulted in the exclusion of powerful mitigating evidence" (id. at 44 (emphasis added)). The Supreme

_____

[26] "When a defendant challenges a death sentence . . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

48

Court, however, rejected any such characterization of mitigation evidence premised on fetal alcohol exposure in <u>Schriro v. Landrigan</u>, 550 U.S. 465, 480-81 (2007), a federal habeas case in which a petitioner under a state death sentence asserted that his trial counsel provided ineffective assistance by failing

> <u>to introduce as mitigation evidence that [the petitioner] was exposed to alcohol and drugs in utero, which may have resulted in cognitive and behavioral deficiencies</u> consistent with fetal alcohol syndrome. He was abandoned by his birth mother and suffered abandonment and attachment issues, as well as other behavioral problems throughout his childhood.
>
> His adoptive mother was also an alcoholic, and [his] own alcohol and substance abuse began at an early age. Based on his biological family's history of violence, [the petitioner] claims he may also have been genetically predisposed to violence.

<u>Id.</u> at 480 (internal block quotation formatting, brackets, and quotation marks omitted) (emphasis added).

In denying this claim, the Supreme Court said that the proposed "mitigation evidence was <u>weak</u>" and that any showing "that genetics made [the petitioner] the way he is could not have been very helpful. <u>There was no prejudice</u>." <u>Id.</u> at 481 (emphasis added). Given such declarations by the Supreme Court, this Court cannot conclude that the state superior court made an unreasonable decision when it did not find prejudice from the absence of an ARND-based mitigation defense.[27]

---

[27] In addition, several considerations unique to this case particularly weakened Petitioner's proposed mitigation strategy, including:

Second, as the Supreme Court's foregoing ruling implies, because of the negative implications of an ARND diagnosis, Petitioner cannot show a substantial likelihood that utilization of such a diagnosis by his trial counsel would have caused the jury to "have concluded that the balance of aggravating and mitigating circumstances did not warrant death," Strickland, 466 U.S. at 695. In this regard, Dr. Zinn testified that, due to ARND, Petitioner:

1) "would go for the immediate payoff irrespective of what the consequences were" (MAR Evid. Hrg. Tr. at 584);

2) can neither "realize that there are consequences" nor "want to belong to a larger social structure" (id.); and

3) has neurological damage that causes "real-world choices and behavior [that] are just abominable," in that "circuits that are designed to pull in all of this information and incorporate it in decision-making are not functioning properly" (id. at 584-85).

Accordingly, as another court recognized in an analogous case:

> [P]resentation of expert mental health opinion testimony suggesting [P]etitioner suffers from [ARND or the like] . . . would have amounted to an admission that [he] would pose a substantial risk of future dangerousness due to developmental factors which had not been addressed during

---

1) at the relevant time, ARND did not have well-established diagnostic criteria of proven reliability (see MAR Evid. Hrg. Tr. at 599-600, 602-03, 613, 627-29, 631-32, 701-03); and

2) the expert on whom Petitioner relied had never diagnosed anyone with ARND and admitted that two well-regarded mental health professionals had concluded Petitioner did not have any brain injury, even after testing of the sort that would identify damage purportedly associated with ARND (see id. at 598, 606-08, 636).

> [his] developmental and childhood years. Presentation of
> such evidence would have necessarily furnished the
> prosecution with substantial expert testimony upon which
> to argue that [P]etitioner would forever remain a
> remorseless, unrepentant, predator.

Sells, 2012 WL 2562666, at *60; see also Cullen, ___ U.S. at ___,
131 S. Ct. at 1410 ("The new evidence . . . is also by no means
clearly mitigating, as the jury might have concluded that [the
petitioner] was simply beyond rehabilitation."). These
considerations confirm that the state superior court acted
reasonably by not finding prejudice as to this claim.

Third, as the state superior court found, "evidence presented
during the guilt/innocence and sentencing phases of [Petitioner's]
trial . . . show[ed] that [Petitioner] planned this murder at least
a day in advance, that he set the scenario which allowed him to
shoot and kill the victim, steal the victim's property, escape from
the scene of the shooting, and subsequently sell the stolen
property." (Docket Entry 6-3 at 10.) Such evidence of calculated
action over a sustained period of time, along with evidence showing
that (when he chose to) Petitioner could hold down a job (even
working double shifts), take care of infirm or young relatives, and
help run a household, see Hurst, 360 N.C. at 201, 624 S.E.2d at
324, substantially undercuts the theory that "ARND caused [him] to
function at a pre-adolescent or adolescent level of maturity"
(Docket Entry 1-1 at 34). On direct appeal, the Supreme Court of
North Carolina concluded that "the record demonstrates that

51

[Petitioner's] maturity was consistent with his chronological age [at the time of the offense, i.e., 23]." <u>Hurst</u>, 360 N.C. at 200, 624 S.E.2d at 324. The evidence Petitioner proposes to submit about ARND simply does not establish a reasonable probability the jury would have found otherwise, would have failed to conclude that aggravating factors outweighed mitigating factors, and would have determined that the evidence did not warrant imposition of the death penalty. <u>See generally</u> <u>Strickland</u>, 466 U.S. at 695.

An insufficient basis thus exists to declare unreasonable the state superior court's failure to rule that Petitioner suffered prejudice from his trial counsel's approach to mitigation. This conclusion provides an alternative basis for denial of Claim II.

<u>Claim III</u> – <u>Ambiguity of Jury Verdict</u>

For Claim III, the Petition challenges Petitioner's first degree murder conviction (and, therefore, his death sentence) based on an alleged "ambiguity in the jury's verdict" due to a combination of: 1) the "short form" indictment;[28] 2) insufficient jury instructions regarding unanimity as to the theory of first degree murder; 3) an improper poll to confirm juror unanimity as to

---

[28] The sections of the Petition and Petitioner's summary judgment response brief that address Claim III do not identify clearly the nature of the alleged deficiency of the "short form" indictment. (<u>See</u> <u>id.</u> at 47-60; Docket Entry 24 at 20-26.) Other sections of the Petition and summary judgment response brief contend that the "short form" indictment does not provide adequate notice of whether it charges first or second degree murder or of what aggravating facts support the death penalty. (<u>See</u> Docket Entry 1-1 at 86-88; Docket Entry 24 at 39-40.)

the theory of first degree murder;[29] and 4) an inadequate verdict sheet to ensure juror unanimity as to the theory of first degree murder. (Docket Entry 1-1 at 48-53.) In adjudicating Petitioner's MAR, the state superior court found this claim procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3), because Petitioner could have raised it on direct appeal but did not and because he failed to show cause and prejudice or a miscarriage of justice to excuse such inaction. (Docket Entry 6-1 at 8-11.)[30] Absent cause and prejudice or a miscarriage of justice, a procedural bar arises in federal court if a state court denied relief based on an adequate and independent state procedural rule. See <u>Harris</u>, 489 U.S. at 262. Section 15A-1419(a)(3) qualifies as such a state rule. See <u>Lawrence v. Branker</u>, 517 F.3d 700, 714 (4th Cir. 2008).

Petitioner, however, asserts that "[t]his claim is not procedurally defaulted because it involves non-waiveable <u>structural</u>

---

[29] In setting out Claim III, the Petition also complains that, in taking the poll, the clerk only asked the jury foreperson if the verdict as read (i.e., guilty of first degree murder) was his verdict and not also whether he still assented. (<u>See</u> Docket Entry 1-1 at 48-50, 56.) However, the section of Petitioner's summary judgment brief addressing Claim III appears to make no argument regarding that issue. (<u>See</u> Docket Entry 24 at 20-26.)

[30] Section 15A-1419 provides in pertinent part:

(a) The following are grounds for the denial of a motion for appropriate relief:
. . . .
(3) Upon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so.

53

error that rendered the verdict a nullity." (Docket Entry 24 at 22 (emphasis added).) This contention lacks merit. As an initial matter, Petitioner has cited no authority that "structural errors" constitute another discrete exception to the state court procedural bar doctrine separate from or in addition to the exceptions for either cause and prejudice or a miscarriage of justice. (See id.) Independent research also revealed no such authority, but instead produced overwhelming authority contrary to Petitioner's position. See, e.g., Thornburg v. Mullin, 422 F.3d 1113, 1141 (10th Cir. 2005) ("[E]ven structural errors are subject to state procedural bars."); Ward v. Hinsley, 377 F.3d 719, 725-26 (7th Cir. 2004) (rejecting argument that "right to a structurally sound trial is one that is not subject to waiver and therefore cannot be subject to procedural default"); Hatcher v. Hopkins, 256 F.3d 761, 764 (8th Cir. 2001) ("[The petitioner argues] that federal courts may review structural errors even though they have been procedurally defaulted in the state courts. That is incorrect. The Supreme Court has recently detailed the circumstances necessary to bypass a state-law procedural default in a § 2254 petition, and 'structural error' is not listed among them."); Beazley v. Johnson, 242 F.3d 248, 269-70 (5th Cir. 2001) (rebuffing contention that "claim is not subject to procedural default because it is a *structural error*" (emphasis in original)); see also Ambrose v. Booker, 684 F.3d 638, 650-51 (6th Cir. 2012) ("Given the Supreme Court's express language, and the

54

procedural default rule's roots in comity and federalism, a petitioner must show that he was actually prejudiced regardless of the nature of the underlying constitutional claim.").

Further, even if "structural errors" constituted a category of claims exempt from procedural default, the United States Supreme Court has "found an error to be 'structural' . . . only in a 'very limited class of cases.'" <u>Neder v. United States</u>, 527 U.S. 1, 8 (1999) (quoting <u>Johnson v. United States</u>, 520 U.S. 461, 468 (1997)). Specifically, the cases in which the Supreme Court identified structural errors involved "complete denial of counsel," a "biased trial judge," "racial discrimination in selection of grand jury," "denial of self-representation at trial," "denial of public trial," and a "defective reasonable doubt instruction." <u>Id.</u> "Those cases, [the Supreme Court] ha[s] explained, contain[ed] a defect affecting the <u>framework</u> within which the trial proceed[ed], rather than simply an error in the <u>trial process</u> itself." <u>Id.</u> (internal quotation marks omitted) (emphasis added). "Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . ." <u>Id.</u> at 8-9 (internal quotation marks omitted.).

The matters at issue here – the short form indictment, jury instructions, jury poll, and verdict sheet - simply do not rise to the level of structural errors. First, they bear no similarity to

the above-listed defects the Supreme Court has declared structural. See id. at 8.  Second, these claimed errors relate to the "trial process" not the trial's "framework."  Id.  Third, Petitioner has cited no authority indicating these alleged deficiencies rendered his trial unfit to determine guilt or innocence. (See Docket Entry 24 at 20-26.)  Nor has legal research uncovered any such authority.

In fact, to the contrary, such research shows that:

1) North Carolina's "short form" indictment comports with the Constitution, see, e.g., Stroud v. Polk, 466 F.3d 291, 295-97 (4th Cir. 2006) (citing, inter alia, Allen v. Lee, 366 F.3d 319, 323-24 (4th Cir. 2004) (en banc), and Hartman v. Lee, 283 F.3d 190, 194 & n.3, 198-99 & n.6 (4th Cir. 2002));

2) "an instruction that merely omits the unanimity requirement with respect to an element of the offense cannot be categorized as structural," United States v. Montalvo, 331 F.3d 1052, 1057 (9th Cir. 2003); accord United States v. Brown, 202 F.3d 691, 698-99 (4th Cir. 2000) (ruling that lack of unanimity instruction as to which three predicate crimes formed "series" required for conviction under 21 U.S.C. § 848 did not qualify as structural error); see also Schad v. Arizona, 501 U.S. 624, 630-45, 648-52 (1991) (Souter, J., for plurality of four, and Scalia, J., concurring in the judgment, respectively) (rejecting Sixth, Eighth, and Fourteenth Amendment challenge based on failure to require unanimity as to first degree murder theory); Estelle v. McGuire,

56

502 U.S. 62, 72 (1991) ("Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the [state's] model [instructions]."); <u>Hoover v. Johnson</u>, 193 F.3d 366, 371 (5th Cir. 1999) (declining to hold "that the Supreme Court requires that [a state], in vindicating its [state constitutional] right to a unanimous verdict in felony cases, follow exactly the procedures established by federal courts in vindicating the right to a unanimous verdict in federal criminal cases");

3) the Fourth Circuit has found "no authority which holds that the right to a [jury] poll is of constitutional dimension" and has held that, to the extent non-constitutional authority creates such right, "the trial court has substantial discretion to decide how the jury should be polled," <u>United States v. Carter</u>, 772 F.2d 66, 67 (4th Cir. 1985) (internal brackets and quotation marks omitted);

4) another court has noted the absence of "any Supreme Court decision holding that an ambiguity in the verdict sheet violates due process . . . [and that] Supreme Court precedent suggests the contrary," <u>Floyd v. Ricci</u>, Civil No. 09-5338(CCC), 2011 WL 5825925, at *13 (D.N.J. Nov. 17, 2011) (unpublished) (citing <u>Harris v. Rivera</u>, 454 U.S. 339, 344 (1981), and <u>United States v. Powell</u>, 469 U.S. 57, 64-65 (1984)); <u>see also</u> <u>Schad</u>, 501 U.S. at 630-45, 648-52 (rejecting Sixth, Eighth, and Fourteenth Amendment challenge based on failure to require unanimity as to first degree murder theory);

57

Flores v. Greiner, No. 97CV5671(RR), 2000 WL 1052054, at *10 (E.D.N.Y. June 19, 2000) (unpublished) ("Even an erroneous . . . verdict form will not warrant federal habeas corpus relief unless it so infected the entire trial that the resulting conviction violates due process." (internal quotation marks omitted)).

In light of the foregoing considerations, the Court should conclude that the procedural bar applies to Claim III. Anticipating that possibility, Petitioner's summary judgment response brief states (without elaboration) that, "[a]lternatively, if this Court finds that [Claim III] is procedurally defaulted then ineffectiveness of trial and appellate counsel in failing to preserve [Claim III] at the trial level and on direct appeal constitutes good cause to excuse the default and because the error is structural there is no need to show actual prejudice." (Docket Entry 24 at 23.) This contention also falls short because:

1) "[a]lthough Petitioner asserts that his claims were not raised due to counsel's ineffectiveness, this conclusory assertion falls far short of establishing 'cause' for his procedural default," Quintero-Hernandez v. United States, No. 3:11cv285-GCM, 2011 WL 2447451, at *3 (W.D.N.C. June 15, 2011) (unpublished) (citing Murray v. Carrier, 477 U.S. 478, 486 (1986), for its ruling that "mere fact that counsel failed to recognize . . . a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default"); and

58

2) as explained above, alleging "structural error" does not excuse Petitioner from satisfying the prejudice portion of the "cause and prejudice" exception and the defects cited by Petitioner in Claim III do not qualify as "structural error."[31]

In sum, the Court should deny relief on Claim III based on Petitioner's failure to overcome an applicable procedural bar.

### Claim IV - Improper Jury Polling

Like Claim III, Claim IV of the Petition alleges that "the jury was not properly polled." (Docket Entry 1-1 at 62; see also id. at 60-61 (limiting "relevant facts" to matters "incorporate[d]

---

[31] Petitioner's citation of Owens v. United States, 483 F.3d 48, 64 nn.13 & 14 (1st Cir. 2007), for the proposition that "where structural error exists actual prejudice is presumed and need not be demonstrated" (Docket Entry 24 at 22) ignores the fact that said decision did not purport to adopt such a rule for federal habeas review of state convictions, see id. at 64 n.14 (acknowledging that "comity and federalism concerns might justify the requirement that a petitioner show prejudice arising out of a structural error"). Moreover, as discussed above, the federal appellate courts that have confronted this issue in the context of federal habeas review of state convictions uniformly have reached conclusions contrary to Petitioner's position. As a final matter, Petitioner's summary judgment response brief asserts in conclusory fashion that, "because the verdict is a nullity, if the error had been raised at trial or on appeal, Petitioner would have received a new trial. As such, Petitioner's entire trial was infected with constitutional error and that error worked to Petitioner's actual and substantial disadvantage demonstrating actual prejudice." (Docket Entry 24 at 23.) The authority cited above forecloses any contention that the verdict in this case constitutes a "nullity"; moreover, unsupported assertions of this sort do not establish the requisite prejudice. See, e.g., Covington v. Kenworthy, No. 5:10-HC-2044-FL, 2011 WL 845921, at *6 (E.D.N.C. Mar. 8, 2011) (unpublished) ("Petitioner has not presented any evidence, outside of conclusory allegations, to demonstrate prejudice necessary to overcome procedural default."), appeal dismissed, 430 Fed. Appx. 243 (4th Cir. 2011).

by reference . . . [from] Claim III").)  In addressing Petitioner's MAR, the state superior court ruled this claim procedurally barred by N.C. Gen. Stat. § 15A-1419(a)(3).  (Docket Entry 6-1 at 11-13.) Petitioner's summary judgment response brief asserts that "[t]his claim should not have been procedurally barred by the state [superior] court and is not procedurally defaulted in this Court for the same reasons articulated [in said brief as to] Claim III . . . ."  (Docket Entry 24 at 26 (internal citation omitted).)  For reasons stated in the preceding subsection of this Memorandum Opinion,[32] Petitioner's jury poll claim is procedurally barred.

Petitioner's summary judgment response brief also argues that, "[i]f this Court finds that [Claim IV] is procedurally defaulted then cause and prejudice exist for the same reasons set forth under Claim III."  (Docket Entry 24 at 26 (internal citation omitted).) For reasons stated in the preceding subsection of this Memorandum Opinion, Petitioner's conclusory contentions as to cause and

---

[32] In particular:

1) "structural errors" do not constitute a class of claims exempt from the state court procedural default doctrine, see, e.g., Thornburg, 422 F.3d at 1141; Ward, 377 F.3d at 725-26; Hatcher, 256 F.3d at 764; Beazley, 242 F.3d at 269-70; and

2) even if they did, errant jury polling does not represent a "structural error," see, e.g., Neder, 527 U.S. at 8-9 (describing highly restricted definition of "structural error"); Carter, 772 F.2d at 67 (recognizing that jury polling does not involve constitutional right and that, in carrying out any non-constitutional obligation to conduct jury poll, trial courts have significant discretion as to nature of inquiry).

60

prejudice fall short. Because a procedural bar applies to Claim IV and Petitioner has failed to satisfy any exception excusing his default, the Court should deny relief on Claim IV.

Claim V – Ineffective Assistance of Counsel (Unanimity/Jury Poll)

In Claim V, the Petition:

incorporates by reference . . . the relevant facts set forth in Claims III and IV [to allege ineffective assistance of counsel on the grounds that] . . . [t]rial counsel did not object to the jury instruction, the verdict sheet, or to the jury polling as it related to the jury polling [sic] . . . [and] [a]ppellate [c]ounsel did not raise as an assignment of error or a ground for appeal the jury instruction, the verdict sheet, or the jury polling as it related to the ambiguity in the jury verdict.

(Docket Entry 1-1 at 63.) The state superior court denied this same claim as part of its adjudication of Petitioner's MAR. (Docket Entry 6-1 at 13-15.) As such, Petitioner acknowledges in his summary judgment response brief that "[t]his Court must review [Claim V] under the deferential standard of review of 28 U.S.C. §§ [sic] 2254(d)(1) & (2)." (Docket Entry 24 at 29.)

Petitioner's summary judgment response brief, however, does not provide the Court with any basis to conclude the state superior court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d) (internal paragraph numbering omitted); see also

61

Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (holding that "petitioner carries the burden of proof" as to Section 2254(d)); instead, Petitioner simply has strung together blanket assertions that the state superior court acted contrary to or unreasonably applied Supreme Court precedent and made unreasonable factual determinations, as well as that "Petitioner would have received a new trial" if his trial/appellate counsel had raised these issues. (See Docket Entry 24 at 29-30.) That tactic cannot succeed because "[c]laims of ineffective assistance of counsel are not shown by conclusory, speculative allegations." Jackson v. United States, 638 F. Supp. 2d 514, 581 (W.D.N.C. 2009) (citing, inter alia, Call v. Polk, 454 F. Supp. 2d 475, 499 (W.D.N.C. 2006), aff'd, 254 Fed. Appx. 257 (4th Cir. 2007), for proposition that, "'[e]ven in a death penalty case, bald assertions and conclusory allegations' are insufficient to show ineffective assistance"); accord, e.g., Locklear v. Beck, No. 1:07CV682, 2008 WL 4426167, at *2 (M.D.N.C. Sept. 24, 2008) (unpublished) (holding that "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient"), appeal dismissed sub nom., Locklear v. North Carolina, 393 Fed. Appx. 122 (4th Cir. 2010).[33]

The Court ought not to have to go any further, e.g., to look behind Petitioner's summary judgment response brief to the Petition

---

[33] In particular, "conclusory allegations are insufficient to establish the requisite prejudice under Strickland." United States v. Terry, 366 F.3d 312, 316 (4th Cir. 2004).

itself to see if he has any non-conclusory basis to challenge the state superior court's ruling that his instant claim fails under "either the performance or the prejudice components in Strickland" (Docket Entry 6-1 at 15), particularly given that Petitioner had two attorneys to draft said brief.  See, e.g., Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of [the] materials [cited in a summary judgment response], but is not required to do so.  If the rule were otherwise, the workload of the district courts would be insurmountable . . . ." (internal citation omitted)), cited with approval in Brown v. Flowers, 196 Fed. Appx. 178, 182 (4th Cir. 2006); Small v. Endicott, 998 F.2d 411, 417-18 (7th Cir. 1993) (ruling that, although pro se petitioner receives liberal construction, "judges are not also required to construct [his] legal arguments for him"), cited with approval in Strickland v. Lee, 471 F. Supp. 2d 557, 577 n.12 (W.D.N.C. 2007), aff'd sub nom., Strickland v. Branker, 284 Fed. Appx. 57 (4th Cir. 2008).

Nonetheless, if the Court chose to go further, it would find no ground to grant relief under Section 2254(d).  Specifically, as to Claim V, the Petition simply declares in blanket fashion that:

1) "[t]rial [c]ounsel's failure to raise issues [in Claims III and IV] that amounted to structural error, and if raised, would have mandated a new trial, rendered trial counsel's performance deficient" (Docket Entry 1-1 at 64 (emphasis added));

63

2) "[u]nder a *Strickland* analysis prejudice is presumed when deficient performance is based upon <u>structural error</u>, such as here" (<u>id.</u> at 65 (emphasis added));

3) "[n]otwithstanding presumed prejudice, there is a reasonable probability that the result would have been different because the error undermines confidence in the verdict" (<u>id.</u>); and

4) "appellate counsel should have raised the issues set forth in Claims III and IV . . . because they were obvious from a reading of the record . . . [and] amounted to <u>structural error</u> that would have mandated a new trial" (<u>id.</u> at 66 (emphasis added)).

To the extent these contentions consist of anything but mere conclusions, they depend entirely on the notion that the alleged errors regarding the jury instructions, jury polling, and verdict sheet are "structural." As discussed in the prior subsections of this Memorandum Opinion addressing Claims III and IV, such matters do not constitute "structural errors." <u>See</u> <u>Neder</u>, 527 U.S. at 8-9 (defining "structural error" narrowly); <u>Montalvo</u>, 331 F.3d at 1057 (holding that "instruction that merely omits the unanimity requirement with respect to an element of the offense cannot be categorized as structural"); <u>Brown</u>, 202 F.3d at 698-99 (ruling that lack of unanimity instruction as to which three predicate crimes formed "series" required for conviction under 21 U.S.C. § 848 did not qualify as structural error); <u>Carter</u>, 772 F.2d at 67 (recognizing that jury polling does not involve constitutional

64

right and that, in carrying out any non-constitutional duty to poll jury, trial courts have broad discretion as to nature of inquiry); <u>Floyd</u>, 2011 WL 5825925, at *13 (noting absence of "any Supreme Court decision holding that an ambiguity in the verdict sheet violates due process"); <u>Flores</u>, 2000 WL 1052054, at *10 ("Even an erroneous . . . verdict form will not warrant federal habeas corpus relief unless it so infected the entire trial that the resulting conviction violates due process." (internal quotation marks omitted)); <u>see also</u> <u>Schad</u>, 501 U.S. at 630-45, 648-52 (rejecting constitutional challenge based on failure to require unanimity as to first degree murder theory); <u>Estelle</u>, 502 U.S. at 72 ("Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the [state's] model [instructions]."); <u>Hoover</u>, 193 F.3d at 371 (declining to hold "that the Supreme Court requires that [a state], in vindicating its [state constitutional] right to a unanimous verdict in felony cases, follow exactly the procedures established by federal courts in vindicating the right to a unanimous verdict in federal criminal cases").

Under these circumstances, the Court should deny relief on Claim V pursuant to Section 2254(d).

Claim VI - <u>Jurisdiction</u>

Claim VI states that Petitioner came to trial "on Monday, March 1, 2004, for the March 1, 2004 session of Randolph County

65

Superior Court.  The session ended on Friday, March 5, 2004 at 5:00 p.m.  The Presiding Judge did not sign and enter an order extending the March 1, 2004 session of court prior to its expiration." (Docket Entry 1-1 at 68.)  According to the Petition, "[t]he jurisdiction of the [state superior] court is limited by statute in North Carolina."  (Id. at 69.)  It quotes N.C. Gen. Stat. § 15-167[34] and State v. Boone, 310 N.C. 284, 287, 289, 311 S.E.2d 552, 555, 556 (1984), to show the state superior court lacked jurisdiction to enter judgment.  (Docket Entry 1-1 at 69-70.)

"Petitioner raised [Claim VI] in his MAR."  (Docket Entry 24 at 31.)  In ruling that Petitioner had not shown sufficient grounds to overcome the procedural bar that arose under N.C. Gen. Stat. § 15A-1419(a)(3) (because Petitioner failed to raise this issue on direct appeal), the state superior court found that:

> The trial transcript indicates that jury selection was in process at the end of Friday, 5 March 2004. . . .  The [state superior] court directed potential jurors and the parties to return to court on Monday, 8 March 2004 at 9:30 a.m.  On [that] Monday, at 9:41 a.m., [the state

---

[34]   N.C. Gen. Stat. § 15-167 provides in pertinent part:

Whenever a trial for a felony is in progress on the last Friday of any session of court and it appears to the trial judge that it is unlikely that such trial can be completed before 5:00 P.M. on such Friday, the trial judge may extend the session as long as in his opinion it shall be necessary for the purposes of the case . . . .  Whenever a trial judge continues a session pursuant to this section, he shall cause an order to such effect to be entered in the minutes, which order may be entered at such time as the judge directs, either before or after he has extended the session.

66

superior] court reconvened and [it] notified the parties that at 9:38 a.m. it had filed an order extending the session.

. . . .

Although the order extending the session in the case <u>sub judice</u> was not entered until the Monday following the end of the session on the previous Friday, compliance with [N.C. Gen. Stat. § 15-167] was achieved by the statements made by the trial court on the record on th[at] Friday.

(Docket Entry 6-1 at 16 (internal brackets and citations omitted) (citing Trial Tr. at 1057-60, 1063 and <u>State v. Locklear</u>, 174 N.C. App. 547, 549, 621 S.E.2d 254, 256 (2005)).)

In his summary judgment response brief, Petitioner makes clear that Claim VI relies exclusively on state law to argue that "[t]he state [superior] court lacked jurisdiction to enter judgment finding [him] guilty of first degree murder and sentencing him to death when the March 1, 2004 session of court ended on March 5, 2004, without an order extending the session of court being entered into the record." (Docket Entry 24 at 31-32 (citing <u>Boone</u>, 310 N.C. at 289, 311 S.E.2d at 556).) Claim VI therefore cannot succeed in this Court because "federal habeas relief simply does not lie for errors of state law." <u>Thomas v. Taylor</u>, 170 F.3d 466, 470 (4th Cir. 1999); <u>see also</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law.").

Indeed, in a federal habeas case in which a state prisoner asserted an "entitle[ment] to a new trial because the state court

lacked jurisdiction," the Fourth Circuit expressly held that such a "claim, when pared down to its core, rests solely upon an interpretation of [state] case law and statutes, [and thus] is simply not cognizable on federal habeas review." Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998); accord, e.g., Poe v. Caspari, 39 F.3d 204, 207 (8th Cir. 1994) ("The question of whether the Missouri courts had jurisdiction to sentence [the petitioner] was one solely of state law and is therefore not properly before this court."); United States ex rel. Roche v. Scully, 739 F.2d 739, 741 (2d Cir. 1984) ("[The petitioner's] first claim – that the Supreme Court, Bronx County, lacked jurisdiction . . . must be rejected because it fails to raise an issue of federal law, which is an essential prerequisite to habeas relief."); Willis v. Egeler, 532 F.2d 1058, 1059 (6th Cir. 1976) ("Determination of whether a state court is vested with jurisdiction under state law is a function of the state courts, not the federal judiciary."); Fields v. Vaughn, No. 3:08cv844, 2009 WL 2959754, at *5 n.8 (E.D. Va. Sept. 15, 2009) (unpublished) ("A claim that a state court lacks jurisdiction under state law presents no federal constitutional issue for habeas review."), appeal dismissed, 372 Fed. Appx. 367 (4th Cir. 2010); Simmons v. Bazzle, No. 0:08-CV-1028-PMD-PJG, 2009 WL 823302, at *5 (D.S.C. Mar. 26, 2009) (unpublished) ("With regard to Petitioner's assertion that the [state] court lacked subject matter jurisdiction over his case when it tried his case outside

68

its statutorily determined term of court pursuant to [state law],
federal habeas relief is not an available remedy for such an
assertion."), appeal dismissed, 332 Fed. Appx. 149 (4th Cir. 2009);
Perkins v. Harvey, No. 1:07CV955, 2008 WL 2570877, at *4 (M.D.N.C.
June 23, 2008) (unpublished) (stating that state prisoner's
contention that state court "was without jurisdiction to try her
. . . fails to state a constitutional claim").

The Court thus should deny Claim VI as non-cognizable under
Section 2254.

### Claim VII - Ineffective Assistance (Jurisdiction)

For Claim VII, the Petition contends that Petitioner's trial
and appellate counsel provided constitutionally ineffective
assistance by failing to raise the state-law jurisdictional issue
presented in Claim VI. (See Docket Entry 1-1 at 71-75.) As
Petitioner acknowledged in his summary judgment response brief, he
"raised this claim in his MAR, where it was resolved against [him]
on the merits. This Court must, therefore, review this claim under
the deferential standard of review of 28 U.S.C. § 2254(d)(1) &
(2)." (Docket Entry 24 at 33; see also Docket Entry 6-1 at 18
(documenting ruling by state superior court that ineffective
assistance claim predicated on failure of Petitioner's trial and
appellate counsel to argue that state superior court lacked
jurisdiction "fails to support either the performance or the
prejudice components in Strickland").)

69

In his summary judgment response brief, just as with regard to Claim V (discussed above in a prior subsection), Petitioner has not set forth any rationale to show that the state superior court's decision as to Claim VII "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d) (internal paragraph numbering omitted); see also Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (holding that "petitioner carries the burden of proof" as to Section 2254(d)); rather, Petitioner again merely has offered blanket assertions that the state superior court acted contrary to or unreasonably applied Supreme Court precedent and made unreasonable factual findings, as well as that "Petitioner would have received a new trial" if his trial or appellate counsel had raised this issue. (See Docket Entry 24 at 33.) Such an approach falls short because "[c]laims of ineffective assistance of counsel are not shown by conclusory, speculative allegations." Jackson, 638 F. Supp. 2d at 581 (citing, inter alia, Call, 454 F. Supp. 2d at 499, for proposition that, "'[e]ven in a death penalty case, bald assertions and conclusory allegations' are insufficient to show ineffective assistance"); accord, e.g., Terry, 366 F.3d at 316 ("[C]onclusory allegations are insufficient to establish the

requisite prejudice under <u>Strickland</u>."); <u>Locklear</u>, 2008 WL 4426167, at *2 (holding that "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient").

The Court also should deny Claim VII if it opts to overlook Petitioner's (and his two post-conviction attorneys') failure to develop any non-conclusory basis for relief under Section 2254(d) in his summary judgment response brief, <u>see, e.g</u>, <u>Adler</u>, 144 F.3d at 672 ("The district court has discretion to go beyond the referenced portions of [the] materials [cited in a summary judgment response brief], but is not required to do so.  If the rule were otherwise, the workload of the district courts would be insurmountable . . . ." (internal citation omitted)); <u>Small</u>, 998 F.2d at 417-18 (ruling that, even for pro se prisoner entitled to liberal construction, "judges are not also required to construct [his] legal arguments for him").  Specifically, Claim VII fails because, in ruling that Petitioner could not establish prejudice from the alleged ineffective assistance of his trial and appellate counsel regarding state-law jurisdiction (<u>see</u> Docket Entry 6-1 at 18), the state superior court necessarily determined that the underlying state-law jurisdictional argument lacked merit.  In other words, as part of its adjudication of the instant ineffectiveness claim, the state superior court held that, at the end of Petitioner's trial, it <u>did</u> have jurisdiction under state law to enter judgment.  That determination forecloses relief in this

71

Court on Claim VII because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67-68. In particular, the United States Supreme Court "ha[s] repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

Accordingly, as to the issue of the state superior court's jurisdiction to enter judgment at the end of Petitioner's trial, "any act or omission by trial [or appellate] counsel [was] irrelevant as any objection [or appeal] . . . counsel would have raised would have failed as a matter of law." Davis v. Painter, No. Civ. A. 2:00-0278, 2000 WL 34333294, at *5 (S.D.W. Va. Dec. 8, 2000) (unpublished) (rejecting claim that state prisoner "received ineffective assistance of counsel by his counsel's failure to object to the jurisdiction of the [state trial] court . . . inasmuch as the state habeas court ruled against [the state prisoner] on the lack of jurisdiction issue . . . [and a] state court's finding of jurisdiction is a matter of state law that binds this [federal] court . . . [such that the state prisoner] could not have been prejudiced [by any failure of his counsel to raise the jurisdictional issue because] the state [habeas] court concluded that the [state] trial court had jurisdiction"), appeal dismissed, 21 Fed. Appx. 206 (4th Cir. 2001); see also Sharpe v. Bell, 593 F.3d 372, 382-83 (4th Cir. 2010) ("[The petitioner's]

72

ineffectiveness claim centers on the proposed testimony of [a witness who] was prepared to tell the jury that her boyfriend . . . confessed to the murder [for which the petitioner was convicted] . . . . [The petitioner] argues that his attorney's failure to argue for the admission of [such] testimony at trial . . . under North Carolina evidentiary law . . . denied him the right to effective assistance of counsel. . . . [T]he [state] MAR court found that [the petitioner] failed both prongs of <u>Strickland</u> because [the] testimony would not have been admissible . . . . The [state MAR] court reasoned that since the testimony would not have been admissible, [the petitioner's] counsel was not ineffective in failing to argue for its introduction. . . . The [federal habeas] court cast aside this conclusion, arguing that there was no [state] authority for the proposition that [the evidence was inadmissible]. It is beyond the mandate of federal habeas courts, however, to correct the interpretation by state courts of a state's own laws."); <u>Callahan v. Campbell</u>, 427 F.3d 897, 932 (11th Cir. 2005) ("[The petitioner's] argument that the state court unreasonably applied <u>Strickland</u> obviously depends upon our determining [his counsel's] performance was deficient, but first we would have to conclude the state court misinterpreted state law . . . . It is a fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters. . . . [A state court] has already answered the

question of what would have happened had [the petitioner's counsel] objected . . . - the objection would have been overruled. Therefore, [the petitioner's counsel] was not ineffective for failing to make that objection [and the petitioner] . . . cannot be prejudiced by his counsel's failure to make a losing objection." (internal citations and quotation marks omitted)).[35]

---

[35] Moreover, by ruling (in disposing of Petitioner's MAR) that "compliance with [N.C. Gen. Stat. § 15-167] was achieved by the statements made by the [state superior] court on the record on the Friday [the trial session would have expired]" (Docket Entry 6-1 at 16), the state superior court correctly construed both:

1) the record (see, e.g., Trial Tr. at 1057 (documenting that, at approximately 5:00 p.m. on March 5, 2004, the state superior court stated: "[L]et me tell you where we are. We have been able to select one alternate juror. So that means that we still have two to go. And that you will be coming back on Monday morning at 9:30, where we must resume this process . . . . So I hope that everyone has a pleasant weekend, and we'll see you back here at 9:30 on Monday morning. At this point you may go . . ., but please be back here on Monday morning." (emphasis added)); and

2) North Carolina law, see, e.g., Locklear, 174 N.C. App. at 549-51, 621 S.E.2d at 256-57 ("Defendant's first assignment is that the trial court entered its judgment out of term . . . [by] fail[ing] to enter an order extending court . . . . As a result, defendant argues, the judgment is null and void and must be vacated. We disagree. . . . The record does not contain a written order specifically referencing N.C. Gen. Stat. § 15-167 and stating that the session was extended thereunder. However, there are sufficient statements made by the trial court in the record to comply with N.C. Gen. Stat. § 15-167 and to effectively extend the court session.") (quoting from trial transcript in relevant part as follows: "'It is Friday afternoon . . . and . . . you will need to come back on Monday . . . . I'm going to let you go for the day but you will need to be back here on Monday. . . . [Y]ou do need to be here Monday. . . . [T]he starting time on Monday is 10:00 . . . . When you come back on Monday, I ask that you come back to the same room . . . . It will give you an opportunity over the weekend . . . to make sure there's no error, omission or anything else that we need to clarify Monday morning . . . . Monday morning

74

For all these reasons, Petitioner has failed to show an entitlement to relief on Claim VII under Section 2254(d).

<u>Claim VIII</u> - <u>Inadequate Advice on Right to Testify</u>

The Petition's Claim VIII states that, because "[Petitioner's] attorneys did not engage in any detailed discussions explaining to [him] the strategic implications of testifying or not testifying . . ., [he] was denied his . . . rights guaranteed by the Fifth, Sixth and Fourteenth Amendments . . . ." (Docket Entry 1-1 at 77.) "Petitioner raised this claim in his post-conviction MAR and AMAR." (<u>Id.</u> at 75.)  In his summary judgment response brief, Petitioner acknowledged that the state superior court denied this claim and that "[t]his Court must, therefore, review the claim under the deferential standard of 28 U.S.C. § 2254(d)(1) & (2)." (Docket Entry 24 at 34.) Petitioner and his two post-conviction attorneys, however, made no effort in said brief to satisfy Section 2254(d), but instead stated:  "Petitioner relies, herein, upon the prior proceedings and prior filings in state court and the Petition . . . in support of this Claim.  The state [superior] court's decision is contrary to or an unreasonable application of clearly established Supreme Court law." (<u>Id.</u>)

In assessing this issue (on which Petitioner bears the burden of proof, <u>see</u> <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398), the

_____

we will basically conclude the charge conference . . . . <u>I'll see you Monday</u>.'" (emphasis added)).

Court has no obligation to do the work Petitioner and his counsel declined to do in his summary judgment response brief. See, e.q, Adler, 144 F.3d at 672 ("The district court has discretion to go beyond the referenced portions of [the] materials [cited in a summary judgment response brief], but is not required to do so. If the rule were otherwise, the workload of the district courts would be insurmountable . . . ." (internal citation omitted)); Small, 998 F.2d at 417-18 (ruling that, even for pro se prisoner entitled to liberal construction, "judges are not also required to construct [his] legal arguments for him"). Nor does the Petition set forth argument sufficient to sustain Petitioner's bald assertion that the state superior court's refusal to grant relief on this claim was contrary to or unreasonably applied Supreme Court precedent.

Notably, the Petition acknowledges that "Petitioner was advised of his right to testify by his trial attorneys. In addition, [he] was advised not to testify . . . [and] made his decision not to testify based upon his attorney's advice." (Docket Entry 1-1 at 76.) The Petition, however, argues that, because "[Petitioner's] attorneys did not engage in any detailed discussions explaining to [him] the strategic implications of testifying or not testifying . . ., [his] decision to waive his right to testify was not his own knowing and voluntary choice. Rather, it was the choice of [his] attorneys." (Id. at 77.) To support that argument, the Petition cites two cases:

76

1) <u>Rock v. Arkansas</u>, 483 U.S. 44, 51 n.8, 52 (1987), for the propositions that, under the Fifth and Sixth Amendments, "a criminal defendant has a right to testify" and "the right to testify is the defendant's decision" (Docket Entry 1-1 at 76); and

2) <u>United States v. Teague</u>, 953 F.2d 1525, 1533 (11th Cir. 1992), for the principle that "'[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for [him] to decide . . . [as well as the principle that such] advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a known right or privilege"'" (Docket Entry 1-1 at 76-77 (quoting <u>Teague</u> quoting in part <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938))).

The record reflects that, prior to closing arguments at the guilt phase, the following exchange occurred between the state superior court and Petitioner's trial counsel:

> THE COURT:  . . . Mr. Megerian, Mr. Wells, do you wish or do you feel it's necessary to have your client questioned on the record about his decision not to testify?
>
> MR. MEGERIAN:  I think his decision's pretty clear.  I would say on the record, we've advised him not to do so, and he's indicated to us that he wants to go along with our decision.  If Your Honor wants to ask him on the record, that's fine.  I know what his answer's going to be.
>
> THE COURT:  No.  For my purposes I think that's sufficient just that you've stated that on the record.

(Trial Tr. at 1852.)

77

In addition, during the MAR proceedings, Petitioner submitted an affidavit, in which he stated in relevant part:

> 3. During the trial, I was advised by my attorneys that I had the right to testify at both the guilt phase and the sentencing phase of the trial.
>
> 4. However, my attorneys told me that they did not believe it was a good idea for me to testify.
>
> 5. We did not have any detailed conversations about whether or not I should testify, nor did we discuss the advantages or disadvantages of testifying. They just told me they didn't think it was a good idea.
>
> 6. I decided not to testify because they told me they didn't think I should.

(Docket Entry 5-1 at 9.)

The state superior court considered the foregoing evidence, including Petitioner's affidavit, which the state superior court noted did "not enlighten [it] as to whether [Petitioner] in fact wanted to testify, or what the content of his testimony would be." (Docket Entry 6-1 at 19-20.) Moreover, the state superior court concluded that Petitioner had to "satisfy the two-prong Strickland test for ineffective assistance of trial counsel" and that his "affidavit [wa]s insufficient to support either the performance prong or the prejudice prong of the Strickland test for ineffective assistance of counsel." (Id.)

As an initial matter, this Court must measure the state superior court's foregoing ruling against "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (emphasis added). Teague thus

cannot provide a basis for granting relief under Section 2254(d)

separate from <u>Rock</u>. Further, the state superior court's denial of

the instant claim does not conflict with or unreasonably apply

<u>Rock</u>'s holding that the Constitution affords defendants a right to

testify at trial, as this explanation by the Fourth Circuit shows:

> Having found the existence of a constitutional right to testify on one's behalf in <u>Rock</u>, the [Supreme] Court has since never resolved the question of whether the right to testify is "personal" and, therefore, can only be waived by the defendant. However, every circuit that has addressed the issue [including the Fourth Circuit in <u>United States v. McMeans</u>, 927 F.2d 162, 163 (4th Cir. 1991), and the Eleventh Circuit in <u>Teague</u>] has held that the right to testify is personal and must be waived by the defendant.
>
> The next question that arises is who should bear the burden of ensuring that the defendant is informed of the nature and existence of the right to testify and that any decision to waive this right be knowingly and intelligently made. Some courts, including [the Fourth Circuit in <u>McMeans</u> and the Eleventh Circuit in <u>Teague</u>], . . . have concluded that the trial court does not have a *sua sponte* duty to conduct a colloquy with the defendant at trial to determine whether the defendant has knowingly and intelligently waived the right to testify. . . . [T]hese courts have focused on avoiding interference with the attorney-client relationship and defense strategy; thus, trial counsel, not the court, has the primary responsibility for advising the defendant of his right to testify and for explaining the tactical implications of doing so or not. . . .
>
> Because the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel, the burden shouldered by trial counsel is a component of effective assistance of counsel.

<u>Sexton v. French</u>, 163 F.3d 874, 881-82 (4th Cir. 1998) (internal

citations and footnote omitted).

In other words, post-conviction claims that counsel did not adequately "inform [a defendant] of his right to testify . . . must satisfy the two-prong test established in Strickland." Id. at 882 (internal citation omitted); accord Teague, 953 F.2d at 1534 ("[T]he appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel . . . ."). "To satisfy the second prong of Strickland, a defendant must demonstrate that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Sexton, 163 F.3d at 882 (quoting Strickland, 466 U.S. at 694). The state superior court held that, given the absence of any evidence showing Petitioner would have testified had he received what he deems competent advice, as well as what his testimony would have reflected, Petitioner failed to prove such prejudice. Petitioner has offered no basis for this Court to rule that decision defective under Section 2254(d) and the Court thus should deny Claim VIII.[36]

## Claim IX - Newspaper in Jury Room

In Claim IX, the Petition alleges that the state superior court's refusal to order a mistrial (and/or failure to make what Petitioner deems adequate inquiry) in response to revelations during jury selection that a potential alternate juror brought a

---

[36] "[T]here is no reason . . . to address both components of the [performance and prejudice] inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

newspaper with an article about Petitioner's case into the jury room "denied the Petitioner the right to confront evidence against him; the right to a fair and impartial jury; and the right to due process of law in violation of the Sixth and Fourteenth Amendments . . . ." (Docket Entry 1-1 at 82.) Petitioner raised this issue on direct appeal. (See State's Ex. D at 139-40 (including within Petitioner's assignments of error alleged federal constitutional violations due to "failure to conduct an adequate inquiry" and "denial of [his] motions for mistrial" related to presence of newspaper in jury room); State's Ex. E at 60-62 (identifying Sixth and Fourteenth Amendments, as well as Parker v. Gladden, 385 U.S. 363, 364 (1966), and Turner v. Louisiana, 379 U.S. 466, 471-72 (1965), as bases for argument in Petitioner's direct appeal brief that newspaper's presence in jury room warranted new trial).)[37] Without making specific reference to federal constitutional provisions or decisions, the Supreme Court of North Carolina upheld the state superior court's handling of this matter. See Hurst, 360 N.C. at 186-92, 624 S.E.2d at 315-18.

That decision summarized the underlying facts as follows:

> Jury selection commenced on Tuesday, 2 March 2004, and by mid-morning Friday, 5 March 2004, twelve jurors had been seated. . . . Selection of the alternates began after the morning recess that same Friday and continued into

---

[37] State's Exhibits D and E (the "Record on Appeal to the North Carolina Supreme Court" and Petitioner's "brief on direct appeal to the North Carolina Supreme Court," respectively) appear in the record only in paper form. (Docket Entry 19 at 1 (¶¶ 4, 5).)

the afternoon. After one alternate was chosen, prospective alternate juror Paul Biedrzycki was called. During voir dire, Biedrzycki stated that he had read a newspaper article concerning the case in the jury room "about half an hour ago." Biedrzycki was excused for cause, then questioned in greater detail as to the newspaper in the jury room. He explained that someone in the jury room had been reading a local newspaper article about the trial and he had asked if he could read it. [According to Biedrzycki, the] headline of the article was to the effect that defendant admitted guilt. Biedrzycki added that the newspaper had not been present in the room on either of the preceding days but was there when he returned to the jury room that afternoon.

[Petitioner's trial] counsel moved for a mistrial based on the article's contents and the jury's disobedience of the [state superior] court's prior instructions not to read any extraneous material. After hearing arguments from [Petitioner] and the State, the [state superior] court observed that the twelve jurors already chosen had left the courthouse by the time the article appeared in the jury room, and denied the motion. Shortly thereafter, the [state superior] court brought the remaining prospective alternate jurors into the courtroom, explicitly instructed them not to read any press accounts about the case nor bring any newspapers to court, then excused them for the weekend recess. The [state superior] court also made arrangements to ensure that the prospective alternates who were scheduled to arrive the following Monday would not mix with the jurors who had already been chosen. The bailiff then retrieved the newspaper from the jury room and the court admitted into evidence as a pretrial exhibit the 5 March 2004 Randolph County edition of the News & Record that contained an article headlined "High Point man admits to killing."

The following Monday, sixteen prospective alternate jurors were individually questioned. Several reported that they had seen or read the article or heard it discussed in the jury room on the preceding Friday. One of the twelve admitted bringing newspapers into the jury room every day but added that the Friday paper was the only one that any other juror had borrowed and read. Of the two alternate jurors that were selected from this pool of twelve, one had read the Friday article but had heard no discussion about it and said he could disregard

82

what he had read. The other said that he had seen but
not read the newspaper and had not observed anyone else
reading it.
. . . .

When the [state superior] court initially denied
[Petitioner's] motion for a mistrial on Friday, 5 March
2004, it stated:

> Well, I'm going to note that by the time
> according to this juror, <u>by the time the
> newspaper appeared in the jury pool room there
> were none of the twelve jurors present, they had
> all been sent home</u>. So at least as to the twelve
> jurors it does not taint them. We will probably
> have to ask the remaining ones about the
> newspaper, and I am going to instruct them.
> . . . .
>
> . . . Because we only have seated one alternate,
> the others were not present at the time this
> alleged newspaper got loose in the jury room. I
> do not believe at this point that [Petitioner]
> has shown substantial and irreparable harm under
> the statute, and so in my discretion I am
> denying the motion for a mistrial.

The following Monday, [Petitioner] twice renewed his
mistrial motion during the examination of prospective
alternate jurors. The [state superior] court again
denied it on similar grounds:

> The motion, in my discretion, is denied on the
> same grounds as I stated on Friday. <u>We have
> twelve jurors that were seated who were not
> present in the jury room at the time these
> discussions took place</u>, so they have presumably
> not been tainted. We have one alternate seated
> that was not tainted. And I'm going to continue
> to go through these alternate jurors, and I will
> allow you to ask questions, but at this point,
> while there certainly appears to have been some
> potential juror misconduct, it has not affected
> the twelve jurors that were seated to be the
> actual tryers [sic] of the facts in this case.

<u>Id.</u> at 186-88, 624 S.E.2d at 315-17 (emphasis added).

In light of the foregoing findings (supplemented by some additional facts regarding the voir dire of the two last-selected regular jurors highlighted in the quotation below), the Supreme Court of North Carolina drew the following conclusions:

[Petitioner] argu[es] that the [state superior] court erred in denying his motion for a mistrial. Upon motion by a defendant, "the judge must declare a mistrial if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C. [Gen. Stat.] § 15A-1061 (2005). "The decision to grant or deny a mistrial rests within the sound discretion of the trial court" and will be reversed on appeal only upon "a clear showing that the trial court abused its discretion." State v. Bonney, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991). Thus, a mistrial should not be allowed unless "'there are <u>improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict</u>.'" <u>Id.</u>
. . . .

Although [Petitioner] argues that insufficient evidence existed to support the [state superior] court's findings, our review of the record reveals no abuse of discretion. At the close of court on Thursday, 4 March 2004, ten jurors had been selected. The final two jurors were seated the morning of Friday, 5 March 2004, then excused until the following Monday. The [state superior] court reconvened on the afternoon of that same Friday to select three alternate jurors. After alternate juror Anna Frye was chosen, prospective alternate juror Biedrzycki mentioned the newspaper in the jury room, advising the [state superior] court that "[i]t was only there the last half hour or hour" and that "[t]here was nothing in there yesterday or the day before." This testimony provided initial support for the [state superior] court's finding that none of the twelve jurors selected for the sitting panel were in the jury room by the time the article appeared there and that [Petitioner] had not shown the substantial and irreparable harm required by N.C. Gen. Stat.] § 15A-1061 for declaration of a mistrial.

84

As to the prospective alternates who were examined on Monday, 8 March 2004, [Petitioner] focuses on the testimony of Donald Reese, who eventually was excused for cause unrelated to the newspaper. On voir dire, Reese stated that he had read the article in the Friday newspaper and that he was responsible for the newspaper's appearance in the jury room. He also reported that he had brought a newspaper to court every day during jury selection and had overheard conversations about the case. However, Reese added that, except for the first day of jury selection when one juror borrowed the first page but then was "called in the courtroom right away," no one asked to borrow his newspaper until Friday, the day he heard the jurors' discussions. In addition, while other prospective alternate jurors questioned on Monday expressed some knowledge of the article or had overheard discussions in the jury room from the preceding Friday, <u>none stated definitively that the newspaper was present in the room before Friday afternoon.</u>

<u>This evidence is consistent with the voir dire testimony of James Phillips and Sheila Thompson, the final two regular jurors selected on Friday morning. Both were asked whether they had read, heard, or watched any news reports or heard discussions about the case. Phillips answered the question in the negative and made no mention of the article. Thompson similarly made no comment about any newspaper article in the jury room, stating that her only familiarity with the case came through overhearing general discussions "long ago" when the crime actually happened.</u> Thus, our review of the record demonstrates that the [state superior] court's findings that the original jury was not tainted and its subsequent denial of [Petitioner's] motion for mistrial was not "'"so arbitrary that it could not have been the result of a reasoned decision."'" <u>State v. Diehl</u>, 353 N.C. 433, 437, 545 S.E.2d 185, 188 (2001) [(quoting <u>State v. Hyde</u>, 352 N.C. 37, 46, 530 S.E.2d 281, 288 (2000) (quoting <u>State v. Barts</u>, 316 N.C. 666, 682, 343 S.E.2d 828, 839 (1986)))].

[Petitioner] next argues that the [state superior] court's inquiry concerning the newspaper article was inadequate and that as a result [it] had insufficient information from which to determine whether [Petitioner] had been prejudiced. Th[e] [Supreme] Court [of North Carolina] has held that "'when there is a substantial reason to fear that the jury has become aware of <u>improper and prejudicial matters</u>, the trial court must question

85

the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial.'" _State v. Campbell_, 340 N.C. 612, 634, 460 S.E.2d 144, 156 (1995) (quoting [_Barts_, 316 N.C. at 683, 343 S.E.2d at 839]).

Here, once the issue of the article came to the [state superior] court's attention, it determined who had been exposed to the article. After concluding that only prospective alternate jurors might have been affected, the [state superior] court and counsel questioned each subsequent prospective alternate juror individually about exposure and possible prejudice. [Petitioner] points out that even if the article had been in the jury room only on Friday, the last two panelists seated as regular jurors that day were not asked specifically if they had seen the article. However, as detailed above, the [state superior] court made findings at the outset of its inquiry that none of the regular jurors had seen the article. The record fully supports this finding. In addition, both of these jurors were asked on voir dire if they had seen or read any news reports about the case, and both answered in the negative. This questioning was sufficient to support the [state superior] court's findings that the regular jury was not exposed to the article and was fully adequate under our law. See Bonney, 329 N.C. at 83, 405 S.E.2d at 158.

Moreover, none of the alternate jurors participated in the deliberations at [Petitioner's] trial. Thus, even if alternate jurors were exposed to the article, any resulting taint was immaterial and caused [Petitioner] no prejudice. _See State v. Blakeney_, 352 N.C. 287, 301-02, 531 S.E.2d 799, 811 (2000), cert. denied, 531 U.S. 1117 (2001). Accordingly, [Petitioner's] argument that he suffered "substantial and irreparable prejudice" fails. This assignment of error is overruled.

_Id._ at 187-91, 624 S.E.2d at 316-18 (emphasis added) (internal

brackets, ellipses, and some parentheticals and parallel citations

omitted).

Petitioner's summary judgment response brief contends that the

Supreme Court of North Carolina only "addressed [these] issues as

a matter of state law . . . . As such, no adjudication on the

86

merits of the federal claims exist, and [Claim IX] should be reviewed de novo." (Docket Entry 24 at 35.)[38] This contention lacks merit given the United States Supreme Court's recent ruling that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, ___ U.S. at ___, 131 S. Ct. at 784-85; see also Brown v. Bobby, 656 F.3d 325, 329 (6th Cir. 2011) ("[T]he mere fact that [a state court] did not specifically explain that it was ruling on [a prisoner's] Sixth Amendment claim does not prevent [a federal] court from deferring to that [state] court's opinion on habeas review."); Childers v. Floyd, 642 F.3d 953, 968 (11th Cir. 2011) (en banc) ("[T]he United States Supreme Court ha[s] interpreted 'adjudication on the merits' broadly. . . . Deference to the autonomy and dignity of the state courts underlies this broad definition of 'adjudication on the merits.' Deciding cases on the merits either with no explanation or using the language of state law is a common practice. . . . [A]n 'adjudication on the merits' is [thus] best defined as any state court decision that does not rest solely on a state procedural bar.").

_____

[38] In so doing, Petitioner reversed the position he took in his Petition. (See Docket Entry 1-1 at 77-78 (stating that Petitioner "raised this issue in his direct appeal . . . [and] [t]he North Carolina Supreme Court found no error").)

87

In this case, the Supreme Court of North Carolina gave no indication that it failed to consider the federal constitutional dimension of Petitioner's argument that the state superior court should have granted a mistrial. See Hurst, 360 N.C. at 186-92, 624 S.E.2d at 315-18. Moreover, as the excerpt above shows, the Supreme Court of North Carolina's instant opinion contains a quotation from its decision in Barts. Id. at 190, 624 S.E.2d at 317. Barts, in turn, makes clear (by reference to federal decisions) that, in North Carolina, courts address jurors' exposure to media reports for the purpose of protecting federal, jury-related constitutional rights. See Barts, 316 N.C. at 681-83, 343 S.E.2d at 838-40 (affirming denial of mistrial due to possible tainting of jury by press coverage and citing, inter alia, Aston v. Warden, Powhatan Corr. Ctr., 574 F.2d 1169 (4th Cir. 1978)).[39]

The fact that, in assessing the propriety of the state superior court's actions, the Supreme Court of North Carolina discussed N.C. Gen. Stat. § 15A-1061 does not require a different result. Said statute provides for the declaration of a mistrial "if there occurs during the trial an error or legal defect in the

_____

[39] The Aston case cited by the Supreme Court of North Carolina in Barts specifically describes the required inquiry into possible jury contamination as something mandated by the fact that the "[S]ixth [A]mendment right to an impartial jury is so central to due process . . . ." Aston, 574 F.2d at 1172. The Supreme Court of North Carolina's acknowledgment of Barts in its opinion in this case thus impliedly confirms its recognition that claims like that presented by Petitioner include a federal constitutional component.

proceedings . . . resulting in substantial and irreparable prejudice to the defendant's case," id. (emphasis added), but does not limit the relevant "error" or "legal defect" to matters of state law, see id. Further, North Carolina courts consistently have observed that "errors" or "legal defects" related to federal constitutional protections can provide the sort of "prejudice" that mandates a mistrial under N.C. Gen. Stat. § 15A-1061, including because (by separate statute) North Carolina has provided that "prejudice" (for error correction purposes) may arise from "violations of the Constitution of the United States," N.C. Gen. Stat. § 15A-1443(b). See, e.g., State v. Graham, No. COA10-841, ___ N.C. App. ___ (table), 710 S.E.2d 707 (table), 2011 WL 721008, at *1-2 (Mar. 1, 2011) (unpublished); State v. Locklear, No. COA02-1696, 162 N.C. App. 181 (table), 590 S.E.2d 333 (table), 2004 WL 26566, at *1-2 (Jan. 6, 2004) (unpublished); State v. Hines, 131 N.C. App. 457, 462-64, 508 S.E.2d 310, 313-15 (1998).

Under these circumstances, the Court should not presume that the Supreme Court of North Carolina failed to adjudicate Petitioner's instant federal constitutional claim, but instead should "presume[] that the state court adjudicated [such] claim on the merits," Harrington, ___ U.S. at ___, 131 S. Ct. at 784-85.[40]

---

[40] Were this Court to rule otherwise, i.e., to determine that, because the Supreme Court of North Carolina did not make explicit reference to the United States Constitution, it did not adjudicate on the merits any federal constitutional claim, the Court also arguably would have to conclude that Petitioner failed to preserve

89

As a result, Petitioner must show that the Supreme Court of North Carolina's refusal to order a new trial based on the alleged tainting of the jury "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d) (internal paragraph numbering omitted); see also Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (holding that

---

any such claim, given that his trial counsel did not expressly invoke any federal constitutional provision in moving for a mistrial (see Trial Tr. at 1049-54, 1089-91, 1116-18), but did cite N.C. Gen. Stat. § 15A-1061 (id. at 1090). This Court then likely could deny Claim IX unless Petitioner showed cause and prejudice or a miscarriage of justice, regardless of whether Respondent properly asserted any procedural bar. See, e.g., Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003) ("Having failed to preserve these issues for his direct appeal, [the petitioner] did not obtain an adjudication on the merits of his [instant] claim in state court. As a result, [federal habeas courts] are procedurally barred from considering this claim, unless [the petitioner] can show cause and prejudice for his failure to preserve the issue by a timely objection."); Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999) ("[A] federal habeas court may, in its discretion, deny federal habeas relief on the basis of issues not preserved or presented properly by a state [including] . . . whether there exists an unexcused adequate and independent state-law ground for a denial of relief . . . ."); State v. Thomas, No. COA11-832, ___ N.C. App. ___ (table), 723 S.E.2d 584 (table), 2012 WL 1337418, at *8 (Apr. 17, 2012) (unpublished) ("To the extent defendant asserts the denial of his motion for a mistrial violated his constitutional rights, [he] did not assert constitutional error before the trial court and accordingly, [he] 'waived his right to appellate review of this issue . . . .'" (quoting State v. Smith, 352 N.C. 531, 557, 532 S.E.2d 773, 790 (2000)). In light of the record and for reasons set forth below, it does not appear Petitioner could establish cause and prejudice or a miscarriage of justice as to Claim IX.

90

"petitioner carries the burden of proof" as to Section 2254(d)). Petitioner has not made such a showing.

As Petitioner has observed (see Docket Entry 1-1 at 80-81; Docket Entry 24 at 35), the United States Supreme Court has established, as a matter of federal constitutional law, that:

1) "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors," Irvin v. Dowd, 366 U.S. 717, 722 (1961) (internal quotation marks omitted)); and

2) "trial by jury in a criminal case necessarily implies . . . that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel," Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); accord Parker, 385 U.S. at 363-65.

In this case, a review of the pertinent portions of the record (see Trial Tr. at 811, 827-28, 1036, 1046-59, 1067-69, 1075-79, 1081-83, 1087-91, 1100, 1107-08, 1110-17, 1119-24, 1130-33, 1136-38, 1143-47, 1158-60, 1166-68, 1171-73, 1178-81, 1186, 1193-94, 1200-01, 1216-18, 1224-25, 1231, 1251) confirms that the Supreme Court of North Carolina accurately recited the relevant facts and circumstances that occurred before the state superior court and reasonably concluded that, upon learning of the presence in the jury room of a newspaper with an article about Petitioner's case,

91

the state superior court took sufficient steps to protect Petitioner's above-cited rights. Moreover, the state superior court found as a fact that the evidence failed to show that any of the 12 regular jurors had been in the jury room at the relevant time and the Supreme Court of North Carolina reasonably upheld that determination. Petitioner has not identified the requisite clear and convincing evidence to justify overturning the "presumption of correctness" that attaches to such factual findings, 28 U.S.C. § 2254(e)(1). Nor has Petitioner otherwise established grounds for relief under Section 2254(d) from the Supreme Court of North Carolina's decision to reject Petitioner's instant federal constitutional challenge and to uphold the state superior court's refusal to order a mistrial. The Court thus should deny Claim IX.[41]

### Claim X - Aggravating Factor Instruction

Claim X of the Petition alleges that the jury instruction for the "heinous, atrocious or cruel" aggravating factor violated the Constitution. (Docket Entry 1-1 at 82-85.) Petitioner's summary

---

[41] Even a cursory review of the Supreme Court of North Carolina's opinion (quoted in relevant part above) forecloses any suggestion that, as to Claim IX, said court acted contrary to or unreasonably applied United States Supreme Court precedent or that it unreasonably assessed relevant facts. To the contrary, the opinion shows that the Supreme Court of North Carolina carefully examined the record, as well as Petitioner's arguments, before reasonably concluding the state superior court acted appropriately in denying a mistrial. Indeed, that conclusion would stand even if subjected to de novo review, particularly given the unimpeached factual finding that the 12 regular jurors had no exposure to the allegedly prejudicial news article in the jury room.

92

judgment response brief concedes that he "raised this claim on direct appeal, and it was resolved on the merits . . . [such that] [t]his Court must review it under the deferential standard of review of 28 U.S.C. §§ [sic] 2254(d)(1) & (2)." (Docket Entry 24 at 36 (citing <u>Hurst</u>, 360 N.C. at 205, 624 S.E.2d at 326-27).) In addition, in said brief, "Petitioner acknowledges that the Fourth Circuit has previously ruled against the argument he raises here." (<u>Id.</u> (citing <u>Fisher v. Lee</u>, 215 F.3d 438, 458-59 (4th Cir. 2000)).) The Court therefore should conclude that Petitioner has not shown that the Supreme Court of North Carolina reached a result on Claim X warranting relief under Section 2254(d).

<u>Claim XI - Improper Closing Argument</u>

For Claim XI, the Petition contends that, because the state superior court did not intervene sua sponte to stop prosecutors from pointing out some of the same facts in the penalty phase closing argument that they had mentioned in their guilt/innocence phase closing argument, Petitioner's death sentence violates the federal constitutional principles enunciated in <u>Gregg v. Georgia</u>, 428 U.S. 153, 197 (1976). (<u>See</u> Docket Entry 1-1 at 85-86.) The Petition states that Petitioner "raised this issue in his direct appeal [but] . . . [t]he North Carolina Supreme Court found no error." (<u>Id.</u> at 85.) In fact, because Petitioner conceded on direct appeal that he had not objected at trial to the argument in question, the Supreme Court of North Carolina subjected the instant

93

claim to only limited review.  See Hurst, 360 N.C. at 203, 624 S.E.2d at 325; see also Daniels v. Lee, 316 F.3d 477, 487 n.8 (4th Cir. 2003) ("When a defendant fails to timely object and properly preserve an issue for appeal, the Supreme Court of North Carolina reviews the record for plain error.").

"Having failed to preserve these issues for his direct appeal, [Petitioner] did not obtain an adjudication on the merits of [this] claim in state court.  As a result, [this Court is] procedurally barred from considering this claim, unless [Petitioner] can show cause and prejudice for his failure to preserve the issue by a timely objection."  Daniels, 316 F.3d at 487.  This rule applies not only when "a claim is dismissed by a state court on a procedural ground, . . . [but in addition] when a state court also discusses the claim on its merits, e.g., in conducting a plain error review having found a procedural default."  Id.

In his summary judgment brief, Respondent has not clearly raised procedural bar as a defense to Claim XI.  (See Docket Entry 18 at 43-47.)  "[T]he issue of procedural default generally is an affirmative defense that the state must plead . . . [but] a federal habeas court may, in its discretion, deny federal habeas relief on the basis of issues not preserved or presented properly by a state [including] . . . whether there exists an unexcused adequate and independent state-law ground for a denial of relief  . . . ."  Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999).  Before

invoking the procedural bar under these circumstances, however, the Court would have to consider a number of issues, including whether to afford Petitioner "a reasonable opportunity to present briefing and argument opposing dismissal [on that basis]." Id. at 262 (internal quotation marks omitted). No need exists to follow that course of action in this case because "the claim advanced by [Petitioner] patently is without merit." Id. at 261 (discussing circumstances that would warrant federal habeas court in refraining from requiring state prisoner to overcome procedural bar that state failed to present properly).

The Petition identifies the following as the "Relevant Facts" regarding Claim XI:

> At the guilt phase, the prosecution argued that the victim, Daniel Branch, was innocent. The prosecution further argued that [Petitioner] had a plan to lure the victim, Daniel Branch, to an isolated area. These arguments [sic] made in order to convince the jury that the crime was premeditated and deliberated.
>
> The prosecution argued that the victim, Daniel Branch, was an innocent man in support of the especially heinous, atrocious or cruel aggravating circumstance, at the sentencing phase. In addition, the prosecution argued that the Petitioner had an evil plan to lure Mr. Branch to a secluded area.

(Docket Entry 1-1 at 85-86 (internal citations omitted) (citing Trial Tr. at 1862-63, 1868-70, 1912, 1915-16, 1919-21, and 2230-32) (emphasis added).)

On the pages of the guilt/innocence phase closing argument transcript cited by Petitioner, prosecutors argued as follows:

95

[Petitioner] killed a man for the car keys . . . . He's
a thief. Clearly we've proven that. That's the armed
robbery that's the underlying felony in the felony
murder. He wanted a car to get out of North Carolina, he
made that decision twenty-four hours earlier. But we're
here chasing that rabbit that he somehow didn't plan what
he clearly did plan. . . . And what a lousy plan it is,
he's left his body in the woods. And Black Ankle, I'll
submit is as far out in the woods as you can get in
Randolph County. Probably in the state. Deep in the
woods, you saw the pictures. It doesn't have to be the
world's greatest plan. . . . That was his plan. That's
what he decided to do after he got the phone call. . . .
By his own statement he said I backed the car in, so we
could reasonably deduce that [Petitioner] drove the car
exactly where he went to, to kill Daniel Branch that he
knew, he made the decision he was going to kill twenty-
four hours earlier. And he acted upon that. And he
carried out his plan.
. . . .

Neither premeditation nor deliberation is usually
susceptible of direct proof. Rarely do you get a
defendant to say yeah, I thought about it a day before
and I went out and lured him out in the woods and I made
him put up cans and then I shot him once, and then I shot
him again, and he was laying on the ground with his hands
up in the air and I just decided to go ahead and execute
him. Rarely do you get that in a case. Most of the time
we have to prove it by facts or proof of circumstances
from which they may be inferred, such as lack of
provocation by the victim. Daniel Branch is an innocent
victim. He did nothing to cause his own death except
trying to get a few dollars by selling a gun that he had
to feed his family. That's all he did. And he gets
killed, shot three times like a deer in the woods, and
all he wants is [a] few dollars to try to help his
family.
. . . .

So the Court . . . says members of the jury, this is how
you determine whether or not there's premeditation and
deliberation. Number One, was there any provocation by
the victim . . . . The evidence in this case is that .
. . there was no provocation by Daniel Branch. Daniel
Branch was defenseless and he was blameless. There's no
evidence that he was anything other than a man who was in
a bad place and needed some money, and he trusted

96

somebody that my goodness, he shouldn't have.  If he made a mistake, if he made an error, it was allowing someone that he thought he trusted to get on the business end of a shotgun and him to be on the other end.  So there's no provocation.  So what does that say to us?  That says to us that it tends to seem that there might have been premeditation and deliberation.
. . . .

Number Three, declarations by [Petitioner].  Well, I showed you a document in [his] own words where [he] says, he's asked if [someone whom he talked to] tried to talk [him] out of it . . . .  [Petitioner] said I believe I'm going to kill this fellow.  I said I'm going to take his car and get the H-E-L-L out of here for awhile.  I said do you want to go with me.  You pack your clothes.  And he said well, come pick me up.  Hum.  Does that tend to give us some evidence that the defense says is not there of what was in [Petitioner's] mind.  A declaration by [Petitioner] the day before.  I'm going to kill this guy, I'm going to get the H-E-L-L out of Dodge.  Want to go with me.   Is that evidence of premeditation and deliberation on the part of [Petitioner]?
. . . .

Then we have this video-taped confession . . . .  And you heard [Petitioner] say I can't say I planned it out but I knew it was going to happen.  He knew it the day before. . . .  It was as planned as it could have been. . . .  Was it really that bad of a plan? . . .  Who's going to stumble across that body when it took four officers who know there's a body there, how long . . . .  You heard them say how difficult it was.  You see the size of the field.  You see this area that we're talking about . . . .  [S]o how long is it going to be if [Petitioner] keeps his mouth shut before his, Daniel Branch's body gets found?  Is that really such a bad plan, after all?  You take a man to a place that is secluded where there's no other witnesses, you murder him with a shotgun, and then you leave his body there.  And you go to West Virginia. . . .

Then we have the argument . . . about this witness . . . [who] is not a witness.   [He] is [Petitioner's] accomplice. . . .  Is that a crazy plan?

(Trial Tr. at 1862-63, 1868-70, 1912, 1915-16, 1919-21.)

97

The transcript from the portion of the penalty phase closing argument cited by Petitioner reflects the following commentary by the prosecution:

> The first point I want to make under this aggravating circumstance is Daniel Branch was an innocent man. And the murder of an innocent man, a man as innocent as Daniel Branch was, fits all of these definitions. Extremely wicked or shockingly evil to kill a man for no reason. It fits the very definition of atrocious, that it's outrageously wicked and vile. It fits the definition of those two things. Daniel Branch, let's not lose sight of the fact that we hear about [Petitioner's] family in the years and decades before he murdered Daniel Branch. Let's not lose sight of the fact that Daniel Branch was absolutely, totally, infinitely innocent of any reason that would give that man to take his life. I defy anyone in this courtroom to come up with a reason other than that Daniel Branch trusted a man he shouldn't have trusted, any reason why Daniel Branch deserved to be shot like an animal. There is none. Is that extremely wicked or shockingly evil? I submit to you it is.
>
> Number two, there's a very evil element of what the defendant did to Daniel Branch. And that is the plan, the luring of Daniel Branch to a secluded location . . . . See if you can find any houses or businesses in that area. Is that an accident? Is it an accident that Daniel Branch was lured to an area that there is absolutely no chance that there's going to be any witnesses other than [Petitioner's] accomplice? You know what else is important on this notion, on this issue of being evil, shockingly evil plan. There's a beer can found at the feet of Daniel Branch. . . . Daniel Branch, a totally innocent man, was lured into participating in his own murder. He gave up his only means of defense. He's lured and he's convinced by the evil and the cunning mind of [Petitioner] to walk out into a field while [Petitioner] has a shotgun loaded with three shotgun shells and [Danile Branch has] got this [beer can]. He thinks that he's setting up a target. Is that shockingly evil that he would lure a man out into the country that far from home, that far from witnesses, and then lure him into the field on the other end of the shotgun that you have in your hand. And let me point out that the entire time that they're driving out to that field in extreme

southern Randolph County, and the entire time that he's
loading that shotgun, and the entire time that he's
walking out he's watching Daniel Branch walk out into
this field, the entire time the motive in his mind is to
kill and to murder and to take the life of Daniel Branch.
How do we know that?  Because from his own mouth he said
that I knew I was going to do it the day before.  But if
he knew he was going to do it the day before, if he knows
with every passing moment that he's one minute closer to
taking the life of this innocent man.  He knows that
every time he shoves a twelve-gauge shell into the gun,
one, two, three, he is one step closer to killing Daniel
Branch.  Is that shockingly wicked or shockingly evil?
Is it outrageously wicked and vile?

(Trial Tr. 2230-32.)

In considering this claim on direct appeal, the Supreme Court

of North Carolina stated:

[Petitioner] contends that the argument improperly
encouraged the jurors to recommend death on the basis of
evidence introduced in the guilt phase of the trial to
support the elements of premeditation and deliberation.
[Petitioner] claims that by arguing this evidence during
the sentencing proceeding, the State was encouraging the
jurors to act on the basis of an aggravating circumstance
that is not set out in N.C. [Gen. Stat.] § 15A-2000(e).

At the close of the guilt phase of the trial, the State
argued that [Petitioner] had premeditated and deliberated
before killing the victim.  In support of this theory,
one prosecutor, noting that [Petitioner] had lured the
"totally innocent victim" to the death scene, emphasized
that [Petitioner] had decided "to kill twenty-four hours
earlier" and then "carried out his plan."  Another
prosecutor argued in the guilt phase "that there was no
provocation by Daniel Branch" and that [Petitioner] acted
according to "plan" by "taking a man to a place that is
secluded where there's no other witnesses."

Later, at the sentencing proceeding, the trial judge
agreed to submit the N.C. [Gen. Stat.] § 15A-2000(e)(9)
aggravating circumstance, that "the capital felony was
especially heinous, atrocious, or cruel."  A portion of
the State's closing argument at the sentencing proceeding
as to this circumstance pointed out that "Daniel Branch

was an innocent man, And the murder of an innocent man
. . . fits all of the definitions" of heinous, atrocious
or cruel. The State went on to argue that "the plan, the
luring of Daniel Branch to a secluded location" was an
"evil element" of the crime. The State added:

> And let me just point out that the entire time
> that they're driving out to that field in
> extreme southern Randolph County, and the
> entire time that he's loading that shotgun,
> and the entire time that he's walking out he's
> watching Daniel Branch walk out into this
> field, the entire time the motive in his mind
> is to kill and to murder and to take the life
> of Daniel Branch. How do we know that?
> Because from his own mouth he said that I knew
> I was going to do it the day before. But if
> he knew he was going to do it the day before,
> if he knows with every passing moment that
> he's in the car with Daniel Branch he knows
> that he's one minute closer to taking the life
> of this innocent man. He knows that every
> time he shoves a twelve-gauge shell into the
> gun, one, two, three, he is one step closer to
> killing Daniel Branch. Is that extremely
> wicked or shockingly evil? Is it outrageously
> wicked and vile?

The jury found this circumstance to exist.
. . . .

In a capital sentencing proceeding, the State is entitled
to present any competent, relevant evidence which will
substantially support the imposition of the death
penalty. Evidence presented during the guilt phase is
competent for the jury's consideration in the sentencing
proceeding. N.C. [Gen. Stat.] § 15A-2000(a)(3). Thus,
the State may reargue evidence that justified the murder
conviction to support the finding of an aggravating
circumstance.

We have also held that the fact that a murder was planned
may be a factor in determining whether the murder was
especially heinous, atrocious, or cruel. Moreover, the
State argued several additional facts to support the
(e)(9) aggravating circumstance, such as the manner in
which the victim was killed:

We've got [Petitioner] tracking his target as
he runs.  Because we see that he ejected the
second round far away from the first.  And we
know for a fact from his own statement that
Daniel Branch was running for his life, which
means that he's tracking him, he's running
with him, he's cutting him off.  Is that
extremely wicked or shockingly evil after
you've shot a man to track him like a dog,
then pump the shotgun to shoot him again?  It
is.

Now, the final thing about the specific facts
in the murder is the final shot to Daniel
Branch's face.  No, it is not a pretty thing
to look at.  But the important reason why I
ask you to look at this is that Daniel Branch
is in, when he looks up and he sees the final
shot into his face, Daniel Branch is in the
most defenseless position that a human being
can be in.  Daniel Branch is on his back.  He
has two shotgun blasts pumped into his body,
and he's on his back. . . .  Daniel Branch is
on his back and his arms are in the surrender
position. . . .  And the testimony is that
he's saying don't shoot me anymore.  And he's
shot.  He's in the most defenseless position
that a man can be in.  And his arms are up
because he's saying I surrender, I don't have
a gun, I'm no longer any threat to you, don't
shoot me anymore. . . .  The evidence is that
he then pulled the keys out of the victim's
pocket after smelling the blood that he's
spilled. . . .  Is that extremely wicked,
shockingly evil, outrageously wicked and vile?
Did what he do inflict a high degree of pain
with utter indifference to the suffering of
Daniel Branch?  Is this crime especially
heinous, atrocious, and cruel?

Arguments addressing the victim's perceptions are
relevant to the (e)(9) aggravator.  Accordingly, we
conclude that the State's argument was proper . . . .

Hurst, 360 N.C. at 202-04, 624 S.E.2d at 325-26 (internal brackets,

some citations, and some quotation marks omitted) (emphasis added).

Even considering the matter de novo, no basis exists for this Court to reach a different conclusion than that drawn by the Supreme Court of North Carolina. Petitioner's filings lack citation to any authority supporting the notion that evidence used to support an element of first-degree murder cannot form part of the evidence used to prove an aggravating factor. (<u>See</u> Docket Entry 1-1 at 85-86; Docket Entry 24 at 36-39.) Nor has independent research revealed any such authority; to the contrary, it resulted in the discovery of authority warranting the opposite conclusion.

For example, in <u>Barfield v. Harris</u>, 719 F.2d 58, 59-61 (4th Cir. 1983), the Fourth Circuit rejected a federal constitutional challenge to a death sentence in a manner that directly refutes Petitioner's position. In <u>Barefield</u>, at the guilt/innocence stage, the prosecution, to prove the first-degree murder element of intent to kill, relied on evidence that the defendant (who claimed to have intended only to make her husband sick with poison) had killed others (with poison). <u>Id.</u> at 59. The Fourth Circuit noted that, pursuant to N.C. Gen. Stat. § 15A-2000(a)(3), "all of the evidence submitted in the guilt determination phase of the trial shall be competent for the jury's consideration in the sentencing phase." <u>Id.</u> at 60. In dispensing with the petitioner's attack on his sentence, the Fourth Circuit expressly held as follows: "[T]he evidence of the four earlier homicides was relevant to the jury's consideration of the statutory aggravating circumstances. It was

102

particularly relevant to the jury's consideration of the aggravating factor that the crime was 'especially heinous, atrocious, or cruel.'" Id. That holding forecloses Petitioner's contention that prosecutors may not attempt to prove the "especially heinous, atrocious, or cruel" aggravating factor with evidence used to establish an element of first-degree murder.

Additionally, a neighboring district court has recognized that, in light of Tuilaepa v. California, 512 U.S. 967 (1994), "[t]he Eighth Amendment is not violated because an aggravating circumstance is contained within a crime's definition. The aggravating circumstance sufficiently narrows the class of death-eligible murderers so long as it does 'not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder.'" Powell v. Lee, 282 F. Supp. 2d 355, 371 (W.D.N.C. 2003) (internal citation omitted) (citing and quoting Tuilaepa, 512 U.S. at 972). Accordingly, the Powell Court observed that "[n]ot every defendant convicted of [first-degree murder under] the felony murder rule will have done so for the purpose of pecuniary gain . . . [and thus] there is no Eighth Amendment violation [in utilizing proof of the robbery that served as the underlying felony to prove the "pecuniary gain" aggravating factor]." Id. Similarly, no Eighth Amendment violation flows from the fact that the prosecution relied on evidence of Petitioner's planning and luring of an innocent victim both to prove the

103

premeditation theory of first-degree murder and the "especially heinous, atrocious, or cruel" aggravating factor, because not all premeditated murderers plan their crimes over a period of 24 hours and/or kill innocent victims whom they lured to remote locations.[42]

In sum, the Court should deny Claim XI as meritless.

<u>Claims XII</u> and <u>XIII</u> - <u>Short Form Indictment</u>

In Claims XII and XIII, the Petition asserts that the "short form" indictment in Petitioner's case violated his federal constitutional rights because it failed to charge the elements of first degree murder and to allege any aggravating circumstances to support the death penalty. (Docket Entry 1-1 at 86-88.) In his summary judgment response brief, Petitioner acknowledges that:

1) the Supreme Court of North Carolina rejected these same contentions on direct appeal (<u>see</u> Docket Entry 24 at 39 (citing <u>Hurst</u>, 360 N.C. at 206, 624 S.E.2d at 327));

2) this Court thus must apply the deferential standard of Section 2254(d) (<u>see</u> <u>id.</u> at 39-40); and

3) "the Fourth Circuit has previously ruled against the argument presented here" (<u>id.</u> (citing <u>Stroud</u>, 466 F.3d at 296-97)).

Under these circumstances, the Court should deny relief on Claims XII and XIII pursuant to Section 2254(d).

_____

[42] Indeed, the premeditation instruction in Petitioner's case did not require any plan (much less one to lure an innocent victim to an isolated locale), but rather only mandated that "he formed the intent to kill the victim over some period of time, <u>however short</u>, before he acted." (Trial Tr. at 1936 (emphasis added).)

104

CONCLUSION

Claims I, II, V, VII, VIII, IX, X, XII, and XIII fail under Section 2254(d).  Petitioner has not overcome the procedural bar that applies to Claims III and IV.  Claim VI is not cognizable on federal habeas review and Claim XI lacks merit.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 17) be **GRANTED**, that the Petition (Docket Entry 1) be **DENIED**, and that Judgment be entered **DISMISSING** this action.

   /s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 7, 2012