```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

JASON WAYNE HURST,                )
                                  )
                Petitioner,       )
                                  )
        v.                        )
                                  )    1:10-CV-725
JAMEL JAMES, Warden, Central      )
Prison, Raleigh, North            )
Carolina,                         )
                                  )
                Respondent.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is the petition for writ of habeas corpus by Petitioner Jason Wayne Hurst pursuant to 28 U.S.C. § 2254. (Doc. 1.) Hurst alleges that during the penalty phase of his capital murder trial, his Sixth Amendment rights to an impartial jury and to confront the witnesses against him were violated by an extraneous communication between a juror and her father. This case returns to the court on remand from the Court of Appeals for the Fourth Circuit with instructions to conduct an evidentiary hearing with respect to Hurst's allegations. (Doc. 79.) The petition was referred to the United States Magistrate Judge, who held an evidentiary hearing and entered a Recommendation to deny the petition without a certificate of appealability. (Doc. 125 ("Recommendation").) Hurst timely filed objections (Doc. 128), and Respondent Jamel James responded in opposition (Doc. 130).

For the reasons set forth below – most notably, the Fourth Circuit's opinion in <u>Barnes v. Thomas</u>, 938 F.3d 526 (4th Cir. 2019) ("<u>Barnes II</u>") — the court is constrained to disagree with the Recommendation and grant the petition.

I.    **BACKGROUND**

The facts of Hurst's underlying conviction are set forth in <u>Hurst v. Joyner</u>, 757 F.3d 389 (4th Cir. 2014), and <u>State v. Hurst</u>, 624 S.E.2d 309 (N.C. 2006), and need not be repeated in full here. The facts relevant to Hurst's objections are set forth below.

Hurst was convicted of first-degree murder for the 2002 premeditated execution-style shooting of Daniel Branch. (Doc. 125 at 3-4.) Hurst was sentenced to death. The North Carolina Supreme Court affirmed, and the United States Supreme Court denied certiorari review. <u>Hurst v. North Carolina</u>, 549 U.S. 875 (2006).

In 2007, Hurst filed a motion for appropriate relief ("MAR") in North Carolina state court. (Docs. 2-1, 3-1, 4-1, 5-1.) Hurst alleged that a trial juror, Christina Foster ("Juror Foster"), had impermissible extraneous communications with her father, who was also an ordained minister, during the sentencing phase, in violation of his Sixth Amendment rights. The state court denied Hurst's claim on the merits without an evidentiary hearing.

In 2010, Hurst filed a petition for federal habeas relief pursuant to 28 U.S.C. § 2254, raising in Claim I that he was "denied the right to confront his accusers, to a fair and impartial

2

jury, and to due process of law where a juror consulted with her father during sentencing deliberations about her decision as to whether to vote for life or death." (Doc. 1-1 at 12 (capitalization altered).) On March 31, 2013, this court denied Hurst's petition without an evidentiary hearing and issued a certificate of appealability on Claim I. (Doc. 67.)

On appeal, the Fourth Circuit held that the MAR court unreasonably applied clearly established law, as determined by the Supreme Court of the United States. Hurst, 757 F.3d at 398. Specifically, the court held that the MAR court unreasonably applied Remmer v. United States, 347 U.S. 227 (1954), by denying Hurst's claim without applying a presumption of prejudice or holding an evidentiary hearing. Id. (citing Barnes v. Joyner, 751 F.3d 229 (4th Cir. 2014) ("Barnes I")). The court thus remanded Hurst's petition "for an evidentiary hearing on the issue of whether the communication between Juror Foster and her father about the Bible verse had a substantial and injurious effect or influence in determining the jury's verdict." Id. at 400.[1]

---

[1] Months prior to the issuance of the Fourth Circuit's opinion on Hurst's petition, a different and divided panel of the Fourth Circuit remanded the case of William Leroy Barnes to the undersigned on substantially similar grounds. See Barnes I, 751 F.3d 229. The Hurst panel acknowledged that the "holding in Barnes dictate[d] the same result," Hurst, 757 F.3d at 398, although a concurring judge wrote separately that he "would affirm the district court's grant of summary judgment to the state" if he were "writing on a clean slate," id. at 400 (Shedd, J., concurring). After remand in Barnes I, the Fourth Circuit held that the juror misconduct there had a substantial and injurious effect on the

3

The magistrate judge held an evidentiary hearing, during which Hurst presented two witnesses: Juror Foster and her father, Michael Freeman. (Doc. 104.) The parties submitted post-hearing briefing. (Docs. 105, 107, 108.) After review of the relevant evidence and briefing, the magistrate judge issued a Recommendation to deny both Hurst's petition and a certificate of appealability. (Doc. 125.) Hurst filed objections to the Recommendation (Doc. 128), and Respondent Jamel James filed a response (Doc. 130). This court held argument on the objections to the Recommendation on August 29, 2024. The petition following remand is ready for resolution.

## II. ANALYSIS

### A. Standard of Review

#### 1. Review of Magistrate Judge's Recommendation

When considering a magistrate judge's report and recommendation, a district court must conduct a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see Fed. R. Civ. P. 72(b)(3). In doing so, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

---

petitioner's trial and ordered that the petition be granted. Barnes II, 938 F.3d at 534-36.

The Fourth Circuit has recognized that "a 'de novo determination' is not necessarily the same as a de novo hearing and that the decision to rehear testimony is within the sole discretion of the district judge, even as to those findings based on the magistrate's judgment as to the credibility of the witnesses before him." Proctor v. North Carolina, 830 F.2d 514, 518 n.2 (4th Cir. 1987) (citing United States v. Raddatz, 447 U.S. 667 (1980)). The district court must review the entire record, including the transcript, to determine whether the magistrate judge's findings are adequately supported by the record. See Johnson v. Knable, No. 90-7388, 1991 WL 87147, at *1 (4th Cir. May 28, 1991) (per curiam); United States v. Mallicone, No. 17-CR-9, 2017 WL 3575894, at *2 (N.D.W. Va. Aug. 18, 2017) ("[T]he first step is for the district judge to review the record, including the transcript, and to determine whether the entire record supports the magistrate judge's findings. If the magistrate judge's findings are supported by the record, the finding can be adopted by the district judge." (quoting United States v. Jones, No. 11-CR-30009, 2011 WL 2160339, at *5 (C.D. Ill. June 1, 2011))). Where a party fails to object to a recommendation, however, the court's review is for clear error. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).

## 2. Review of the Petition

As to the governing law, "[i]t is clearly established under

5

Supreme Court precedent that an external influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury." Barnes I, 751 F.3d at 240 (collecting cases). The Supreme Court in Remmer "clearly established not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing, when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury." Id. at 242.

Nevertheless, "principles of comity and respect for state court judgments preclude federal courts from granting habeas relief to state prisoners for constitutional errors committed in state court absent a showing that the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" Richmond v. Polk, 375 F.3d 309, 335 (4th Cir. 2004) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). "[T]he Remmer presumption is meant to protect against the potential Sixth Amendment harms of extraneous information reaching the jury, but a state court's failure to apply the presumption only results in actual prejudice if the jury's verdict was tainted by such information." Barnes I, 751 F.3d at 252 (quoting Hall v. Zenk, 692 F.3d 793, 805 (7th Cir. 2012)). For that reason, "[habeas] petitioners are not entitled to the Remmer presumption of prejudice

6

when proving a substantial and injurious effect." <u>Barnes II</u>, 938 F.3d at 533 n.2.

A habeas petitioner is entitled to relief if the court is in "grave doubt" as to the harmlessness of the error. <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995). A court is in "grave doubt" where it "finds itself in virtual equipoise" as to the substantial and injurious effect or influence of a trial error. <u>Lawlor v. Zook</u>, 909 F.3d 614, 634 (4th Cir. 2018) (quoting <u>Cooper v. Taylor</u>, 103 F.3d 366, 370 (4th Cir. 1996)). In a juror misconduct case, the court's inquiry may be "frustrated to some extent by the application of Federal Rule of Evidence 606" because "juror testimony concerning the <u>effect</u> of the outside communication on the minds of jurors is inadmissible." <u>Barnes II</u>, 938 F.3d at 534 (quoting <u>Stockton v. Virginia</u>, 852 F.2d 740, 744 (4th Cir. 1988)). Accordingly, "it is especially important . . . to view the record practically and holistically when considering the effect that a juror's misconduct 'reasonably may be taken to have had upon the jury's decision.'" <u>Id.</u> (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 764 (1946)).

In North Carolina, a court may not impose the death penalty unless the jurors unanimously agree to such a sentence. N.C. Gen. Stat. § 15A-2000(b). Otherwise, the court must sentence the defendant to life imprisonment. <u>Id.</u> Thus, the court must determine whether it can say "with fair assurance" that the

7

judgment was "not substantially swayed by the error." <u>Kotteakos</u>, 328 U.S. at 765. Because the jury's recommendation for a capital sentence must be unanimous, an extraneous effect on only one juror is sufficient to "draw into question the integrity of the verdict" and deprive a criminal defendant of his right to twelve impartial jurors. <u>Fullwood v. Lee</u>, 290 F.3d 663, 681 (4th Cir. 2002) (quoting <u>Stockton</u>, 852 F.2d at 743).

     **B.   Evidentiary Hearing**

     Following remand from the Fourth Circuit, the magistrate judge heard testimony from Juror Foster and her father, Michael Freeman, at an evidentiary hearing. (Doc. 104.) The record before the court prior to this hearing included a handwritten affidavit that Juror Foster appeared to execute on April 21, 2007, almost ten years earlier. That affidavit states in relevant part:

> During the trial, I often had lunch with my father who worked near the courthouse. Prior to deliberations, I asked my father where I could look in the Bible <u>for help and guidance in making my decision for between life and death</u>. After the jury had found Mr. Hurst guilty but before we decided his sentence, I opened my Bible at home <u>because I wanted to read something to help me with my decision</u>. My father had given me the section in the Bible where I could find "an eye for an eye." That night after reading that section in the Bible, it helped me sleep better. It didn't make the decision any easier. The next day during deliberations, I voted for the death penalty.

(Doc. 4-1 at 5 (emphasis added).)

     The testimony adduced at the evidentiary hearing was more robust:

Following the guilt phase of Hurst's trial, but before sentencing deliberations began, Juror Foster drove to the home of her father, Freeman. (Doc. 104 at 28:5-10.) Regarding what specifically Juror Foster asked Freeman, she testified, "I asked my dad if he could lead me to where I needed to go for an eye for an eye. That's all I asked him." (Id. at 27:18-20.) She later reiterated, "The only thing I asked my father is if he could guide me to passages for an eye for an eye. That was it. He didn't know anything regarding what I was doing at that trial." (Id. at 36:10-12.)

Freeman's recollection was somewhat different. He recalled Juror Foster's inquiry as the following: "She called me and she asked me if in around about -- this is not quoted. Does it say anything in the Bible about murder? That's what she asked." (Id. at 12:23-25.)

Juror Foster disavowed that she asked Freeman where to look in the Bible for "help and guidance in making my decision for between life and death," as stated in the 2007 affidavit. (Id. at 35:13-23 (testifying that the affidavit is "not an accurate statement that I presented to my father").) She confirmed her prior deposition testimony, where she stated that she believed the first time she saw the executed 2007 affidavit was when she received a deposition notice for this case in December 2015. (Id. at 29:18-23.) She testified, however, that she recalled "preparing

or at least executing an affidavit with an investigator." (Id. at 28:24-29:1.)

Juror Foster testified that she did not tell Freeman any facts about the case and did not talk to him about the possible punishments she would be asked to determine. (Id. at 36:2-6.) Freeman testified that he knew that Juror Foster was on a jury but that they never discussed the case itself. (Id. at 13:16-19.) He "assume[d]," however, that she was on a murder case because of the question that she asked him. (Id. at 13:19-21; see also id. at 15:9-15 (Freeman stating that it was "pretty obvious" that she was on a murder case and clarifying that when he said he "assumed," he meant that he "recognized that it was definitely a murder case").) Freeman testified that he never provided any direct recommendation on how she should vote in the case. (Id. at 20:15-18.)

The evidentiary hearing clarified what Freeman said in response to Juror Foster's inquiry. At first, Juror Foster testified, "I said, Dad, I need to know where I can find in the Bible an eye for an eye. He said sure. So he went and got his Bible. He come back outside. He told me where it was, and I left and went home." (Id. at 28:7-10.) As to the exact eye-for-an-eye passage, Juror Foster testified that it was not a verse in the Book of Deuteronomy — in contrast to her earlier deposition testimony in this case. (Id. at 31:4-33:13 (disavowing deposition testimony that the verse was from the Book of Deuteronomy).)

10

Instead, she testified that the verse was Matthew 5:38. (Id. at 37:22.)

Juror Foster also testified, however, that Freeman provided a verse from the Book of Numbers:

> The eye-for-an-eye passage that my father had told me to read was Matthews [sic] and in Numbers. Matthews [sic], "an eye for an eye" and "a tooth for a tooth." Numbers, "and if he smite him with an instrument of iron, so that he die, he is a murderer; the murderer shall be put to death." That was Numbers 16. 17, "and if he smite him with . . . a stone, he is a murderer; the murderer shall surely be put to death." "Or if he smite him with a hand weapon of wood, wherewith he may die, and he die, he is a murderer; the murderer shall surely be put to death."

(Id. at 33:1-12 (emphasis added).) Juror Foster testified that Freeman did not "explain anything" to her about the verses, and she did not recall him cautioning her not to speak to anybody about the conversation. (Id. at 38:17-25.)

Freeman testified that his response to Juror Foster's question was as follows:

> I read to her Matthew 18, and all that says is an eye for an eye. You know, it's better if your eye offend you to pluck it out and go to heaven with one eye than to go to hell with two eyes. That's what it says pretty much. To me, that really didn't carry on to what she was asking, so that's why I referred her back to Numbers 35 where it actually says the word "murder."

(Id. at 21:9-15; see also id. 13:4-5, 15:16-19 (Freeman describing verses as "the Book of Numbers in the King James version, Chapter 35, Verses 16 through about 21, 22" and "Matthew 18:9").) He testified that he provided the Numbers verse "based upon her

11

question about murder in the Bible."  (<u>Id.</u> at 21:18-21.)[2]

     When asked if there was anything else about the conversation
that he remembered, Freeman testified,

> Well, I explained to her that in the biblical days of -
> - in the biblical days, if you committed murder, then
> you was [sic] a murderer <u>and you would be put to death
> and that most of the times, you was put to death by
> stoning, I did say that, where they would, you know,
> take big stones and throw them at you until you were
> dead</u>.

(<u>Id.</u> at 14:10-18 (emphasis added).)

     He also confirmed his deposition testimony, where he told her
that one who reads a Bible verse must "break it down and understand
what it's saying."  (<u>Id.</u> at 15:20-24.)  He also confirmed his
deposition testimony wherein he said that "if a man, woman, whoever
commits murder, then they definitely should be punished for it,
and it's -- and then it is not -- it's not -- none of the people
are sinning by not, they are sinning if they don't punish him."
(<u>Id.</u> at 16:1-7 ("Yeah that sounds about what I said.  Yeah, I say
I said that.").)

     After confirming that the punishment would have been death by
stoning, Freeman testified that discussing the punishment of
stoning "would . . . have been a part of [his] conversation with
[Juror Foster]."  (<u>Id.</u> at 16:17-17:7.)  He confirmed, however,

---

[2] The Book of Numbers scripture to which Juror Foster testified she read
tracks Freeman's references to chapter 35 of that same biblical text.
(<u>See</u> Doc. 104 at 13:4-6, 33:4-12); <u>Numbers</u> 35:16-21 (King James).

12

that he did not suggest the appropriate punishment in the case she was sitting on:

> Q [by the State's counsel]: And following up on [Hurst's counsel's] question to you about your statement to her about people would be sinning if they didn't impose a punishment, did you suggest to her what an appropriate punishment should be in the case that she was sitting on?
>
> A No. I just said the word is the word. What it says in here is what it says in here, and that's what me -- as a preacher, that's what I go on, what the Bible says.

(Id. at 21:22-22:3.)

Freeman also testified that he "sure did" tell Juror Foster that she ought not talk to anybody about their conversation because he did not want her to get in trouble. (Id. at 17:8-14.) Both Freeman and Juror Foster testified that they have a close relationship, and Juror Foster stated that she respects Freeman's opinion as an ordained minister. (Id. at 10:4-7; id. at 26:10-18 (Juror Foster characterizing her "very tight-knit relationship" with Freeman).) Freeman did not pinpoint an exact duration of the discussion but testified that it was "[n]ot long." (Id. at 18:16-18.)

Potentially complicating their recollection, both Juror Foster and Freeman acknowledge having experienced traumas that affect their memories. (Id. at 31:24-25 (Juror Foster stating, "I have had events in my life, sir, that have hurt my memory"); id. at 14:19-21 (Freeman describing "short-term memory" issues due to

13

a head-on automobile collision).)  The magistrate judge found both witnesses to be credible.  (Doc. 125 at 25.)

## C.  Hurst's Objections

Hurst raises five objections to the Recommendation: (1) the magistrate judge incorrectly found that the evidence adduced in the hearing did not strengthen Hurst's claim; (2) the magistrate judge placed too much weight on facts that are not dispositive; (3) the magistrate judge misapplied the Fourth Circuit's decision in Barnes II; (4) the magistrate judge misinterpreted a variance between the juror's affidavit and her testimony; and (5) the magistrate judge placed too much weight on the evidence in aggravation.  (Doc. 128.)  Thus, Hurst challenges both the Recommendation's findings of fact and its application of binding precedent.[3]

The court turns first to a recitation of Barnes II.

### 1.  **Barnes II**

In Barnes II, a closely similar case, the Fourth Circuit vacated the death sentence on the ground that a juror's extraneous communication with her pastor during deliberations had a

---

[3]  No party has objected to the magistrate judge's credibility determinations.  "[A] district court may not reject a magistrate judge's credibility findings without first conducting a de novo evidentiary hearing."  United States v. Boatrite, 165 F. Supp. 3d 484, 489 (N.D.W. Va. 2016) (collecting cases).  "A magistrate judge's credibility determinations based on live testimony are entitled to deference where they are supported by the record as a whole."  Id. (citing United States v. Gibbs, 421 F.3d 352, 357 (5th Cir. 2005)).

14

substantial and injurious effect on the juror's vote for the death penalty. Barnes II, 938 F.3d at 536. In the closing argument of the capital trial's sentencing phase, Barnes's trial counsel argued that the jurors would be judged "not by the law of man, but by a higher law, the laws of God," and insisted that imposing the death penalty would violate one of God's Ten Commandments. Id. at 529. In other words, counsel insinuated that the jurors would face eternal condemnation if they sentenced the defendants to death. Id.

At an evidentiary hearing ordered by the Fourth Circuit in Barnes I, Juror Hollie Jordan testified that in the evening following the defendants' closing argument and during sentencing deliberations, she met with Pastor Tom Lomax, her "spiritual guide." Id. at 531. She spoke with Pastor Lomax for "a couple hours probably" and discussed the case for a "few minutes." Id. She told him how "horrific" the crime scene photos were and "asked him if we gave [the defendants] the death sentence would we burn in hell." Id. Pastor Lomax responded that the jurors would not burn in hell and told her that the jurors "had to live by the laws of the land." Id. at 531-32. Pastor Lomax pointed her to "some scriptures in the Bible . . . that explained everything." Id. at 532 (alteration in original). Juror Jordan testified that she "was worried" that the jurors were "going to die because [they

15

were] killing [the defendants]" but that she felt better after speaking with Pastor Lomax. Id. (alterations in original).

During the following day's deliberations, Juror Jordan discussed her conversation with Pastor Lomax for fifteen to thirty minutes with the jury. Id. Two other jurors testified that Juror Jordan read several passages from the Bible. Id. One remembered Juror Jordan reading one passage that dealt with "eye for an eye and tooth for a tooth" and perceived that Juror Jordan was intending to rebut the religious arguments made by defendants' counsel in closing. Id. Another juror testified regarding the verses Juror Jordan shared stating, "I guess [Juror Jordan] was trying to convince someone to — it was okay to give him the death penalty." Id.

A divided panel of the Fourth Circuit found that Juror Jordan's extraneous communication with Pastor Lomax had a substantial and injurious effect on the petitioner's trial. Id. at 536. Several factors weighed in favor of granting the petition. First, the defendants' counsel's religious arguments had apparently troubled several jurors, and Juror Jordan, who herself was a "devoutly religious" individual, sought extraneous guidance on that very subject. Id. at 534. The court found it notable that another juror perceived that by relaying Pastor Lomax's guidance to the jury, Juror Jordan was trying to "convince someone . . . it was ok" to impose the death penalty. Id. at 535

16

(alteration in original). Moreover, while the court was skeptical of the admissibility of Juror Jordan's testimony that she had already made her decision to impose the death penalty before speaking to Pastor Lomax, the court concluded that Juror Jordan would have no other reason to discuss what Pastor Lomax had said than to convince others to impose the death penalty. Id. The court's "profound distrust" of extraneous conversations was therefore "amplified when [it was] . . . offered to the entire jury." Id. at 535 n.6 (emphasis omitted).

Second, the court found that while Pastor Lomax did not directly tell Juror Jordan how to vote, the message he conveyed was not "neutral" as to the death penalty. Id. at 535-36. The court reasoned that the defense trial counsel's closing argument regarding eternal condemnation was directly contradicted by Pastor Lomax, and that the duration of the jury's discussion about Pastor Lomax's guidance demonstrated a substantial effect on the jury's decision. Id. at 536.

In dissent, Judge G. Steven Agee disagreed with the majority's analysis as to the neutrality of Pastor Lomax's guidance. Principally, in Judge Agee's view, Juror Jordan's question spoke not to the jury's sentencing decision (i.e., a matter before the jury), but rather to the personal, religious implications of sentencing someone to death. Id. at 541 (Agee, J., dissenting). "Most importantly," Judge Agee noted, Pastor Lomax did not lead

17

Juror Jordan to believe that the Bible supported or did not support the death penalty. Id. Instead,

> [t]he communication involved a topic tangential to the jury's assessment of the law and facts relevant to the sentencing determination. At no point did the pastor communicate his views about Barnes, Barnes' co-defendants, or the case itself. Nor did he even mention the Bible's views of the death penalty generally, or under what circumstances the Bible may allow for such a sentence. Because Jordan's conversation with her pastor did not advocate for or against the death penalty in general — let alone as the appropriate punishment for Barnes — it could not have swayed her own or any other juror's decision about how to sentence Barnes.

Id. at 543.

Furthermore, Judge Agee viewed Pastor Lomax's guidance as consistent with North Carolina law, not as contradictory to the law as instructed or supplemental to any evidence submitted at trial. Id. at 546. In so reasoning, Judge Agee likened the case to Bauberger v. Haynes, 632 F.3d 100 (4th Cir. 2011), which found there was no substantial and injurious effect where the jurors relied on extraneous dictionary definitions for malice that the Fourth Circuit found "fully conveyed the essence of North Carolina law." Id. at 545-46 (quoting Bauberger, 632 F.3d at 107). Judge Agee concluded that an admonition to follow the "law of the land — regardless of th[e juror's] personal convictions regarding the morality of the death penalty — corresponds precisely with federal and state law establishing a juror's sworn obligation during deliberations." Id. at 546.

18

## 2. Application of **Barnes II**

Viewed in light of Barnes II, Hurst's case contains a scenario that is both more severe and less severe than what the Fourth Circuit found to require granting the petition. As with Pastor Lomax in Barnes II, the evidence here supports that Freeman directed Juror Foster to a passage containing "eye for an eye." (Doc. 104 at 33:4-12.) But unlike Barnes II, Freeman went further. Importantly, he pointed Juror Foster to the following passage in the Book of Numbers:

> And if he smite him with an instrument of iron, so that he die, he is a murderer: the murderer shall surely be put to death. And if he smite him with throwing a stone, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death. Or if he smite him with an hand weapon of wood, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death. The revenger of blood himself shall slay the murderer: when he meeteth him, he shall slay him. But if he thrust him of hatred, or hurl at him by laying of wait, that he die; Or in enmity smite him with his hand, that he die: he that smote him shall surely be put to death; for he is a murderer: the revenger of blood shall slay the murderer, when he meeteth him.

Numbers 35:16-21 (King James) (emphasis added) ("Numbers passage"); (Doc. 104 at 33:4-12 (Juror Foster testifying that Freeman directed her to the Numbers passage and quoting passage to which he directed her); id. at 21:9-21 (Freeman testifying that he pointed Juror Foster to the Numbers passage).) Moreover, Freeman testified that he provided the Book of Numbers passage because he understood that an "eye for an eye" "didn't carry on to what [Juror

19

Foster] was asking." (Doc. 104 at 21:9-15 (testifying that that was "why [he] referred her back to Numbers 35 where it actually says the word 'murder'").)

To be sure, there is some dispute as to whether Freeman explained the Numbers passage to Juror Foster. She testified that he did not. (Id. at 38:17-19.) However, Freeman testified — in detail — that he did explain the passage and that one must "break . . . down" a Bible verse to "understand what it's saying." (Id. at 15:23-24.) As to a "murderer," he testified that he explained to Juror Foster that "people are sinning . . . if they don't punish him" (id. at 15:25-16:1-7), and that the punishment for a murderer in the Bible is stoning, which he testified he told Juror Foster involved "tak[ing] big stones and throw[ing] them at you until you were dead" (id. at 14:17-18). And while he testified that he did not suggest to Juror Foster what an appropriate punishment should be for Hurst specifically, he testified,

> I just said the word is the word. What it says in here is what it says in here, and that's what me -- as a preacher, that's what I go on, what the Bible says.

(Id. at 22:1-3.)

Compared to the record in Barnes II, which the Fourth Circuit found required granting the petition, Juror Foster's extraneous communication is far more directed to the issue of punishment for the Defendant. In Barnes II, the panel disagreed whether the issue of a juror's eternal condemnation was a matter before the jury,

20

and therefore whether the extraneous communication was "neutral" as to the issue of whether to sentence Barnes to death. Barnes II, 938 F.3d at 535-36; id. at 540 (Agee, J., dissenting). Judge Agee viewed Pastor Lomax's conversation with Juror Jordan as neutral — "most importantly" — because the pastor did not lead the juror to the Bible's or his own view of the death penalty. Id. at 541 (Agee, J., dissenting). In stark contrast, here, Freeman independently pointed Juror Foster to a different passage from the one she sought because the "eye for an eye" passage did not seem — in his view — to answer her question about murder. (Doc. 104 at 21:9-15.) Critically, that unsolicited passage commands the death penalty for murder. As compared to Pastor Lomax's assurances that the jurors in Barnes II would not be personally condemned for imposing the death penalty, Freeman's comments are more directed to the issue of punishment for murder and calls for the death penalty.[4]

---

[4] In this respect, the Recommendation's citation to Crease v. McKune, 189 F.3d 1188 (10th Cir. 1999) (finding ex parte contact with judge, who merely repeated the jury instructions, not prejudicial), and Furnish v. Commonwealth, No. 2018-SC-000126, 2019 WL 5617687 (Ky. June 13, 2019) (finding juror contact with priest, who said that "generally the [Catholic] Church opposed imposition of the death penalty but there were some exceptions," not prejudicial), do not support Respondent's position. Similarly, Alkebulanyahh v. Byars, No. 13-CV-00918, 2015 WL 2381353, at *30 (D.S.C. May 18, 2015), cited by the Recommendation, is distinguishable in that there the minister did not direct the juror to any religious text and told the juror to "follow the law."

Moreover, the parties did not rely on Oliver v. Quarterman, 541 F.3d 329 (5th Cir. 2008), in their briefs regarding Hurst's objections to the

21

Moreover, unlike in Barnes II, where Pastor Lomax told Juror Jordan to follow the law of the land, Freeman's reference to the Book of Numbers and his comments on it were inconsistent with the law of the land. Unlike North Carolina law, which requires jurors to carefully weigh aggravating and mitigating circumstances in determining whether to impose a life sentence or the death penalty, N.C. Gen. Stat. § 15A-2000(b), (e)-(f), the passage from the Book of Numbers defaults to the death penalty, cf. Bauberger, 632 F.3d at 107 (holding that dictionary definition of "malice" that jury improperly reviewed during deliberations did not warrant habeas relief because it "fully conveyed the essence of North Carolina

_____

Recommendation. Hurst did cite this case in his reply to Respondent's post-hearing brief (Doc. 108 at 4 & n.3) but did not compare it to his own. In Quarterman, during sentencing deliberations in a capital murder trial, some of the jurors read the Bible privately, and Bible passages were also read aloud to several jurors. Quarterman, 541 F.3d at 331-32. The passages read by the jury included the same Numbers passage Juror Foster read in this case. Id. at 332 n.3. The Fifth Circuit concluded that while the jury's use of the Bible was an external influence, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Id. at 344 (quoting Brecht, 507 U.S. at 637). The court deferred to the state court's finding that the Bible did not influence the jury and also relied on four other considerations: (1) it was not clear whether the use of the Bible occurred before or after the jury's decision was made; (2) several jurors had testified that discussions during deliberations did not focus on the Bible; (3) the court properly instructed the jury to consider only the evidence and that it was bound by the law; and (4) the jurors brought the Bible into the deliberations themselves. Id. at 343. The jury's use of the Bible in Quarterman can be distinguished from Juror Foster's exchange with her father in two key ways. First, the exchange between Juror Foster and Pastor Freeman occurred before sentencing deliberations began. (Doc. 104 at 28:5-10.) Second, as explained in this section, Pastor Freeman directed Juror Foster to the Numbers passage, in contrast to the jurors in Quarterman, who read the Bible independent of a third party's involvement.

law concerning malice"); <u>Robinson v. Polk</u>, 444 F.3d 225, 227 (4th Cir. 2006) (Wilkinson, J., concurring in denial of reh'g en banc) ("It . . . bespeaks no disrespect of divinely inspired teaching to say that a jury's capital sentencing determination must rest in the end on the requirements of law.").

Furthermore, the injurious effect of the extraneous communication should be viewed in light of Juror Foster's relationship to Freeman as her stepfather and his status as an ordained minister. <u>Cf.</u> <u>Parker v. Gladden</u>, 385 U.S. 363, 365 (1966) (per curiam) (observing that "official character of the bailiff" exacerbated injurious effect because he was an officer of the court and had been "shepherding" the jury for days). Both Freeman and Juror Foster testified that they share a close relationship, and Juror Foster stated that she respects Freeman's knowledge and understanding of the Bible because he is an ordained minister. (Doc. 104 at 10:4-7; <u>id.</u> at 26:10-18 (Juror Foster describing a "very tight-knit relationship")); <u>see also</u> <u>Robinson</u>, 444 F.3d at 227 (Wilkinson, J., concurring in denial of reh'g en banc) ("[The Bible's] place as a canon of scriptural authority is so powerful that it threatens to supplant the individualized sentencing inquiry into the nature and consequences of the crime and the particular aggravating and mitigating circumstances brought forward in the evidence."). According to Juror Foster, she and her father spoke on a daily basis since Freeman adopted her at the

23

age of two. (Doc. 104 at 26:19-22.) While Freeman disclaimed that he suggested an appropriate punishment in Hurst's case, he testified that during their conversation he said to her, "the word is the word." (Id. at 21:22-22:3.) Their relationship and Freeman's status as an ordained minister accordingly supports the injurious effect of his directing her to the Numbers passage.[5]

Respondent notes that there is some dispute over which "eye for an eye" passage Freeman provided Juror Foster. Freeman, for his part, testified that the verse was Matthew 18:9:

> And if thine eye offend thee, pluck it out, and cast it from thee: it is better for thee to enter into life with one eye, rather than having two eyes to be cast into hell fire.

Matthew 18:9 (King James); (Doc. 104 at 15:16-29, 21:9, 23:9-13.) Juror Foster, on the other hand, testified that Freeman pointed her to the passage at Matthew 5:38, (Doc. 104 at 37:19-22):

> Ye have heard that it hath been said, 'An eye for an eye, and a tooth for a tooth.'

Matthew 5:38 (King James); see also id. 5:39 (completing the verse

---

[5] Juror Foster was never asked directly to state whether the extraneous communication influenced her decision. Such testimony would be inadmissible under Federal Rule of Evidence 606(b). See Barnes II, 938 F.3d at 534 ("[J]uror testimony concerning the effect of the outside communication on the minds of jurors is inadmissible." (quoting Stockton, 852 F.2d at 744)); see also id. ("Given how Rule 606 limits the presentation of evidence in these circumstances, it is especially important for us to view the record practically and holistically when considering the effect that a juror's misconduct 'reasonably may be taken to have had upon the jury's decision.'" (quoting Kotteakos, 328 U.S. at 764)).

24

with "But I say unto you, That ye resist not evil: but whosoever shall smite thee on thy right cheek, turn to him the other also").[6]

Respondent posits in his post-hearing brief that "it certainly cannot be said that [Freeman] was attempting to influence" Juror Foster because the Matthew 5:38 passage "diverg[es]" from the Book of Numbers passage. (Doc. 107 at 14.) Notably, Respondent never expressly argues how it diverges or that this passage somehow vitiates the Numbers passage. The Recommendation similarly did not consider these verses in relation to one another.

Nevertheless, Respondent's position that Freeman was not attempting or intending to influence Juror Foster rests on the assumption that Freeman's intent would be material here. (See also Doc. 125 at 25-27, 34-36 (Recommendation analyzing Freeman's intent).) While the intent of an extraneous communicator may, in some cases, be relevant to the veracity of the verdict, the Fourth Circuit has vacated convictions on habeas appeal where there was no ill intent by the extraneous influence. See United States v. Lawson, 677 F.3d 629, 648 (4th Cir. 2012) ("We are greatly concerned about the [jury's] use of Wikipedia in this context.");

---

[6] The Fourth Circuit in Hurst noted that the precise verse was at that time "undetermined." Hurst, 757 F.3d at 398. It noted that the "King James Version of the Bible contains several 'eye for an eye' verses." Id. at 392 n.1. By her own admission, Juror Foster's evidentiary hearing testimony that the verse she read was Matthew 5:38 contradicted her deposition testimony that the verse to which she was directed was in the Old Testament. (Doc. 104 at 31:11-32:9.)

25

see also Robinson v. Polk, 438 F.3d 350, 362 (4th Cir. 2006) (describing extraneous prejudicial influence as "information" that was "not admitted into evidence but nevertheless bears on a fact at issue in the case"); cf. Tanner v. United States, 483 U.S. 107, 117–18 (1987) (describing juror reading a newspaper as an "external" influence); Bauberger, 632 F.3d at 107-08 (upholding conviction despite jurors' use of extraneous dictionary without evidence of ill intent).

Respondent argued at the hearing that the injurious effect of Freeman's comments is mitigated in that he acted only as an index of sorts to respond to Juror Foster's questions of where to find "an eye for an eye" and about "what the Bible said about murder." (Doc. 136 at 41:18-19.) Respondent therefore equates this case to the "Bible in the jury room" cases that have upheld capital sentences. In Robinson, the Fourth Circuit held that the jury's use of a Bible, provided upon request from the bailiff, was not an external influence on the jury's deliberations. Robinson, 438 F.3d at 363 ("[I]t would have been reasonable for the MAR court to conclude that the Bible is not analogous to a private communication, contact, or tampering with a juror . . . ."). The court noted that "it would have been reasonable for the MAR court to conclude that the Bible had no bearing on any fact relevant to sentencing," and rather that "the reading of Bible passages invites the listener to examine his or her own conscience from within."

26

Id.

Importantly, in Barnes I, the court distinguished Robinson, saying:

> Despite the State's arguments to the contrary, the only similarity between the instant case and the "Bible in the jury room" line of cases is the Bible itself.  Unlike in Robinson, where the juror in question was simply given a Bible and read from it in the jury room, Barnes has alleged that Juror Jordan was actually directed to a specific biblical passage by her pastor in response to an argument about the death penalty and that other jurors were aware that Juror Jordan had consulted her pastor in this regard.  We alluded that Robinson might have been a different case if the bailiff had "instructed the jury to consult the Bible" or done "anything other than simply provide the Bible upon the juror's request."

Barnes I, 751 F.3d at 251 (quoting Robinson, 438 F.3d at 366).

Thus, Respondent's "index" argument fails to fully explain Pastor Freeman's role in his exchange with Juror Foster.  Here, unlike in Robinson, there is no dispute that Pastor Freeman's contact was an external influence.  And unlike in Robinson, he did not merely provide Juror Foster with a Bible, or even with biblical passages responsive to her inquiry.  Cf. Robinson, 438 F.3d at 366 (noting that the bailiff did not do "anything other than simply provide the Bible upon the juror's request").  Rather, Pastor Freeman directed Juror Foster toward the specific passage in the Book of Numbers, which directed a death sentence for a murderer, based on his own view of what would be helpful to her given his assumption about the case on which she was sitting as a juror.

Aside from any lack by Freeman of an intent to influence Juror

27

Foster, he did testify that he easily put together that she was sitting on a capital jury because he already knew that she was on a jury, and because she asked him where to look in the Bible for a passage on "murder." (See Doc. 104 at 13:20-21 ("I can only assume that that's what [she was] doing."); id. at 15:9-15 (stating that by "assume," Freeman meant he "definitely" knew it was a murder case, adding that it was "pretty obvious").) Juror Foster's perception that Freeman was not attempting to influence her, while perhaps earnest, is in tension with his testimony that he offered the Numbers passage because he knew that the "eye for an eye" passage "didn't carry on to what she was asking." (Id. at 21:9-15.) Moreover, Freeman testified that he "sure did" tell Juror Foster that she should not tell anyone about their conversation to avoid "get[ting] in trouble." (Id. at 17:8-14.) While the court has little reason to doubt the solemnity with which Juror Foster took her responsibility as a juror, nor to doubt her or Freeman's good faith, the putative lack of intent to violate Hurst's constitutional rights is simply overborne by the prejudicial effect of the communication itself.

The Recommendation distinguishes Barnes II in two ways. While correctly observed, these do not lead to the conclusion suggested, however. First, it is true that Juror Foster and Freeman spoke only for a brief period and before any extensive jury deliberations had occurred. The conversation was brief by all accounts and

occurred after the jury had spent just five minutes deliberating on the capital sentence phase before taking an evening recess. (See id. at 18:16-18; Doc. 105 at 14 (citing trial transcript at 2321-22).) The following day, the jurors deliberated until about 5:00 p.m. before delivering a verdict. (Doc. 105 at 14 n.5 (citing trial transcript at 2328-34).) In Barnes II, by contrast, Juror Jordan's conversation with Pastor Lomax lasted for a couple of hours, yet the discussion of the case lasted "for a few minutes." Barnes II, 938 F.3d at 531. Second, unlike in Barnes II, where Juror Jordan relayed her conversation with Pastor Lomax to the entire jury for fifteen to thirty minutes, id. at 532, there is no evidence that Juror Foster shared her conversation with any other juror.

As to the timing and duration of the conversation, some courts have considered the sequence of the extraneous communication vis-à-vis deliberations to assess the likelihood that the communication played a role. See Vigil v. Zavaras, 298 F.3d 935, 941 (10th Cir. 2002). Here, there appears to be no meaningful distinction from Barnes II. The sequence in Barnes II was relevant because deliberations necessarily had to have begun for Juror Jordan to know that Pastor Lomax would have relevant guidance on eternal condemnation. This follows because, contrary to this case, there was evidence that other jurors beyond Juror Jordan had concerns about Barnes's counsel's threat about imposing the death

29

penalty and could only communicate those once deliberations had begun. See Barnes II, 938 F.3d at 531-32. Had Juror Jordan in Barnes II only had her own concerns about imposing the death penalty, like Juror Foster here, she may not have needed to wait until deliberations had begun to know to seek spiritual guidance. Moreover, the extraneous communication in Barnes II relating to the case before the jury lasted for a brief period of time – for "a few minutes" – comparable to that here. See id. at 531 (stating that Juror Jordan spoke with Pastor Lomax about the case for "a few minutes");[7] Barnes v. Joyner, No. 08CV271, 2018 WL 4765207, at *7-8 (M.D.N.C. Jan. 25, 2018) (report and recommendation providing Juror Jordan's testimony that her conversation with Pastor Lomax was "an hour or two" but that they also discussed "family and . . . other things like").

In contrast to Barnes II, there is no evidence Juror Foster shared her conversation with Freeman with other jurors. It is true that the injurious effect of an extraneous communication is magnified when shared with the entire jury. Barnes II, 938 F.3d at 535 n.6 (stating that the "profound distrust with which courts regard an extraneous influence on any juror . . . is only amplified when . . . extraneous information is offered to the entire jury"). In this way, this case is not as severe as that in

---

[7] To be sure, Juror Jordan's conversation with the other jurors lasted "up to 30 minutes." Barnes II, 938 F.3d at 536.

Barnes II.  However, that Juror Foster did not share her extraneous discussion with other jurors does not mean that the conversation did not substantially or injuriously affect the verdict.  That is because "'[i]f even a single juror's impartiality is overcome' by such an external influence, the defendant's right to an impartial jury has been compromised."  United States v. Johnson, 954 F.3d 174, 179 (4th Cir. 2020) (quoting Lawson, 677 F.3d at 648-49); see also Parker, 385 U.S. at 366 ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

The length of jury deliberations after an external influence can be indicative of its impact on the jury's decision.  See Bauberger, 632 F.3d at 108 (noting that after the jury read extraneous dictionary definitions it "still needed an additional four hours before reaching a decision").  Here, Juror Foster spoke with Freeman "the night before [deliberations]."  (Doc. 104 at 35:5-8.)  The jury deliberated the entire next day.  (Doc. 105 at 14 n.5 (citing trial transcript at 2328-34).)  However, in Barnes II, while Juror Jordan spoke with Pastor Lomax after jury deliberations had begun, the jury also deliberated for the entire next day before making a decision.  Barnes II, 938 F.3d at 536. Thus, while the length of time the jury deliberated after Juror Foster's conversation with Pastor Freeman is relevant, it does not weigh heavily for the Respondent.

The Recommendation notes that the Fourth Circuit in <u>Hurst</u> viewed the record as insufficient to grant the petition at that time and instead ordered an evidentiary hearing. (Doc. 125 at 23.) The magistrate judge concluded that "the evidence adduced at the post-remand hearing . . . did <u>not</u> materially strengthen [Hurst's] (prior insufficient) showing." (<u>Id.</u> at 24.) In so doing, the Recommendation credits Juror Foster's testimony disavowing portions of her 2007 affidavit. Specifically, the Recommendation observes that Juror Foster testified credibly that she did not ask Freeman where she "could look in the Bible for help and guidance in making her decision for between life and death," as set out in her 2007 affidavit. (<u>Id.</u> at 25; <u>see also</u> Doc. 104 at 35:14-23.) Thus, the magistrate judge reasonably discredited that portion of the affidavit.

While that conclusion is appropriate, the Recommendation does not expressly address the potential prejudicial effect of Freeman directing Juror Foster to the passage in the Book of Numbers or his comments about stoning a murderer, which were not made apparent in the record at all before this case was remanded by the Fourth Circuit. The Recommendation does dispel Hurst's counsel's characterization of Freeman's testimony; but it does not discuss what Freeman's testimony actually entailed. (<u>See</u> Doc. 125 at 33-34 (describing "distortions of the record" but not discussing that the passage from the Book of Numbers repeatedly states that a

32

"murderer shall surely be put to death").)  In so doing, the Recommendation correctly considered the ways that the evidentiary hearing may not have improved Hurst's case, but it did not address the ways the new evidence adduced at the evidentiary hearing substantially supported it.  Cf. Remmer, 347 U.S. at 229-30 ("The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.").

At oral argument, Respondent contended that Hurst's case is less "egregious" than Barnes II in part because Freeman's comments were not necessarily about the morality of the death penalty. Respondent characterizes Freeman's statement that the punishment for murder would be stoning by death as an historical observation of what happened "in biblical times," and not a moral one that would have any obvious application today.  Importantly, the parties agree that it is unsettled on this record whether Juror Foster's motivation in speaking with Freeman was to ease her religious doubts about imposing the death penalty.  Or, whether she sought guidance in her decision whether to impose the death penalty.  Or some combination of both.  In considering the totality of the conversation, however, it is difficult to conclude that Freeman's conversation and Bible references simply informed Juror Foster of

33

an historical practice.  _See_ _Numbers_ 35:16-21 (King James) (directing that "the murderer _shall surely be_ put to death").

Indeed, Pastor Freeman, as Juror Foster's father and an ordained minister, did not contextualize or contemporize his reference to the Numbers passage but testified that he told her, after informing her of the biblical practice, that "the word is the word."  (Doc. 104 at 21:22-22:3.)[8]  In _Barnes II_, the court found that even in light of the fact that the Bible texts were about an "eye for an eye," at a minimum it was reasonable to infer that such reference was received as assuaging the juror's reservations about imposing a death sentence.  _Barnes II_, 938 F.3d at 536 (finding it "reasonable to conclude that, especially coming from a figure of religious authority, Pastor Lomax's message assuaged reservations about imposing the death penalty").  The present record provides even more indication of that.  Juror Foster's affidavit declared that "after reading that section in the Bible [referring to the "section in the Bible" that her "father had given me" as "an eye for an eye"], it helped me sleep better." (Doc. 4-1 at 5.)  Even the dissent in _Barnes II_ distinguished what was not present there, but which is present here.  _Cf._ _Barnes II_, 938 F.3d at 541 (Agee, J., dissenting) ("Most importantly, at no

_____

[8] It would be speculation to attempt to consider whether and, if so, how Juror Foster weighed reliance on the Old Testament verses in light of the New Testament verses she considered.

34

time did the pastor lead Jordan to believe 'the Bible supported [or] didn't support the death penalty.'" (alteration in original)); id. at 543 (noting that "[n]or did [the pastor] even mention the Bible's views of the death penalty generally, or under what circumstances the Bible may allow for such a sentence"). Here, by contrast, the Old Testament reference Pastor Freeman shared with Juror Foster not only supported, but commanded, capital punishment for a murderer.

Finally, Hurst objects to the Recommendation's consideration of aggravating facts of the offense of conviction in finding that the extraneous communication did not have a substantial and injurious effect. (Doc. 128 at 17-18.) As the Recommendation correctly described at length, the premeditated murder for which Hurst was convicted was heinous. (See Doc. 125 at 37-44.) Here, Hurst invited the victim to sell firearms, and after luring the victim into a field to set up targets for a test fire, Hurst shot the victim three times, the last at point blank range, execution-style, and then stole the victim's car. (Id. at 40-41 (Recommendation accurately describing murder as a "calculated, point-blank execution of a blameless, unarmed, wounded man").) These facts weigh very heavily in Respondent's favor against a conclusion that Juror Foster's contact with Freeman was injurious.

Yet, this court does not write on a clean slate. The murders in Barnes II were similarly heinous, as the defendants there robbed

35

the victims, husband and wife, at home and shot them multiple
times. State v. Barnes, 481 S.E.2d 44, 51-53 (N.C. 1997); see
also id. at 53 (describing how the wife had been shot ten times,
four of which were to the head, and the husband died from multiple
gunshot wounds, including to the chest and face and head, after
having been beaten; one of the murderers wore jewelry from the
victims to his court proceedings).  But the Fourth Circuit found
these aggravating facts unavailing for the State, even in light of
the seemingly less injurious conversation Juror Jordan had with
Pastor Lomax.  Barnes II, 938 F.3d at 536 ("[W]e are not convinced
that the strength of the State's case against Barnes precludes us
from holding that Barnes has shown actual prejudice."); id. at 548
(Agee, J., dissenting) (describing "limited utility" of the
strength of the prosecution's case because "the decision to impose
the death penalty involves a level of subjective assessment that
is not present when assessing guilt in the first instance").

     In Barnes II, the fact that the jury considered this
aggravating evidence as well as mitigating evidence and decided to
impose a death sentence for only two of the three defendants
(recommending life imprisonment for the third defendant) was
insufficient for the Fourth Circuit to outweigh the injurious
effect of the extraneous influence.  Here, likewise, the record
reflects that the jury weighed many mitigating facts for an entire
day of deliberations.  The jury unanimously agreed that the murder

was committed for "pecuniary gain" and that it was "especially heinous, atrocious or cruel." (Doc. 4-1 at 28.) However, it also answered that "[o]ne or more" of the jurors found the presence of fourteen of eighteen listed mitigating factors: that the crime was committed while Hurst was under the influence of a mental or emotional disturbance; that Hurst was a victim of physical abuse as a child at the hands of his father; that Hurst was introduced to drugs and alcohol at age 13 by his father, who smoked marijuana and drank with him; that Hurst witnessed numerous acts of physical violence by his father against his mother; that Hurst "desperately desire[d] a stable, loving relationship"; that early in the proceedings Hurst voluntarily acknowledged wrongdoing in the shooting; that Hurst accepted responsibility for his actions; that by his teenage years Hurst exhibited signs of treatable psychological illness and addictions which were not effectively diagnosed or treated; that Hurst had a loving and protective relationship with his sister; that Hurst "exhibited caring and helpful behavior to family and friends"; that Hurst recognized and expressed the wrongfulness of his actions; that Hurst's parents failed to provide him a stable and caring home; that Hurst's breakup with his child's mother caused him tremendous distress; and that Hurst expressed sorrow for the suffering of the victim's family. (Id. at 29-32; Doc. 105 at 14 n.5 (citing trial transcript at 2328-34).)

Importantly, the extraneous communication in this case was not directed to the evidence against Hurst or the heinous nature of his crime, and indeed, every North Carolina capital sentence must be based upon aggravating facts. See N.C. Gen. Stat. § 15A-2000(c), (d)(2). While a reasonable juror could have sentenced Hurst to death absent juror misconduct — and here, eleven jurors did — "[h]armless error review looks . . . to the basis on which 'the jury actually rested its verdict[,]' . . . not [to] whether, in a trial that occurred without the error, [the same] verdict would surely have been rendered." Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (quoting Yates v. Evatt, 500 U.S. 391, 404 (1991)).

\* \* \*

In sum, in light of Barnes II, the court declines to accept the Recommendation and is constrained to vacate Hurst's capital sentence. The facts adduced at the evidentiary hearing demonstrate that during the sentencing phase Pastor Freeman, in an improper extraneous communication with Juror Foster, directed her specifically to a biblical command that "the murderer shall be put to death," a text more severe than the biblical text in Barnes II. The decision whether to vote for death plainly weighed on the juror, as it surely should have, because she stated that reading the biblical text identified for her "didn't make the decision any easier" but "helped [her] sleep better." (Doc. 4-1 at 5 (Juror Foster's affidavit referring to the "text" as "an eye for an eye,"

38

although the evidentiary hearing revealed subsequently that she also read the Book of Numbers passage).) The testimony of the juror and her father, considered together, suggests that this was not an instance of a juror consulting the Bible merely for personal comfort and reflection - an area not constitutionally suspect. Rather, there is evidence that she sought it out as a deliberative aid to help guide her in making her sentencing decision. Even where there is a heinous murder, as here, for which guilt is found, punishment must not be the product of religious mandate. Cf. Robinson, 444 F.3d at 227 (Wilkinson, J., concurring in denial of reh'g en banc) (distinguishing between personal and deliberative use of biblical text, noting: "A defendant must never suspect that he was sentenced to death on the basis of religious dictate, . . . [n]or should the families and friends of murder victims believe a capital verdict of whatever sort was driven by biblical readings and discussions."). This is true no matter what religion is the source of the text or scripture. Id.

The rules of evidence prohibit knowing whether Juror Foster's decision to impose capital punishment was in fact influenced by her extraneous communication with Pastor Freeman, but there is evidence that the encounter assuaged her concerns in doing so. The juror's decision to keep her improper contact to herself is a distinction from Barnes II; however, a case in "virtual equipoise" nevertheless constitutes "grave doubt" under the law as to the

39

harmlessness of the error, entitling the Petitioner to habeas relief. That the error affected only one juror does not absolve the constitutional violation. Fullwood, 290 F.3d at 681.

## III.  CONCLUSION

State court judgments are due respect in federal habeas proceedings. Here, the State concedes that during the penalty phase of a capital trial there was juror misconduct. A juror had a discussion with her father, a pastor, who advised, among other things, that according to the Old Testament, a murderer shall be put to death. The question here is whether that improper contact raises "grave doubt" – defined in the law as the court being in at least "virtual equipoise" as to the substantial and injurious effect of the trial error. In light of the Fourth Circuit's decision in Barnes II, the court is compelled to conclude that it does.

For the reasons stated, therefore,

IT IS ORDERED that Hurst's objections (Doc. 128) are SUSTAINED to the extent set out herein;

IT IS FURTHER ORDERED that Hurst's writ of habeas corpus vacating his death sentence is conditionally GRANTED;

IT IS FURTHER ORDERED that the execution of the writ of habeas corpus is STAYED for 30 days from the date of this order, during which time the State of North Carolina may file a notice of appeal

40

and/or move to extend the stay to conduct a new sentencing hearing; and

IT IS FURTHER ORDERED that after 30 days, if the State of North Carolina has not filed a notice of appeal or moved to extend the stay to conduct a new sentencing hearing, the writ shall issue, and the State of North Carolina shall sentence the petitioner to life imprisonment.

 /s/   Thomas D. Schroeder
United States District Judge

October 31, 2025